No. 18-3955

=====================================================

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**


**GARY HUGHBANKS**
*Petitioner-Appellant,*

**v.**

**STUART HUDSON, Warden**
Respondent-Appellee.

**ON APPEAL FORM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION
CASE NO. 1:07-CV-11**


**BRIEF OF PETITIONER-APPELLANT
GARY HUGHBANKS**

Dennis L. Sipe – 0006199
Dennis@buellsipe.com
410 Front Street, Unit 2
Marietta, Ohio 45750
Telephone: (740) 525-7760

David Paul Williamson - 0032614
dpw@biesergreer.com
Bieser, Greer & Landis, LLP
6 North Main Street, Suite 400
Dayton, Ohio 45402-1908
Telephone: (937)-223-3277

*Counsel for Petitioner-Appellant Gary Hughbanks*

=====================================================

# TABLE OF CONTENTS

**PAGE**

**TABLE OF CONTENTS**................................................................. i

**TABLE OF AUTHORITIES** ........................................................ x

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**................................. xiv

**JURISDICTIONAL STATEMENT** ................................................... 1

**STATEMENT OF THE ISSUES**..................................................... 2

**THE STATEMENT OF THE FACTS** ............................................... 3

I.     Petitioner Hughbanks:  A Life Marked By Serious Mental Illnesses............. 3

II.    The Crime: The Victims Were Killed In Their Residence Where They Were Present Much Of The Evening......................................................... 4

III.   The Ten Year Investigation Of The Crime: (1) Identification Of Countless Suspects Including Some Who Confessed, (2) Elimination Of Hughbanks As A Suspect, (3) The Fbi Report That Concluded The Assailant Knew The Decedent, And (4) The Focus On The Decedents' Son................................. 5

IV.    The Interrogation Of Hughbanks After Ten Years: (1) The Detective Failed To Honor Hughbanks' Request To Cease Interrogation And To Properly Mirandize Him, And (2) Hughbanks' Answers During The Four Hour Interrogation Were Inconsistent With The Evidence ..................................... 8

V.     The Pretrial Phase: (1) The Prosecution Failed To Provide Favorable Evidence, And (2) Counsel Failed To Meaningfully Challenge Hughbanks' Custodial Statement........................................................................11

VI.    The Trial Phase: The Prosecution Proceeded On A Flawed Theory And Relied On Perjured Testimony To Support That Theory.................................12

VII.   The Sentencing Phase: The Flawed Mental Health Testimony That Conflated An Anti-Social Diagnosis With A Bipolar Diagnosis ................. 16

**THE STATEMENT OF THE CASE**................................................... 17

I.     Charges, Convictions, And Sentences ......................................... 17

II.    State Court Direct Appeals .................................................. 18

III.   Application For Reopening.................................................. 19

IV.    First Post-Conviction Proceedings....................................... 19

V.     *Atkins* Petition .............................................................. 20

VI.    Initial Federal Habeas Proceedings in District Court Prior to Abatement.... 21

VII.   Second Post-Conviction Proceedings ................................... 22

VIII.  Federal Habeas Proceedings In The District Court After The Exhaustion Of State Court Remedies.................................................. 22

IX.    Federal Habeas Proceedings In This Court............................. 23

**STANDARD OF REVIEW**.................................................. 25

I.     This Court's Review Of The District Court Decisions............... 25

II.    This Court's Review Of The State Court Decisions................... 25

**SUMMARY OF THE ARGUMENT** ..................................... 27

**ARGUMENT** .................................................................. 32

SEVENTH CLAIM FOR RELIEF: The Prosecution Withheld Material Evidence From The Defense In Violation Of *Brady v. Maryland,* 373 U.S. 83 (1963)......... 32

I.     This Court Conducts De Novo Review Of This *Brady* Claim Without Reference To The Standards Contained In 2254(d)(1) and (2) .................... 33

       A.     This Court conducts de novo review of Hughbanks' *Brady* claim.............................................................. 33

       B.     This Court conducts its de novo review of the *Brady* claim without reference to the standards contained in 28 U.S.C. 2254(d)(1) and (2)................................................. 34

II.    The *Brady* Analysis Involves A Three Part Test.......................... 36

III.   Hughbanks Satisfies The First Prong Of The *Brady* Test: The Prosecution Suppressed All Six Categories Of The Evidence .......................... 37

A.    The prosecution's discovery responses at trial were misleading and incomplete..................................................................... 38

    1.    The prosecution's Brady discovery responses were misleading........................................................................ 40

    2.    The prosecution's Brady discovery responses were incomplete ..................................................................... 41

B.    The Hamilton County Prosecutor's Office has never contended it disclosed the evidence in question to trial counsel ......................... 41

C.    Conclusion first prong, the Proscutor's Office suppressed the evidence ................................................................................... 42

IV.    Hughbanks Satisfies The Second Prong Of The *Brady* Test: All Six Categories Of The Suppressed Evidence Are Favorable.............................. 42

A.    The prosecution suppressed favorable evidence concerning the existence of other suspects................................................................. 44

B.    The prosecution suppressed favorable evidence concerning Burt Leeman...................................................................................... 47

C.    The prosecution suppressed favorable trace evidence test results ..... 52

D.    The prosecution suppressed favorable eyewitness statements........... 54

E.    The prosecution suppressed favorable evidence, which included the FBI report and other reports, that impeached the prosecution theory of the case...................................................................................... 57

    1.    The assailant(s) knew the victims ........................................... 57

    2.    The assailant(s) did not enter the residence to commit a theft offense ..................................................................................... 60

    3.    The assailant(s) had not entered the residence when the Leemans returned home ...................................................... 62

F.    The prosecution suppressed favorable evidence that impeached its own witnesses .................................................................................. 64

1. Suppressed information that impeached the testimony of Leonard Leeman ........................................................................ 65

2. Suppressed information that impeached the testimony of Detective Kemper .................................................................. 66

V. Hughbanks Satisfies The Third Prong Of The *Brady* Test: The Six Categories Of The Suppressed Favorable Evidence When Considered Cumulatively Are Material ........................................................... 69

A. The prosecution's case was totally dependent on Hughbanks' custodial statement .............................................................. 70

1. This Court previously granted habeas relief on Brady claims in cases in which the petitioners gave inculpatory statements ...... 71

2. Like Bies and Gumm, Hughbanks was severely mentally ill .. 73

3. The detectives who questioned Hughbanks used the same strategies for questioning that the detectives used when questioning Gumm and Bies ...................................................... 73

a. The Detectives told Hughbanks the time of day when the murders were committed ................................................ 74

b. Hughbanks incorrectly described the exterior of the Leemans' residence ......................................................... 74

c. The Detectives told Hughbanks the manner in which entrance was obtained to the Leemans' residence ......... 74

d. The Detectives gave Hughbanks a detailed description of the interior of the Leemans' residence ............................ 75

e. The Detectives informed Hughbanks of Mrs. Leeman's response when she purportedly saw him in the residence ...................................................................... 77

f. Hughbanks initially incorrectly identified the murder weapon ......................................................................... 77

g. The officers told Hughbanks from where he obtained the murder weapon ............................................................ 78

h.     The Detectives informed Hughbanks of the details involved in the fatal stabbing of Mr. Leeman ................ 79

i.     The Detectives instructed Hughbanks concerning the details involving the stabbing of the Mrs. Leeman ........ 80

j.     The Detectives informed Hughbanks as to the property that he purportedly took from the residence ................. 80

k.     The Detectives through their questioning got Hughbanks to confess that he had stolen jewelry from the residence, even though no jewelry was taken from the residence .. 81

l.     The Detectives got Hughbanks to confess that he washed the blood from his clothes in a nearby creek ................ 82

m.     Consistent with the Detectives' conflicting suggestions, Hughbanks gave conflicting answers as to the involvement of other individuals in the murders .......... 84

B.     The prosecution offered little other admissible evidence that connected Hughbanks to the murders ................................................. 85

1.     The testimony of Leonard Leeman did not accurately portray Hughbanks' inculpatory statement .......................................... 86

2.     The testimony of Detective Kemper misled the jury ............. 86

3.     The testimony of John Jay consisted mainly of inadmissible hearsay that contained no details .............................................. 89

4.     The testimony of Michael Millstone only provided background information as to Hughbanks' custodial statement ................. 89

5.     The testimony of James Fillippelli only provided background information as to Hughbanks' custodial statement ................. 91

6.     The testimony of Doctor Lee Lehman confirmed that it was impossible to determine if either of the knives that the brother and former common law wife gave the officers was the murder weapon ................................................................................................ 91

C.     Conclusion, the suppressed evidence was material ............................ 92

1. The prosecution's case was not strong ................................. 92

2. The suppressed evidence was material especially given the prosecution's weak case ........................................ 94

VII. The District Court Erred Both Factually And Legally When It Denied Hughbanks Relief On His *Brady* Claim........................ 95

VIII. Hughbanks' *Brady* Claim Is Not Procedurally Defaulted ................ 100

IX. Conclusion, This Court Should Order The Writ Granted On The Seventh Claim For Relief....................................... 102

THIRTEENTH CLAIM FOR RELIEF: Trial Counsel Failed To Provide Hughbanks With Effective Assistance Of Counsel In The Sentencing Phase Of His Capital Case. *Strickland v. Washington,* 466 U.S. 668 (1963) ................ 103

I. The Governing Law On Penalty Phase Ineffective Assistance Of Counsel Claims....................................................... 103

A. The Prevailing Law on Deficient Performance ................. 104

B. The Prevailing Law as to Prejudice ................................ 104

II. The Evidence Trial Counsel Presented At Hughbanks' Sentencing Hearing....................................................... 107

A. Voir Dire ....................................................... 107

B. Defense Opening Statement in the Sentencing Phase .......... 108

C. Trial Counsels' Sentencing Presentation......................... 109

1. Dr. Sagi Raju ........................................ 109

2. Doctor Bernard DeSilva ............................ 110

3. Larry Kramer ....................................... 112

4. Larketa Ann Hughbanks ........................... 113

5. Evageline Hughbanks .............................. 114

6. Gary Hughbanks ................................... 115

C.     The Prosecution's Sentencing Presentation ......................................... 115

D.     Closing Arguments ................................................................. 117

E.     The Jury Deliberations ........................................................... 119

F.     The Trial Court's Sentencing ................................................... 120

III.     The Evidence Trial Counsel Failed To Present At Hughbanks' Sentencing Hearing ............................................................................................. 120

A.     Evidence concerning Hughbanks' childhood ............................. 120

      1.     Sexual abuse including rape ..................................... 121

      2.     Mother's substance abuse ......................................... 121

B.     Evidence concerning prior treatment for Hughbanks' mental illnesses ................................................................................... 122

C.     Evidence concerning Hughbanks' mental illnesses ................... 122

IV.     Trial Counsel Failed To Conduct A Reasonable Sentencing Investigation That Would Have Uncovered That Hughbanks (A) Was Sexually Abused As A Child, (B) Suffered From Bipolar And Post Traumatic Syndrome Disorders At The Time Of The Offense, And (C) Was Exposed To Factors Beyond His Control That Substantially Increased The Likelihood That He Would Became A Substance Abuser ............................................................ 126

A.     Trial counsel failed to collect all necessary records ................... 128

B.     Trial counsel failed to conduct necessary and adequate interviews of Hughbanks' family members ................................................. 129

C.     Trial counsel failed to retain a competent clinical psychologist .. 131

D.     Conclusion, trial counsel conducted an unreasonable sentencing phase investigation ................................................................... 135

V.     Trial Counsel's Failure To Conduct A Reasonable Sentencing Investigation Prejudiced Hughbanks ................................................................................. 136

A.     The standard for establishing prejudice ................................... 136

B.    Three factors establish the existence of prejudice ............................ 137

    1.    Trial counsel failed to present substantial facts and expert opinion in support of a sentence of less than death ................ 137

    2.    The substantial facts and expert opinion trial counsel failed to present would have negated the prosecution's closing argument that the aggravating circumstances outweighed the mitigation factors by proof beyond a reasonable doubt ............................ 138

    3.    The prosecution did not have a strong case in favor of death as evidenced by the length of the jury's sentencing deliberations ................................................................ 140

C.    Trial counsels' deficient performance in the sentencing phase prejudiced Hughbanks ........................................................ 141

VI.    The State Appellate Court's Ruling On Hughbanks Sentencing Ineffective Assistance Of Counsel Claim Constituted Both An Unreasonable Application Of Clearly Established Federal Law And An Unreasonable Determination Of Facts As They Existed Before That Court ...................... 142

A.    The state appellate court's unreasonable factual determinations ..... 147

B.    The state appellate court's unreasonable application of clearly established Federal law ........................................................ 149

VII.    The District Court Erred When It Denied Hughbanks Relief on His Mitigation Ineffective Effective Assistance of Counsel Claim. (R 242, Page ID 6636-6644) ................................................................ 151

A.    Investigation and Preparation ............................................. 152

    1.    Failure to retain a competent expert ........................................ 152

    2.    Failure to develop a detailed social history ............................ 154

B.    Performance during Mitigation Phase ............................................. 155

    1.    Trial counsels' opening and closing statements ...................... 155

    2.    The information that trial counsel failed to present ............... 156

    3.    The admission of Dr. Schmidtgoessling's testimony ............. 157

VII.   Conclusion, Trial Counsel Failed To Provide Hughbanks In The Sentencing Phase With Effective Assistance Of Counsel As Guaranteed By The Sixth, Eighth And Fourteenth Amendments ......................................................... 159

**CONCLUSION** ......................................................................... 159

**CERTIFICATE OF COMPLIANCE** ..................................... 160

**CERTIFICATE OF SERVICE** ............................................... 161

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS** ....... 161

**FEDERAL DISTRICT COURT RECORD OF PROCEEDINGS** ................. 162

**STATE COURT RECORD OF PROCEEDINGS** .......................... 163

# TABLE OF AUTHORITES

*Ake v. Oklahoma*, 470 U.S. 68, 83 (1985)................................................................ 131

*Amadeo v. Zant,* 486 U.S. 214 (1988).................................................................. 100

*Apanovitch v. Houk*, 460, 480-82 (6th Cir. 2006).................................................. 53

*Atkins v. Virginia,* 536 U.S. 304 (2002)............................................................. 20,126

*Austin v. Bell*, 126 F.3d 843, 849 (6th Cir. 1997)................................................. 136

*Banks v. Dretke,* 540 U.S. 668 (2004)................................................. 36,42,43,100

*Barton v. Warden,* 786 F.3d 450 (6th Cir. 2015)............................................. 33,42,64

*Berger v. United States,* 295 U.S. 78 (1035)........................................................ 37

*Berghuis v. Thompkins*, 560 U.S. 370, 379 (2010)............................................. 144

*Bies v. Shelton,* 775 F.3d 386 (6th Cir. 2014)................................................*passim*

*Bobby v. Van Hook*, 558 U.S. 4 (2009)............................................................. 127

*Boss v. Pierce,* 263 F. 3d 734 (7th Cir. 2001)..................................................... 54

*Brady v. Maryland,* 373 U.S. 83 (1963)...........................................................*passim*

*Brumfield v. Cain*, 135 S. Ct. 2269, 2276 (2015)............................................... 144

*Bugh v. Mitchell*, 329 F.3d 496, 500 (6th Cir. 2003)............................................. 25

*Burton v. Renico*, 391 F.3d 764, 770 (6th Cir. 2004)............................................. 25

*California v. Brown*, 479 U.S. 538 (1987)........................................................... 126

*Campbell v. Coyle*, 260 F.3d 531, 539 (6th Cir. 2001)............................................ 26

*Castleberry v. Brigano*, 349 F.3d 286 (6th Cir. 2003)....................................... 48,54

*Clark v. Warden,* 934 F.3d 483 (6th Cir. 2019).................................................... 36

*Coleman v. Thompson*, 501 U.S. 729 (1991)..................................................... 100

*Cone v. Bell*, 556 U.S. 449 (2009)................................................................... 43

*Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) ............................................ 105

*D'Ambrosio v. Bagley*, 527 F. 3d 489 (6th Cir. 2008) ............................ 43,44,57,60

*Demjanjuk v. Petrovsky,* 10 F.3d 338 (6ᵗʰ Cir. 1993) ................................... 38

*Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) ........................................ 126

*Florida v. Nixon*, 543 U.S. 175, 191, n.6 (2004) ....................................... 127

*Frazier v. Huffman*, 343 F.3d 780, 787 (6th Cir. 2003) ................................ 26

*Garcia v. United States*, 469 U.S. 70, 75 (1984) ....................................... 144

*Glenn*, 71 F.3d at 1210 ................................................................ 131

*Gumm v. Mitchell,* 775 F.3d 345 (6ᵗʰ Cir. 2014) ...................................*passim*

*Harris v. LaFler*, 553 F.3d 1028 (6ᵗʰ Cir. 2009) .................................... 38,71

*Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990) ..................................... 105

*Harrington v. Richter*, 562 U.S. 86, 109 (2011) ...................................... 104

*Hill v. Mitchell,* 2019 WL 1785485 (S.D. Ohio Sept. 4, 2019) .......................... 27

*Horsely v. State of Alabama*, 45 F.3d 1486, 1494-1495 (11th Cir. 1995) ........... 131

*Jamison v. Collins,* 291 F.3d 380 (6ᵗʰ Cir. 2002) ............................ 27,32,64,101

*Jells v. Mitchell*, 538 F.3d 478 (6ᵗʰ Cir. 2008) ....................................... 57

*Johnson v. Williams*, 133 S.Ct. 1088 (2013) ............................................ 35

*Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) .................................. 105,106

*Kyles v. Whitley*, 514 U.S. 419 (1965) ...........................................*passim*

*Lee v. Kemna,* 534 U.S. 362 (2002) .................................................... 100

*Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) ........................................ 26,145

*Mason v. Mitchell*, 320 F.3d 604, 619-620, 622 (6th Cir. 2003) ........................ 141

*Matthews v. Ishee*, 486 F.3d 883 (6ᵗʰ Cir. 2007) ...................................... 34

*McFarland v. Scott*, 512 U.S. 849, 859 (1994) .................................................. 143

*McWilliams v. Dunn*, 137 S.Ct.1790, 1793 (2017) ........................................ 131

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ............................................ 143

*Miranda v. Arizona*, 384 U.S. 436 (1966) ...................................................... 10

*Murray v. Carrier*, 477 U.S. 478 (1986) ........................................................ 100

*Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) ............................................ 127

*Palazzolo v. Gorcyca*, 244 F.3d 512, 515 (6TH 2001) ................................... 25

*Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ................................................ 126

*Porter v. McCollum*, 558 U.S. 30, 41 (2009) ........................... 106,107,136,142,150

*Ramseyer v. Wood*, 64 F.3d 1432, 1436 (9th Cir. 1995) .............................. 131

*Rompilla*, 545 U.S. at 382-83 ................................................................ 141,150

*Rust v. Zent*, 17 F.3d 155 (6th Cir. 1994) ..................................................... 100

*Stojetz v. Ishee*, 892 F.3d 175, 190 (6th Cir. 2018) ..................................... 143

*Strickler v. Greene,* 527 U.S. 263 (1999) ................................................ 43,70,100

*Strickland v. Washington,* 466 U.S. 668 (1963) ....................................... 2,29,103

*State v. Hughbanks,* 1999 Ohio App. LEXIS 5789 (1st Dist. Dec, 3, 1989) ........... 19

*State v. Hughbanks,* No. C-9080595 (1st Dist. Sept. 7, 2000) ............................. 19

*State v. Hughbanks,* 800 N.E.2d 1152 (Ohio 2004) ......................................... 19

*State v. Hughbanks,* Ham. No. B-9706761 (Ham. C.P. May 8, 2001) ................... 19

*State v. Hughbanks,* 2003 Ohio App. LEXIS 164 (1st Dist. Jan. 17, 2003) ........... 20

*State v. Hughbanks,* 792 N.E.2d 1081(Ohio 2003) ......................................... 20

*State v. Hughbanks,* 798 N.E.2d 1093 (Ohio 2003) ......................................... 20

*State v. Hughbanks,* 825 N.E.2d 623 (2005) .................................................. 21

*State v. Hughbanks,* 903 N.E.2d 325 (Ohio 2009)..................................................... 21

*State v. Hughbanks,* Ham. No. B-9706761 (Ham. C.P. Dec. 9, 2003) ................... 20

*State v. Hughbanks,* 823 N.E.2d 623 (2005).......................................................... 20

*State v. Hughbanks,* Ham. No. B-9706761 (Ham. C.P. October 1, 2007).............. 21

*State v. Hughbanks,* No. C-120351 (Judgement Entry, March 6, 2014) ............... 22

*State v. Hughbanks,* 30 N.E.973 (Ohio 2015).......................................................... 22

*State v. Brooks,* 661 N.E.2d 1030 (1996)................................................................ 119

*State v. Post* (1987), 32 Ohio St.3d 380, 388-389, 513 N.E.2d 754 ..................... 146

*United States v. Agurs,* 427 U.S. 97 (1976)........................................................ 38,70

*United States v. Bagley,* 473 U.S. 667 (1985)................................................. 64,69,95

*United States v. Howell,* 231 F.3d 615 (9th Cir. 2000)............................................ 43

*United States v. Tavera,* 719 F.3d 705 (6th Cir. 2013) ................................... 36,37,70

*Weary v. Cain,* 136 S. Ct. 1002, 1005 (2016) .......................................................... 64

*Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000) ................. 26,107,144,150

*Wiggins v. Smith*, 539 U.S. 510, 521 (2003)............... 103,104,107,127,135,137,150

*Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1998) ......................................... 136

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Sixth Circuit Rule 34(a), Appellant Gary Hughbanks respectfully requests oral argument. This is a capital case involving a voluminous record. The Court granted him a certificate of appealability on two factually intensive issues: (1) whether the prosecution withheld material evidence from the defense in violation of *Brady v. Maryland,* 373 U.S. 83 (1963) and, (2) whether trial counsel were ineffective for failing to adequately investigate and present mitigation evidence. Gary Hughbanks submits that oral argument will assist the Court in understanding and clarifying the positions of the parties.

## JURISDICTIONAL STATEMENT

On February 12, 2007, Gary Hughbanks Jr. filed his initial petition for writ of habeas corpus in the District Court. (Habeas Petition R. 16). He invoked the District Court's jurisdiction pursuant to 28 U.S.C. § 2254. The parties consented to the Magistrate Judge hearing the case. (Order of Reference, R. 13).

On April 21, 2017, Hughbanks filed a third amended habeas petition. (R. 213). On September 15, 2017, On September 7; 2018, the District Court issued its decision and order dismissing his third amended habeas petition. (R. 242, 243). The Court denied Hughbanks a COA. (R. 242, PageID 16650). On October 5, 2019, Hughbanks timely filed his notice of appeal with the District Court. (R. 244).

On December 14, 2018, Hughbanks filed his motion for a certificate of appealability. (Doc. No. 15). On August 15, 2019, the Court granted Hughbanks a certificate of appealability on the issues: (1) whether the prosecution withheld material evidence from the defense in violation of *Brady v. Maryland,* 373 U.S. 83 (1963) and (2) whether trial counsel were ineffective for failing to investigate and present mitigation evidence adequately. (Doc. No. 25-2, p. 3).

This Court has jurisdiction to hear Hughbanks appeal pursuant to 28 U.S.C. § 1291 and 1294, 28 U.S.C. § 2253, and U.S. Const. art. III.

## STATEMENT OF THE ISSUES

On August 15, 2019, the Court granted Hughbanks a certificate of appealability on issues. Pursuant to that certificate, he raises the following issues:

### Seventh Claim for Relief

The prosecution withheld material evidence from the defense in violation of *Brady v. Maryland,* 373 U.S. 83 (1963).

### Thirteenth Ground for Relief

Trial Counsel Failed To Provide Hughbanks With Effective Assistance Of Counsel In The Sentencing Phase Of His Capital Case. *Strickland v. Washington,* 466 U.S. 668 (1963).

## STATEMENT OF THE FACTS

### I.     Petitioner Hughbanks: A Life Marked By Serious Mental Illnesses

Gary Hughbanks ("Hughbanks") suffers from three major mental illnesses: bipolar disorder, post-traumatic stress disorder, and substance abuse (marijuana, alcohol, and amphetamine dependence). (Trial Transcript, Mitigation, R. 163-15, PageID 3439, 3442; Smith Affidavit R. 166-20 PageID 9295, ¶ 51). He may also suffer from significant brain impairment which would affect his cognitive processes, emotions, and reasoning ability. (*Id.* at PageID 9294, ¶ 50). Like his father, Hughbanks has a long history of hallucinations involving a devil like figure. In addition, Hughbanks hears voices. (Trial Transcript, Mitigation, R. 163-15 PageID 3517-18; Trial Transcript, Mitigation, R. 163-16, PageID 3629-31). Hughbanks has been hospitalized eight times for his mental illnesses. (Trial Transcript, Mitigation, R. 163-15, PageID 3435, 3518-22; Smith Affidavit, Transcript, R. 166-16, PageID 3723). His mental illnesses impair his judgment. (Trial Transcript, Mitigation, t R. 163-15, PageID 3576). His three mental illnesses have a synergy effect. (Smith Affidavit, R. 166-20, PageID 9295, ¶ 51).

To offset the severe effects of his bipolar disorder, Hughbanks self-medicated. (*Id.* at PageID 9293, ¶¶ 24-25). He took amphetamines to cope with his depression. (*Id.*).

## II. The Crime: The Victims Were Killed In Their Residence Where They Were Much Of The Evening

The victims, William and Juanita Leeman resided in a single story home in Springfield Township, Hamilton County, Ohio. (Photographs of Victims' Residence, State's Trial Exhibits 9 to 11, R. 166-32, PageID 11108-10).

On the evening of May 13, 1987, the victims arrived home separately. (Investigative Report, R. 167-5, PageID 14130). After returning home, they worked in their front yard. (*Id.* at PageID 14136). After completing the yard work, the victims entered their residence. Mrs. Leeman changed into her night gown. (Crime Scene Investigation, R. 167-5, PageID 13998).

At approximately 9:30 p.m., Officer Pat Kemper of the Springfield Township Police Department drove by the Leemans' residence. (Trial Transcript, Trial Phase, R. 163-13, PageID 3192). He drove by the residence approximately fifteen minutes earlier (*Id.*). When passing the residence the second time, he saw Mrs. Leeman laying on the front of the driveway and waving her arms. (*Id.* at PageID 3194). He stopped his vehicle and approached her. (*Id.*). Her throat had been cut. (*Id.*). She attempted to communicate with him, but was physically unable. (*Id.* at PageID 3195-96). She suffered so many cuts and stabbings times that that the coroner was unable to count them. (Trial Transcript, R. 163-14, Trial Phase, PageID 3322-26).

After tending to Mrs. Leeman, Officers Kemper and McDaniel entered the residence. (Trial Transcript, Trial Phase, R. 163-13, PageID 3197-98). Mrs. Leeman left a trail of blood from the living room to where she was found in the driveway. (*Id.*). Officer McDaniel found the body of Mr. Leeman in the master bedroom. (*Id.* at PageID 3198). He suffered eight cuts and seventeen stab wounds. (Trial Transcript, Trial Phase R. 163-14, PageID 3310). His throat had also been cut. (*Id.* at PageID 3320-21).

The interior lights were on throughout the residence. (Kemper Dep. R. 167-2, PageID 11947). The television was on and the volume "was fairly loud." (*Id.* at PageID 11925). Two reclining chairs were in front of the television, one of which was in a reclining position "indicating that someone had jumped out of the chair from a reclined position without first returning the chair to an upright position." (Crime Scene Investigation, R. 167-5, PageID 13998). The only item taken from the residence was the wallet of Mr. Leeman. (Investigative Report, R. 167-5, PageID 14002).

III. **The Ten Year Investigation Of The Leemans' Deaths: (1) Identification Of Countless Suspects Including Some Who Confessed, (2) Elimination Of Hughbanks As A Suspect, (3) The FBI Report That Concluded The Assailant Knew The Decedent, And (4) The Focus On the Decedent's Son.**

The Cincinnati Police Department, Federal Bureau of Investigation ("FBI"), and the Springfield Township Police Department conducted a ten year investigation

of the deaths of William and Juanita Leeman. For that entire time period the Springfield Township Police Department conducted an extensive investigation into the murders. (Trial Transcript, R. 163-13, Trial Phase, PageID 3225). It pursued "literally hundreds of leads, rumors. Anytime anybody would call for the police, call to the police station to give us a lead, it would be checked out thoroughly. There were no stones left unturned." (*Id.* at PageID 3325-26).

The investigating officer recovered fingerprints from the crime scene. (Hillard Dep. R. 167-2, PageID 11651-52, 11678; Heimpold Letter, R. 167-5, PageID 14053). The Department submitted one-hundred-twenty-six sets of fingerprints from suspects for comparison. (Lists of Fingerprints, R 167-5, PageID 14024-27). Early in the investigation, the officers submitted Hughbanks' fingerprints for comparison. (*Id.* at PageID 14026). His fingerprints did not match the prints found in the master bedroom. (Kemper Dep. R. 167-4, PageID 13412).

The local law enforcement agencies requested assistance from the FBI. The Bureau issued a report based on its analysis of the crime scene analysis. Because the victims' bodies were mutilated and their throats cut, the report concluded that their causes of death were consistent with the fact assailant knew the victims, "the crime was of a personal nature." (FBI VICAP Report, R. 167-5, PageID 14137). The report, due to the severity of the victims' wounds, concluded that the "crime [was] motivated by passion or feeling more than a burglar surprised in the house, trying to

get out." (Police Dept. Report Concerning Burt Leeman, R. 167-5, PageID 14061). The drawers in the master bedroom had been pulled out. (Trial Transcript, 163-13, Trial Phase, PageID 3216). The report concluded "the drawers had been pulled out neatly without the appearance of ransacking. . . . The offender wants others to believe he had gone through the drawers looking for something to steal. This is a technique used to draw attention away from himself and his motive." (FBI VICAP Report, R. 167-5, PageID 14137).

Consistent with the Bureau's report, the investigators focused on Burt Leeman ("Burt"), one of the decedents' sons. Each of the decedents' three sons received two-hundred-thousand dollars upon the death of their parents. (*Id.*). When Burt arrived at the crime scene, he was very calm and only concerned with obtaining a box from his father's desk. (Police Report Concerning Burt Leeman, R. 167-5, PageID 14061). One week after the decedents' deaths, a female posing as a merchant called Master Card requesting approval for a phantom customer to place charges on the decedents' credit card. (Credit Card History, 167-5, PageID 14005-06). Between May 20, 1987 and August 24, 1987, the female called Master Card eight times. (*Id.*). The female caller necessarily had inside information; she had the authorization numbers for the stores for which she claimed to be a clerk and the telephone number for the Master Card authorization center. (*Id.* at PageID 14006). Burt Leeman's wife worked for Discover Card. (Police Report Concerning Burt Leeman, R. 167-5, PageID 14063).

**IV.** **The Interrogation Of Hughbanks After Ten Years: (1) The Detective Failed To Honor Hughbanks' Request To Cease Interrogation And To Properly Mirandize Him, And (2) Hughbanks' Answers During the Four Hour Interrogation Were Inconsistent With the Evidence.**

Approximately ten years after the murders, Hughbanks' brother Larry Hughbanks ("Larry"), was on probation for the offense of aggravated burglary (Entry Terminating Probation, R. 166-17, PageID 8498), and had an outstanding warrant for a probation violation. (L. Hughbanks Affidavit, ¶ 2 R. 167-17, PageID 8490). Larry had prior convictions for assault and gross sexual imposition. (Newspaper Clipping, R. 166-19, PageID 9060). Larry blamed his brother Gary for his gross sexual imposition conviction. (L, Hughbanks Affidavit, R. 166-17, PageID 8491, ¶ 10). Prior to Larry meeting with the investigating officers, the police arranged for the common pleas court to withdraw the outstanding warrant for the probation violation. (Entry Withdrawing Warrant, 166-17, PageID 8497). Larry told the officers that when his brother Gary was drunk he confessed to the Leeman murders. (L. Hughbanks Affidavit, ¶ 7, R. 166-17, PageID 8490). After the trial court sentenced Hughbanks to death, the common pleas court released Larry from probation. (Entry Terminating Probation, R. 166-17, PageID 8498).

On September 9, 1997, more than 10 years after the Leeman murders, law enforcement in Arizona arrested Hughbanks. (Trial Transcript, Pretrial Transcript, R. 163-7, PageID 2405). Immediately after the arrest, Investigator William Fletcher

of the Hamilton County Prosecutor's Office and Officer Kemper of the Springfield Police Department interviewed Hughbanks for several hours. (*Id.* at PageID 2408). Hughbanks did not make any inculpatory statement. However, at the conclusion of the interview, Hughbanks agreed to submit to a polygraph examination. The charts from the examination showed a flat affect consistent with Hughbanks having consumed crystal methamphetamine earlier that day. (Millstone Deposition submitted at motion to suppress, Transcript, R. 166-3, PageID 4222).[1]

The following morning, on September 10, 1997, Hamilton County Prosecutor Joe Deters instructed Investigator Fletcher "to go down and talk to him [Hughbanks] again at the jail." (Fletcher Dep, R. 167-3, PageID 12489-90). At his federal habeas deposition, Fletcher testified for the first time that Hughbanks "became agitated that we were talking to him again. He did answer some of our questions, and he got very upset with me, and some obscenities, and he said, I don't want to talk any more. So I said okay." (*Id.* at PageID 12489-90). Fletcher honored Hughbanks' request and ceased further interrogation. (*Id.*).

---

[1] Investigator Fletcher later testified at the motion to suppress that Hughbanks was not under the influence of any drugs during this initial interrogation session. (Trial Transcript, R. 163-7, Pretrial, PageID 2409).

On September 16, 1997, the Hamilton County Prosecutor's Office asked the Tucson Police Department to re-interview Hughbanks. (Trial Transcript, Trial Phase, R. 163-13, PageID 3263, 3271). Hughbanks did not reinitiate the questioning. Hughbanks consented to take another polygraph examination administered by the Arizona detectives. Prior to taking the examination, Hughbanks executed a consent form to take the polygraph examination. That form did not contain all of the constitutional rights required pursuant to *Miranda v. Arizona*, 384 U.S. 436, 473 (1966).

At the conclusion of the polygraph examination, the Arizona detectives did not advise Hughbanks of his *Miranda* rights. Instead, after completion of the polygraph examination, the officers immediately proceeded to question Hughbanks for almost four hours. During the interrogation, Hughbanks repeatedly gave answers that were inconsistent with the physical evidence from the murders including, but not limited to the following: (1) the victims' residence was a single story home. (State's Trial Exhibits, R. 166-32, PageID 11108-10), but Hughbanks said that the residence contained two stories and the upstairs carpet was beige (Hughbanks' Custodial Statement, R. 193-1, PageID 15598); (2) Mrs. Leeman wore a nightgown when she was murdered. (Crime Scene Investigation, R. 167-5, PageID 13998), but Hughbanks said that Mrs. Leeman was wearing a floral top and slacks (Hughbanks' Custodial Statement, R. 193-1, PageID 15572); (3) both victims were killed with a

knife (Trial Transcript, Trial Phase, R. 163-14, PageID 3328-30), but Hughbanks initially told the Detectives that he killed the victims with a screwdriver (Hughbanks Custodial Statement, Hughbanks' Statement, R. 193-1, PageID 15546, 15556); and (4) the only item taken from the residence was Mr. Leeman's wallet (Investigative Report, R. 167-5, PageID 14129), but Hughbanks told the Detectives that he took Mrs. Leeman's costume jewelry including necklaces, earrings, pins, and broaches. (Hughbanks' Custodial Statement, R. 193-1, PageID 15599, 15606, 15610).

## V.  The Pretrial Phase: (1) The Prosecution Failed to Provide Favorable Evidence, And (2) Counsel Failed To Meaningfully Challenge Hughbanks' Custodial Statement

During pretrial discovery, the prosecutors failed to provide defense counsel with any of the countless leads that law enforcement agencies pursued during the ten year investigation. In addition, the prosecution failed to provide trial defense with the following documents: (1) the FBI report that contained the conclusion that the physical evidence was consistent with the assailant having been a family member or acquaintance of the victims, (FBI VICAP Report, R. 167-5, PageID 14135, 14137); (2) police reports wherein investigating officers believed that the decedents' son Burt Leeman used the decedents' credit cards after their deaths (Credit Card Report, R.167-5, *Id.* at PageID 14005-07), and (3) police reports that two other individuals confessed to committing the murders. (Supplementary Offense Report, R-1675. PageID 14021).

Trial counsel filed a motion to suppress Hughbanks' statement to the Arizona detectives. (Motion to Suppress, R. 166-3, PageID 4209-13). However, trial counsel failed to address in the motion the constitutional issues that: (1) Hughbanks previously requested that all questioning cease, and (2) the polygraph consent forms did not fully advise him of his constitutional rights. (Id). Furthermore, counsel failed to retain a: (1) mental health specialist to address the suppression issue in the context of Hughbanks' major mental illnesses, and (2) a false confession expert to address the reliability of his custodial statement given Hughbanks' repeated misstatements of facts concerning the murders.

## VI. The Trial Phase: The Prosecution Proceeded On A Flawed Theory And Relied On Perjured Testimony To Support That Theory.

The prosecution told the jury in opening statement, "[a]s they (the Leemans) pulled into their drive that night and returned home, there was a killer inside their home. There was an armed intruder, a man who had broken in, who brought a weapon with him, and whose intention it was to take whatever they had at whatever the cost." (Trial Transcript, Trial Phase. R. 163-13, PageID 3147). The prosecution continued "[a]nd that night of May 13th, as the Leemans pulled into the driveway, this is the armed killer (referencing Hughbanks) who's inside their home. They don't know it yet as they got out of their car, but their fate is waiting them." (*Id.* at PageID 3149). The suppressed FBI report concluded that the victims were NOT ambushed

in their residence as they returned home together that evening. Instead, the victims arrived home separately (Investigative Report, R. 167-5, PageID 14130), worked in their front yard, (FBI VICAP Report, R167-5, PageID 14136), changed clothes, (Crime Scene Investigation, R. 167-5, PageID 13998), and watched television (Kemper Dep., R. 167-2, PageID 11925) prior to their deaths.

The prosecution told the jury in opening statement that "what made it (the murders) difficult to solve, in this case, as you'll find out, this particular killer had no connection with this home. Never been there before. He had no connection with the Leemans. He never met them before. And that made this an exceptionally difficult case to solve." (Trial Transcript, R. 163-13, Trial Phase, PageID 3155). The prosecution again emphasized this point in closing argument. (*Id.* at PageID 3352). The suppressed FBI report reached the exact opposite conclusion, that the causes of death were consistent with the fact that the assailant knew the victims, and therefore "the crime was of a personal nature" (FBI VICAP Report, R. 167-5, PageID 14137). Yet the prosecution failed to share the FBI report with defense counsel.

Further, the prosecution told the jury that the assailant entered the victims' residence to steal items from the residence: "in burglarizing a home in a nice suburban neighborhood, there is a reasonable likelihood of obtaining something worth stealing, something worth breaking into a home for." (Trial Transcript, Trial Phase, R. 163-13, PageID 3147-48). "You're going to see that from a burglar's point

13

of view the home, though this home is on Adams Road, it's kind of isolated." (*Id.* at PageID 3148-49). "You'll see in these photos of the dresser drawers pulled open as though the intruder had been looking for valuables in the room." (*Id.* at PageID 3149-50). The withheld FBI report rebutted this part of the prosecutions' argument: "the drawers had been pulled out neatly without the appearance of ransacking. . . . The offender wants others to believe he had gone through the drawers looking for something to steal. This is a technique used to draw attention away from himself and his motive." (FBI VICAP Report, R. 167-5, PageID 14137).

The prosecution employed the perjured testimony of the lead detective and the victims' son to support is theory of the case. Because the prosecution withheld the FBI report and other police reports, trial counsel was unable to develop on cross examination the misleading testimony of the Detective and decedents' son.

Detective Kemper testified that the investigating officers did not find any trace evidence in the residence that could be used to identify the assailant(s). (Trial Transcript, Trial R. 163-13, PageID 3194). This testimony was not true. Criminalist William Hillard recovered fingerprints from the interior of the residence. (Hillard Dep. R. 167-2, PageID 11651-52, 11678; Heimpold Correspondence, R. 167-5, PageID 14053). The investigating officers used the prints to eliminate countless suspects including Hughbanks. (Kemper Dep. R. 167-2, PageID 11961). Detective Kemper testified at length concerning the consistencies between Hughbanks'

description of the victims' residence. (Trial Transcript, Trail Phase, R. 163-13, PageID 3241). This too was wrong. The victims' residence was a single story house. (State's Trial Exhibits 9 to 11, R. 166-32, PageID 111108-10). Hughbanks said that the residence contained two stories and the upstairs carpet was beige. (Hughbanks' Custodial Statement, R. 193-1, PageID 15598). The murders were committed in the master bedroom which is located at the front of the house. (State's Trial Exhibit 1, R. 166-32, PageID 11109). Hughbanks incorrectly and repeatedly told the officers that the murders occurred in the rear bedroom of the house. (Hughbanks' Custodial Statement, R. 197-1, PageID 15540, 15546, 15555, 15602). Detective Kemper testified that Hughbanks accurately described the unique light in the master bedroom closet. (Trial Transcript, Trial Phase, R. 163-13, PageID 3242). Hughbanks incorrectly described the light in the closet. (Hughbanks' Custodial Statement, R. 197-1, PageID 16612).

The prosecution also called Leonard Leeman to bolster the reliability of Hughbanks' custodial statement. (Trial Transcript, Trial Phase, PageID R. 163-13, PageID 3171). The witness opined that because Hughbanks in his custodial statement accurately described the interior of his parents' residence, he must have previously been in the residence (contrary to the prosecutor's remarks in opening and closing argument) (*Id.* at PageID 3178-79). Leeman identified in great details the supposed consistencies. (*Id.* at PageID 3179-88). Trial counsel's cross

examination of the witness consisted of five questions. (*Id.* at PageID 3188-89). Trial counsel did not cross examine Leeman concerning the number of times that Hughbanks inconsistently described the interior of his parent's homes including the: (1) description of portions of the exterior of the victim's residence (Hughbanks Statement, 193-1, R. 167-3 PageID 15598); (2) location of the bedroom in which his father was killed (*Id.* at PageID 15540, 15546, 15555, 15602); (3) description of the closet and its contents in the master bedroom (*Id.* at PageID 15611-12); and (4) items stolen from the residence (*Id.* at PageID 15599, 15606, 15610).

## VII. The Sentencing Phase: The Flawed Mental Health Testimony That Conflated An Anti-Social Diagnosis With A Bipolar Diagnosis

Dr. Nancy Schmidtgoessling from the Hamilton County Court Clinic, conducted the only mental health evaluation for purposes of the trial, (she conducted an insanity evaluation, as opposed to a sentencing evaluation).[2] She testified for the prosecution that Hughbanks had the characteristic of an individual with an anti-social personality disorder and did not suffer from a bipolar disorder. (Trial

---

2

Trial counsel called Sagi Raju, a psychiatrist (Trial Transcript, R. 163-15, Mitigation phase PageID 3432), who last saw Hughbanks in 1986, twelve years prior to the trial. (*Id.* at PageID 3452). Defense counsel also called a second psychiatrist, Bernard DeSilva (*Id.* at PageID 3483) who last treated Hughbanks in 1996. (*Id.* at PageID 3543).

Transcript R. 163-16, Mitigation Phase, PageID 3694-3706). Her testimony was incorrect. The records from Hughbanks' long history of hospitalizations and treatment contained overwhelming evidence that since his adolescence, Hughbanks suffered from bipolar disorder. (Smith Affidavit, R. 166-20, PageID 9289). Dr. Schmidtgoessling instead conflated the diagnoses of anti-social and bipolar disorders despite testifying that Hughbanks did not suffer from a bipolar disorder. (*Id.* at PageID 9294, ¶ 49). She further failed to diagnose Hughbanks with a post-traumatic stress disorder (*Id.* at PageID 9289, ¶ 23). This diagnosis was the product of the chaotic environment in which Hughbanks was raised and the multiples times that he was sexually assaulted first by a cousin and then by a stranger. (*Id.* at PageID 9290, ¶¶ 24-26).

### STATEMENT OF THE CASE

### I.  Charges, Convictions, And Sentences

On September, 17, 1997, more than ten years after the deaths of William and Juanita Leeman, the Hamilton County Grand Jury indicted Hughbanks on two counts of capital murder (First and Second Counts). Each of the two counts included three death penalty specifications (aggravating circumstances), the offenses were: (1) committed for purpose of escaping detection, apprehension or trial for the commission of an aggravated burglary; (2) part of a course of conduct involving the purposeful killing of two or more people; and (3) committed during course of an aggravated

burglary and Hughbanks was principal offender. (Indictment, R. 166-2, PageID 3925-28). The indictment also charged Hughbanks with the aggravated burglary of the Leemans' residence (Third Count). (*Id.* at PageID 3927).

On June 2, 1998, a Hamilton County jury found Hughbanks guilty of all the charges and specifications contained in the indictment. (Guilty Verdicts, R. 166-3, PageID 4384-86, 4393-98).

On June 11, 1998, the jury began its penalty phase deliberations. (Trial Transcript, Mitigation Phase, R. 163-17, PageID 3834). The following day, the jury returned verdicts recommending the trial court sentence Hughbanks to death for the murders of William and Juanita Leeman. (Sentencing Verdicts, R. 166-3, PageID 4418-19). On July 6, 1998, the trial judge accepted the jury's recommendations and sentenced Hughbanks to death for each count of aggravated murder (First and Second Counts) and ten to twenty-five years on the count involving aggravated burglary (Third Count). (Trial Court's Sentencing Entry, R. 166-3, PageID 4420).

## II.    State Court Direct Appeals[3]

Hughbanks appealed to the First Appellate District, Hamilton County Court of Appeals. That court affirmed his convictions and sentences. *State v. Hughbanks,*

---

[3]    Because the offenses in question occurred prior to January 1, 1995, Hughbanks had two direct appeals of right. *See* O.R.C. § 2929.05(A).

1999 Ohio App. LEXIS 5789 (1st Dist. Dec, 3, 1989) (Decision, R. 166-4, PageID 4643-77).

Hughbanks appealed to the Supreme Court of Ohio. That Court affirmed his convictions and sentences. *State v. Hughbanks,* 792 N.E.2d 1081 (Ohio 2003) (Decision, R. 166-5, PageID 4952-77)

## III.    Application for Reopening

On March 1, 2000, Hughbanks filed an application to reopen his direct appeal with the First Appellate District, Hamilton County Court of Appeals. (Application for Reopening, R. 166-6, PageID 5002-11). That court denied his application for reopening in an unreported decision. *State v. Hughbanks,* No. C-9080595 (1st Dist. Sept. 7, 2000) (Entry Overruling Application, R. 166-14, PageID 7907-08).

The Supreme Court of Ohio affirmed that decision. *State v. Hughbanks,* 800 N.E.2d 1152 (Ohio 2004) (Decision, R. 166-15, PageID 8173-76).

## IV.    First State Post-Conviction Proceedings

Hughbanks sought post-conviction relief in the trial court from his convictions and death sentences. (Post-Conviction Petition, R. 166-16, PageID 8192-8281; Notice of Supplementation and/or Amendment to Post-Conviction Petition, R. 166-21, PageID 9443-9492), That court summarily denied his post-conviction petition without the benefit of discovery, an evidentiary hearing, or discovery. *State v. Hughbanks,* Ham. No. B-9706761 (Ham. C.P. May 8, 2001) (Findings of Fact,

Conclusions, And Entry Dismissing Petition to Vacate, R. 166-23, PageID 10049-62). The Court of Appeals affirmed the trial court's summary dismissal of his petition. *State v. Hughbanks,* 2003 Ohio App. LEXIS 164 (1st Dist. Jan. 17, 2003) (Decision, R. 166-26, PageID 10596-623). The Supreme Court of Ohio declined to exercise its discretionary jurisdiction to hear his appeal from the decision of the Court of Appeals. *State v. Hughbanks,* 798 N.E.2d 1093 (Ohio 2003) (Entry, R. 166-27, PageID 10739).

## V. *Atkins* Proceedings

Hughbanks filed a petition with the trial court to vacate his two death sentences pursuant to the Supreme Court decision in *Atkins v. Virginia,* 536 U.S. 304 (2002) (Gary L. Hughbanks' Post-Conviction Petition Pursuant to *Atkins v. Virginia,* 536 U.S. 304 (2002), R. 166-28, PageID 10753-63). The trial court summarily denied the *Atkins* petition. *State v. Hughbanks,* Ham. No. B-9706761 (Ham. C.P. Dec. 9, 2003) (Findings of Fact, Conclusions of Law, and Entry Denying Dismissing Successive Petition, Filed Pursuant to *Atkins v. Virginia,* R. 166-28, PageID 10856-62). The court of appeals reversed the judgment of the trial court and remanded the matter for further proceedings. *State v. Hughbanks,* 823 N.E.2d 623 (2005) (Decision, R. 166-29, PageID 10991-98). Hughbanks appealed to the Supreme Court of Ohio on the issues he did not prevail on in the Court of Appeals. The Ohio

Supreme Court declined to hear the discretionary appeal. *State v. Hughbanks,* 825 N.E.2d 623 (2005) (Entry, R. 166-30, PageID 11053).

On remand from the court of appeals, the trial court appointed experts and granted leave to conduct discovery. (Entry, R. 166-31, PageID 11069-70, 11070, 11071) Subsequently, the trial court denied Hughbanks' *Atkins'* petition. *State v. Hughbanks,* Ham. No. B-9706761 (Ham. C.P. October 1, 2007) (Amended Entry Denying Atkins Post-Conviction Petition R. 167-1, PageID 11414). The court of appeals affirmed the decision of the trial court in an unreported decision. *State v. Hughbanks,* No. C-070773 (Sept. 3, 2008) (Judgment Entry, R. 167-1, PageID 11535-38). The Supreme Court of Ohio declined to hear the discretionary appeal. *State v. Hughbanks,* 903 N.E.2d 325 (Ohio 2009) (Entry, R. 167-1, PageID 11573).

## VI.  Initial Federal Habeas Proceedings In District Court Prior To Abatement

On February 12, 2007, Hughbanks filed his initial Petition for Writ of Habeas Corpus. (Habeas Petition for Writ of Habeas Corpus, R. 16). On April 13, 2007, the Warden filed his Return of the Writ. (Initial Return of the Writ, R. 22).

On May 4, 2007, the District Court granted Hughbanks' leave to conduct discovery. (Decision and Ordering Granting Petitioner's Motion for Discovery, R. 24, p. 2). On January 29, 2010, the Court granted Hughbanks' motion to hold the proceedings in abeyance to permit him to return to state court to exhaust the claims

and facts he initially identified in the federal discovery. (Decision and Order Granting Petitioner's Motion to Stay Proceedings Pending Exhaustion, R. 106, p. 3).

## VII. Second State Post-Conviction Proceedings

Hughbanks filed a second post-conviction petition to exhaust the claims he initially identified in the federal discovery. (Gary Hughbanks Jr.'s Post-Conviction Petition, R. 167-2, PageID 11587-11631). The trial court summarily denied his post-conviction petition. *State v. Hughbanks,* Ham. No. B-9706761 (Ham. C.P. April 13, 2012) (Findings of Fact, Conclusions of Law and Entry Dismissing Gary L. Hughbanks J.'s Post-Conviction Petition R. 167-5, PageID 14185-97). The Court of Appeals, in an unreported decision affirmed the decision of the trial court. *State v. Hughbanks,* C-120351 (March 6, 2014) (Judgement Entry, R. 167-5, PageID 1429-31). The Supreme Court of Ohio declined to exercise its' discretionary jurisdiction to hear Hughbanks' appeal. *State v. Hughbanks,* 30 N.E.973 (Ohio 2015) (Entry, R. 167-5, PageID 14542).

## VIII. Federal Habeas Proceedings In The District Court After Exhaustion Of State Court Remedies

On May 22, 2015, the District Court dissolved the stay it previously entered to permit Hughbanks to return to state court. (Order Dissolving Stay and Setting Schedule, R. 158, PageID 2293).

On June 24, 2016, Hughbanks filed his second amended habeas petition. (Second Amended Petition, R. 188). On August 10, 2016, the Warden filed his amended return of the writ. (Amended Return R. 194). On March 31, 2017, the District Court granted in part and denied in part the Warden's motion to dismiss. (Decision and Order on Motion to Dismiss, R. 202).

On April 21, 2017, Hughbanks filed a third amended habeas petition. (Third Amended Petition, R. 213). On September 15, 2017, Hughbanks filed his traverse in support of his third amended habeas petition. (Traverse, R. 234). On September 7, 2018, the District Court issued its decision and order dismissing his third amended habeas petition. (Decision and Order; Judgment in a Civil Case, R. 242, 243). The Court denied Hughbanks a Certificate of Appealability. (Decision and Order, R. 242, PageID 16650).

IX.    **Federal Habeas Proceedings In This Court**

On October 9, 2018, Hughbanks filed his notice of appeal to this Court from the September 7, 2018 decision and order of the District Court. (Doc. No. 1).

On December 14, 2018, Hughbanks filed his motion for a certificate of appealability. (Doc. No. 15). On January 3, 2019, the Warden filed his opposition to Hughbanks motion. (Doc. No. 19). On March 11, 2019, Hughbanks filed his reply in support of his motion for a certificate of appealability. (Doc. No. 24).

On August 15, 2019, the Court granted Hughbanks a certificate of appealability on the issues: (1) whether the prosecution withheld material evidence from the defense in violation of *Brady v. Maryland,* 373 U.S. 83 (1963) and (2) whether trial counsel were ineffective for failing to investigate and present mitigation evidence adequately. (Doc. No. 25-2, p. 3).

On January 8, 2020, the Court extended the time for Hughbanks to file his merit brief until January 27, 2020. (Doc. No. 39, p. 3).

## STANDARD OF REVIEW

### I. This Court's Review of the District Court Decisions

This Court reviews *de novo* the legal conclusions of the district court denying habeas relief. *Palazzolo v. Gorcyca*, 244 F.3d 512, 515 (6TH 2001). The District Court did not conduct an evidentiary hearing and instead relied on the state court record. Therefore, this Court conducts de novo review of the factual finding of the District Court. *Bugh v. Mitchell*, 329 F.3d 496, 500 (6th Cir. 2003); *Burton v. Renico*, 391 F.3d 764, 770 (6th Cir. 2004).

### II. This Court's Review of the State Court Decisions

Hughbanks filed his habeas petition after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Therefore, to the extent that the relevant state court decision constitutes "an adjudication on the merits," this Court can grant relief when the adjudication:

> 1) Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2) Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) and (2)

A federal court may grant a writ of habeas corpus under § 2254(d)(1)'s "contrary to" clause "if the state court arrives at a conclusion opposite to that reached

by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

Section 2254(d)(1)'s unreasonable application clause provides two additional bases for habeas relief. See *Frazier v. Huffman*, 343 F.3d 780, 787 (6th Cir. 2003) (citing *Campbell v. Coyle*, 260 F.3d 531, 539 (6th Cir. 2001). The first avenue of relief occurs if "the state court identifies the correct governing legal principle from [the Supreme] Court's decision, but unreasonably applies that principle to the facts." *Williams*, 529 U.S. at 413. Second, relief is available under this provision if the state court decision "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context." *Frazier*, 344 F.3d at 787 (citing Campbell, 260 F.3d at 539).

Clearly established federal law consists of those Supreme Court decisions that were decided prior to the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

To prevail under § 2254 (d)(2), the state court decision must be premised on an unreasonable determination of the facts in light of the evidence presented before the state court.

## SUMMARY OF THE ARGUMENTS

### Seventh Claim for Relief

**The prosecution withheld material evidence from the defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).**

This Court has three times granted petitioners habeas relief in capital cases because the Hamilton County Prosecutor's Office suppressed favorable material evidence. *Jamison v. Collins,* 291 F.3d 380, 391 (6th Cir. 2002) ("the above evidence was favorable to Jamison, that it was suppressed by the prosecution and that prejudice resulted from that suppression"); *Gumm v. Mitchell,* 775 F.3d 345, 375 (6th Cir. 2014) ("no reasonable jurist could have found that the disclosure of this small mountain of evidence . . . would not have undermined confidence in the verdict in this case"); *Bies v. Shelton,* 775 F.3d 386, 403 (6th Cir. 2014) ("it is painfully clear that the result of the trial would likely have been different had the suppressed evidence been disclosed to defense"). The District Court recently granted habeas relief bases on another *Brady* claim in a capital case originating from Hamilton County. *Hill v. Mitchell,* 2019 WL 1785485, *16 (S.D. Ohio Sept. 4, 2019). This Court should grant Hughbanks the same relief on his *Brady* claim.

The suppressed evidence in this case falls into six categories, information that (a) identified the existence other suspects; (b) one of the victim's son's actions were consistent with having committed the murders: (c) Hughbanks' fingerprints did not

match the fingerprints recovered from the victims' residence; d) eyewitnesses gave physical descriptions of suspects seen in the area at the time of the murders that that did not match the physical description of Hughbanks; (e) impeached the State's theory of the case including a report authored by the FBI that debunked the prosecution's theory of the case and interpretation of the crime scene evidence; and (f) impeached the prosecution's witnesses.

The District Court found that Hughbanks did not prove that the suppressed evidence was material because Hughbanks gave a lengthy recorded inculpatory statement to the Arizona detectives. But this Court in both the *Gumm* and *Bies* decisions ruled that the suppressed evidence was favorable and material even though the petitioner in each case confessed. In this case, Hughbanks' custodial statement was the product of the detectives' leading questions. Hughbanks, without the "assistance" of the detectives, stated that the murder weapon was a screw driver (it was a knife); the victims' house was a two story residence with beige carpeting upstairs (it was a one story residence); the residence was dark at the time of the murders (it was well lit at the time of the murders); and he took costume jewelry including necklaces, earrings, pins, and broaches during the burglary (only Mr. Leeman's wallet was taken).

This Court should reverse the judgment of the trial court as to the *Brady* claim, find the suppressed evidence favorable and material, and order that the writ be issued granting Mr. Hughbanks a new trial.

## Thirteenth Claim for Relief

**Trial Counsel Failed To Provide Hughbanks With Effective Assistance Of Counsel In The Sentencing Phase Of His Capital Case.** *Strickland v. Washington,* **466 U.S. 668 (1963).**

Trial counsel failed to provide Hughbanks with effective assistance of counsel in the mitigation phase of his capital case. This was the critical phase of his capital case because trial counsel conceded that Hughbanks killed both of the victims and was guilty of the three aggravating circumstances attached to the each of the counts charging Hughbanks with aggravated murder.

Trial counsel built its sentencing case on the testimony of the two psychiatrists who previously treated Hughbanks. Trial counsel did not prepare either witness to testify. As a result, the one witness, Dr. Sagi Raju had to review his notes each time a question was posed to him because he had not seen or treated Hughbanks in the twelve years prior to the mitigation phase. The other witness, Doctor Bernard Silva had not seen or treated Hughbanks in the two years prior to the mitigation phase. Doctor Silva had recently undergone bypass surgery and was suffering from

recurrent fever at the time of his trial deposition. Neither doctor conducted or caused to be conducted any testing of Hughbanks.

Trial counsel offered the Doctors' testimony in support of the O.R.C. § 2929.03(B)(3) mitigating factor, "[w]ther at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law." (emphasis added). Neither Doctor was able to render an opinion as to Hughbanks' state of mind at the time of the commission of the murders. The prosecution repeatedly emphasized this point to the jury in closing argument.

The prosecution its mitigation phase rebuttal called to testify Dr. Nancy Schmidtgoessling of the Hamilton County Court Clinic. She testified that at the time of the offense Hughbanks did not suffer from a mental disease or defect. She further testified that while she questioned whether Hughbanks had a bipolar disorder, he met the diagnostic criteria for an anti-social disorder.

The trial court failed to instruct the jury as required by Supreme Court of Ohio precedent that the vote of a single juror could preclude the jury from returning a verdict recommending that the trial court impose the death penalty. The jury deliberated for twelve hours prior to returning its sentencing death recommendations.

In post-conviction, counsel retrained Dr. Robert Smith and provided him with an extensive social history of Hughbanks including twenty-eight sets of records from Hughbanks' prior mental health treatments. Dr. Smith concluded, after reviewing the records, interviewing Hughbanks, and administering testing to him that: a) at the time of the offenses Hughbanks suffered from bipolar, post-traumatic, and substance abuse disorders. None of the experts called in the mitigation phase rendered an opinion as to Hughbanks' statement of mind at the time of the offenses. In addition, the jury did not hear, as Dr. Smith concluded in his affidavit that Hughbanks was sexually assaulted by a cousin and later a stranger which cause Hughbanks to suffer from post-traumatic stress disorder. They jury also did not hear, as Dr. Smith concluded in his affidavit, that Hughbanks' substance abuse disorder was the product of his bipolar and post-traumatic disorders. Finally, contrary to Dr. Schmidtgoessling's testimony, Dr. Smith concluded, in his affidavit that Hughbanks did not qualify for an anti-social diagnosis. Dr. Smith summarized his findings:

> In light of the two evaluations of Mr. Hughbanks, the psychological testing results and the documents reviewed, it is my professional opinion, with a reasonable degree of psychological certainty that Mr. Hughbanks was, at the time of the instant offense, suffering from several psychiatric illnesses. These disorders included Bipolar Disorder with Psychotic Features, Post Traumatic Stress Disorder, Alcohol Dependence, Cannabis Dependence and Amphetamine Dependence. These psychiatric illnesses impaired Mr. Hughbanks' cognitive functioning and emotional reactions at the time of the instant offense. The cumulative effect of these disorders constituted a · significant mental disease or defect that directly contributed to his involvement in the instant offense.

31

(Smith Affidavit, ECF 166-20, PageID 9295, ¶ 51).

A reasonable probability exists that if the jury heard the evidence that counsel identified and developed in the state post-conviction proceedings, one or more jurors would have voted to returned verdicts recommending sentences of less than death. Accordingly, this Court should order the writ issued and Hughbanks receive a new sentencing trial.

## ARGUMENT

### Seventh Claim Ground for Relief

**The prosecution withheld material evidence from the defense in violation of *Brady v. Maryland,* 373 U.S. 83 (1963).**

Hughbanks requests this Court grant him habeas relief in the form of a new trial because the Hamilton County Prosecutor's Office suppressed favorable material evidence. This Court in three other capital cases granted habeas relief because the Hamilton County Prosecutor's Office suppressed material, exculpatory evidence. *Jamison v. Collins,* 291 F.3d 380, 391 (6th Cir. 2002) ("We therefore affirm the district court's finding that the above evidence was favorable to Jamison, that it was suppressed by the prosecution and that prejudice resulted from that suppression"); *Gumm v. Mitchell,* 775 F.3d 345, 375 (6th Cir. 2014) ("no reasonable jurist could have found that the disclosure of this small mountain of evidence, much of which

was admissible or would clearly have led to admissible evidence, would not have undermined confidence in the verdict in this case"); *Bies v. Shelton,* 775 F.3d 386, 403 (6th Cir. 2014) ("Considering the evidence collectively, it is painfully clear that the result of the trial would likely have been different had the suppressed evidence been disclosed to defense").

In this case, the Hamilton County Prosecutor's Office suppressed some of the same types of evidence that the Court found the Office suppressed in *Jamison, Gumm, and Bies*. The suppressed evidence included: (a) the existence of other suspects including individuals who confessed, (b) exculpatory eyewitness statements, (3) reports that impeached the testimony of the prosecution's witnesses, and (4) evidence called into question the prosecution's theory of the case.

This Court, like it did in *Jamison, Gumm, and Bies*, should find the evidence in question suppressed, favorable, and material. It should make these three findings even though Hughbanks, like Gumm and Bies, made an inculpatory statement to the investigating officers.

## I.     This Court Conducts De Novo Review Of Hughbanks *Brady*.

### A.     This Court conducts de novo review of Hughbank's *Brady* claim.

This Court conducts a de novo review of the District Court's decision dismissing Hughbanks' habeas petition. *Barton v. Warden,* 786 F.3d 450, 460 (6th Cir. 2015). It also reviews the District Court's factual findings de novo because the

District Court did not conduct an evidentiary hearing and instead relied exclusively on the state-court-record when denying Hughbanks' *Brady* claim. *Id.; Matthews v. Ishee,* 486 F.3d 883, 889 (6th Cir. 2007).

**B.    This Court conducts its de novo review of the *Brady* claim without reference to the standards contained in 28 U.S.C. 2254(d)(1) and (2).**

Hughbanks in his initial post-conviction proceedings raised two grounds for relief that asserted a violation of *Brady,* the Ninth and Thirty-Eighth Claims for Relief. (Post-Conviction Petition R. 166-16, PageID 8213, 827 ).The Eighth Claim for Relief relied exclusively on Exhibits KK, OO, SS which were newspaper clippings. (R. 166-18, PageID 8956-57, 8961-62, 8966). The Thirty-Eighth Claim for Relief relied on Exhibits MM, NN, PP, QQ, RR, TT, UU, XX which were also newspaper clippings. (*Id.* at PageID 8959, 8960, 8963, 8964, 8965, 8969-70, 8971, 8973).

Hughbanks in his second post-conviction proceedings in the Fifth to Eleventh Grounds for Relief asserted that the prosecution suppressed material evidence. (Post-Conviction Petition, R. 167-2, PageID 11606-22). The exhibits he submitted in supported of those grounds for relief he initially learned of in the federal discovery. (Sipe Affidavit, R. 167-3, PageID 12723-24, ¶¶ 3-7).

Those exhibits included documents obtained from the records depositions of Springfield Township Police Department and the Hamilton County Prosecutor's

Office and the transcripts of the depositions of Detective Patrick J. Kemper with the Springfield Township Police Department, Criminalist William B. Hillard with the Cincinnati Police Department, and Investigator William Fletcher with the Hamilton County Prosecutor's Office. (*Id*). Hughbanks did not rely on any of the newspaper clippings that he relied on in his initial post-conviction proceedings.

Hughbanks in this appeal relies exclusively on the records obtained during the federal discovery and submitted in support of his second post-conviction *Brady* claims. The last reasoned state court decision addressing Hughbanks' *Brady* claims in his second post-conviction proceedings did not reach the merits of those claims and instead ruled that Hughbanks did not satisfy the statutory criteria contained in O.R.C. § 2953.21(A). (R. 167-5, PageID 14430-31).[4]

The standard contained in 28 U.S.C. 2254(d) is only applicable if the state court addressed the merits of the claim. *Johnson v. Williams*, 133 S.Ct. 1088, 1097 (2013) ("The language of 28 U.S.C. § 2254(d) makes it clear that this provision

---

[4]

The state appellate court references Hughbanks having initiated three state post-conviction proceedings. In the second post-conviction proceedings Hughbanks unsuccessfully challenged his death sentences pursuant to Atkins v. Virginia, 536 U.S. 304 (2002). Hughbanks in this appeal does not rely on the state court Atkins litigation. Instead, he relies exclusively on the post-conviction proceedings in which he presented to the state courts the documents and information he received in federal discovery.

applies only when a federal claim was 'adjudicated *on the merits* in State court'")
(emphasis added); *See also, Clark v. Warden,* 934 F.3d 483, 497 (6th Cir. 2019).

Because the state courts did not address the merits of Hughbanks' *Brady* claim,
this Court should *not* review this claim through the deferential standards contained
in 28 U.S.C. 2254(d)(1) and (d)(2).

## II.      The *Brady* Analysis Involves a Three Part Test

Since the Supreme Court decided *Brady v. Maryland,* 373 U.S. 83(1963)
one of the cardinal rule[s] of criminal procedure" has been that the "[f]undamental
guarantees of due process require the government to provide defendants with
evidence in its possession that is exculpatory and material to the defense." *United
States v. Tavera,* 719 F.3d 705, 710 (6th Cir. 2013).

"[T]he suppression by the prosecution of evidence favorable to an accused
upon request violates due process where the evidence is material either to guilt or
to punishment, irrespective of the good faith or bad faith of the prosecution."
*Brady v. Maryland,* 373 U.S. at 87. A *Brady* claim has three elements: "[t]he
evidence at issue must be favorable to the accused, either because it is
exculpatory, or because it is impeaching; that evidence must have been suppressed
by the State, either willfully or inadvertently; and prejudice must have ensued."
*Banks v. Dretke*, 540 U.S. 668, 691 (2004). "So long as favorable evidence could
very well affect the jury's decision, prosecutors *must* disclose it. And when they fail

to do so, courts have a duty to order a retrial, allowing a jury to consider the previously concealed evidence." *United States v. Tavera,* 719 F.3d at 708.

Because of the quantity and quality of the suppressed evidence in this case, Hughbanks will divide the suppressed evidence into six categories. The prosecution suppressed evidence and information that: (a) identified other suspects including two individuals who confessed; (b) documented the actions of one of the victim's son's that were consistent with him having committed the murders; (c) contained favorable results of the testing of trace evidence; d) contained favorable eyewitness statements; (e) called into question the prosecution's theory of the case; and (f) impeached the prosecution's witnesses.[5]

### III. Hughbanks Satisfies the First Prong of the *Brady* Test: The Prosecution Suppressed All Six Categories of the Evidence

The prosecutor's interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States,* 295 U.S. 78, 88 (1035). With respect to pretrial disclosure, a rule declaring that a "'prosecutor may hide,

---

[5]

While Hughbanks, due to the large quantity of suppressed evidence, is dividing that evidence into six categories, the ultimate test focuses on the impact of all of the evidence and the resulting faith in the jury's verdict. Kyles v. Whitley, 514 U.S. at 436 (materiality of the suppressed evidence "should be considered collectively, not item by item") (footnote omitted).

defendant must seek' is not tenable in a system constitutionally bound to accord defendants' due process." *Banks v. v. Dretke*, 540 U.S. at 696.

"[A]n individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in this case, *including the police*." *Kyles v. Whitley*, 514 U.S. 419, 437 (1965) (emphasis added). The issue is not whether the prosecution acted in bad faith, but simply whether the prosecution provided the evidence in question to trial counsel. *Id.* at 437; *Harris v. LaFler,* 553 F.3d 1028, 1033 (6th Cir. 2009) ("*Brady* thus applies to relevant evidence in the hands of the police whether the prosecutors knew about it or not, whether they suppressed it intentionally or not"). "If evidence highly probative of innocence is in his [prosecutor's] file, he should be presumed to recognize its significance even if he overlooked it." *United States v. Agurs*, 427 U.S. 97, 110 (1976). When identifying the information that should be disclosed, the prosecution's "obligation is to work for justice rather than a result that favors its attorneys' preconceived idea of what the outcome of the legal proceedings should be." *Demjanjuk v. Petrovsky,* 10 F.3d 338, 350 (6th Cir. 1993).

A. **The prosecution's discovery responses at trial were misleading and incomplete.**

Prior to trial, counsel filed ten motions requesting that the court order the prosecution to provide various types of information to assist counsel in preparing for

trial. (Trial Court Motions for Discovery, R. 166-2, PageID 3930-31, 3932-34, 3994-95, 3996-01, 4002-06, 4007-08, 4012-19, 4020-21, 4048-49, 4147-49). Trial counsel, in three of the discovery motions, specifically requested that the prosecution disclose all exculpatory evidence. (*Id.* at PageID 3933, 4007-08, 4012-19). The prosecution filed nine responses to the requests for discovery. (*Id.* at PageID 3948-51, 3954-55, 4050, 4061-62, 4063-64, 4065-66, 4067-68, 4185-86). The trial court heard oral·argument, granted on all but one of the discovery motions. (Trial Transcript, Pretrial, R. 163-5, PageID 2345-46, 2348-49, 2352-54, 2356, 2357-58). The trial court ordered the prosecution to provide all exculpatory evidence. (*Id.* at PageID 2356-58).

The prosecutors three times responded to trial counsels' requests for exculpatory evidence. (R. 166-2, PageID 3948-51, 4063-64, 4065-66). The first response in its entirety provided:

EVIDENCE FAVORABLE TO DEFENDANT:

Previously provided were records showing prior diagnosis and treatment of defendant by mental health professionals.

No fingerprint or forensic evidence exists to link the defendant to the crime.

No eyewitnesses place the defendant at the crime scene on the night of the murders.

The defendant was questioned about the case when arrested in 1987 for a burglary near the scene of the murders and denied any involvement.

There were some merchants who contacted Master Card after the murders verifying the Master Card of the victim William Leeman. However the card was never actually used.

Numerous "suspects" were either questioned or had their Fingerprints checked over the ten year period from 1987 to 1997.

None of these "suspects" were ever linked to the homicide by either admission, fingerprints, forensic evidence or eye witnesses.

(State's Response to Defendant's Demand for Discovery, R. 166-2, PageID 3950).

This limited discovery response is significant because it demonstrates that the prosecution was aware of its disclosure obligations pursuant to *Brady v. Maryland.* The limited response also highlights the skewed view that the prosecution had of its disclosure obligations.

1. *The prosecution's Brady discovery responses were misleading*

Because the prosecution's disclosures were misleading at best, trial counsel would not have felt a need to follow up on the disclosures:

- While no forensic evidence linked Hughbanks to the crime, forensic evidence existed that *eliminated* him as a suspect. Hughbanks' fingerprints did not match the fingerprints recovered from the victims' residence. *See* Section IV (C), **pp. 52-53,** *infra.*

- While no eyewitnesses placed Hughbanks at the scene of the crime, several eyewitnesses gave physical descriptions of assailant(s) that did not match Hughbanks' physical description. *See* Section IV (D), **pp. 54-56,** *infra.*

- The prosecution's discovery response that "some merchants who contacted Master Card after the murders verifying the Master Card of the victim William Leeman" does not remotely suggest that Burt Leeman, one of the decedents' sons, was the individual

whom the police suspected attempted to contact Master Card. *See* Section IV (B), **pp. 47-48** *infra*.

- The prosecution's discovery response that numerous "suspects" were either questioned or had their fingerprints checked over the ten year period from 1987 to 1997, but were "not ever linked to the homicide by either admission, fingerprints, forensic evidence or eye witnesses", was incorrect. Some individuals purportedly confessed. That some suspects were eliminated by "fingerprints" was not significant because Hughbanks was also eliminated by "fingerprints." *See* Section IV (A), p**p. 44-45**, *infra*.

2.   *The prosecution's Brady discovery responses were incomplete*

Equally telling are the items the prosecution did *not* include on its list "of evidence favorable to defendant:"

- The evidence, including the FBI report, that contradicted the prosecution's theory of the case. **See** Section IV (E)**, pp. 57-60** *infra*.

- The evidence that impeached the testimony of prosecution's own witnesses. *See* Section IV (F), **pp. 64-69** *infra*.

**B.     The Hamilton County Prosecutor's Office has never contended it disclosed the evidence in question to trial counsel.**

The District Court ordered that the habeas proceedings be held in abeyance to permit Hughbanks to return to state court to exhaust his *Brady* claim. (Decision and Order Granting Petitioner's Motion to Stay Proceedings Pending Exhaustion, R. 106, p. 3). The Hamilton County Prosecutor's Office ("Office") represented the State in those post-conviction proceedings; the same Office that Hughbanks asserts suppressed the information. That Office would be aware if the information in

question was disclosed to trial counsel. Nevertheless, in its Motion to Dismiss Hughbanks' post-conviction petition, the Hamilton County Prosecutor's Office did not assert that it had provided the information in question to trial counsel. (Motion to Dismiss Post-Conviction Petition, R. 167-3, PageID 12551-60). Instead, the Office submitted proposed findings of fact and conclusions of law to the trial court. (State's Proposed Findings of Fact, Conclusions of Law, R. 167-3, PageID 12567-79) that did not state that the suppressed information had been disclosed. (*Id.* at PageID 12570-76).

### C. Conclusion first prong, the Prosecutor's Office suppressed the evidence.

It was reasonable for trial counsel to rely on the prosecution's responses concerning the existence of favorable evidence. *Banks v. Dretke*, 540 U.S at 694 ("it was also appropriate for Banks to assume that his prosecutors would not stoop to improper litigation conduct to advance prospects for gaining a conviction").

That the prosecution identified some exculpatory information, *albeit* those responses were incomplete and misleading, does not preclude a finding that the prosecution violated its disclosure obligations. *Id.* at 695 ("Our decisions lend no support that defendants must scavenge for hits of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed); *Barton v. Warden,* 786 F.3d at 468 ("It is difficult for us to understand how Barton would have

been able to (or should have been expected to) connect the dots" based on the limited information provided in discovery").

## IV. Hughbanks Satisfies The Second Prong Of The *Brady* Test: All Six Categories Of the Suppressed Evidence Are Favorable.

The second *Brady* prong, favorability, is straightforward. Evidence is favorable to the accused either because it is exculpatory or because it impeaches the prosecution's case. *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999). Evidence is favorable evidence if it: (a) establishes a defense. *Cone v. Bell*, 556 U.S. 449, 451 (2009) (suppressed evidence supported defendant's insanity defense and bolstered his mitigation case); (b) impeaches the prosecution's case *Banks v. Dretke*, 540 U.S. at 669-700 (suppressed evidence impeached witness's penalty phase testimony); or (c) supports either a verdict of not guilty, or the imposition of a lesser sentence *Brady v. Maryland*, 373 U.S. at 87 (prosecution must disclose favorable evidence that is material to guilt or punishment).

Suppressed evidence is favorable if a reasonable probability exits that it would have changed the defense strategy, had the defense known about it. *D'Ambrosio v. Bagley*, 527 F. 3d 489, 498 (6th Cir. 2008). The defense is entitled to plan its strategy on the basis of full and accurate disclosure from the government. *See United States v. Howell*, 231 F.3d 615, 623-25 (9th Cir. 2000). Suppressed evidence is favorable if it would have provided the defense with an opportunity to challenge the

thoroughness and good faith of the police investigation. *Kyles v. Whitley*, 514 U.S. at 445. In *Kyles,* the suppressed evidence would have opened the door to a strategy the defense never would have imagined absent the suppressed evidence, calling as their own witness the informant against their client. *Id.* The suppressed evidence was favorable because it would have given the defense the opportunity to choose a more effective trial strategy.

## A. The prosecution suppressed favorable evidence concerning the existence of other suspects

The prosecution suppressed evidence which pointed to individuals, other than Burt Leeman, as serious suspects. The prosecution should have disclosed the identity of the other suspects. *D'Ambrosio v. Bagley,* 527 F. 3d at 499 (prosecution must disclose the existence of "legitimate suspects"); *Gumm v. Mitchell,* 775 F.3d at 364 ("'Withholding knowledge of a second suspect conflicts with the Supreme Court's directive'") (citations omitted): *Bies v. Shelton,* 775 F.3d at 400 ("On its face, the nondisclosure of the identities of other suspects – two of whom were reported to have confessed to the murder – was an egregious breach of the State's *Brady* obligations").

The prosecution in its pretrial *Brady* response did not identify the existence of other suspects but instead stated that:

> Numerous "suspects" were either questioned or had their Fingerprints checked over the ten year period from 1987 to 1997.

44

None of these "suspects" were ever linked to the homicide by either admission, fingerprints, forensic evidence or eye witnesses.

(State's Response to Defendant's Demand for Discovery, R. 166-2, PageID 3950).

Thomas Edward Buster informed Detective Kemper that Douglas Hayes had confessed to committing the murders. (Polygraph Results, R. 167-5, PageID 14070-01). Royce Winters of the Cincinnati Police Department administered a polygraph examination to Mr. Buster, after which Officer Winters concluded that "Thomas Buster was **truthful** in his answers. (*Id.* at PageID 14071) (emphasis in original). The investigators requested and received from Ross Correctional Facility a psychological profile of Hayes. (Kemper Letter, R. 167-5, PageID 14034-35).[6] Hayes was later a suspect in a murder at the Whitewater Park. (Hayes 7-08-92 Interview, R. 167-5, PageID 14047-50).

Jenny Birch told the investigating officers that Stacy Grisby confessed to breaking into the Leeman's residence. (Interview of Jenny Burch, R. 167-5, PageID 14141)

Lori (no last name) informed the investigating officers that George Wambsganz was involved in an altercation with a man and a woman which resulted

---

[6]

The documents received in federal discovery did not contain the profile of Hayes.

in him being covered with blood. (Interview conducted by Bill Schaeffer, R. 167-5, PageID 14058-60).

Michael Hensley provided the police with a number of conflicting statements. When Detective Kemper initially approached Hensley, he was in the company of Nick Seiber. (Pat Kemper Letter/Memo, R. 167-5, PageID 14020). Seiber was present when Kemper discovered the body of Mrs. Leeman. (*Id.*). The investigating officers originally focused on Hensley because he was treated at Provident Hospital for cuts or stab wounds in the early morning hours after the murders. (Investigative Report, R. 167-5, PageID 14128). Hensley told the investigating officer that he had put his arm through a window. (Pat Kemper Letter/Memo, R. 167-5, PageID 14020). Hensley told the hospital receptionist that he cut his hand on a piece of glass in the woods. (*Id.*). Hensley told the doctor that he cut himself with a knife (*Id.*). Hensley's girlfriend originally provided an alibi for him, but she later withdrew the alibi. (Investigative Report, R. 167-5, PageID 14128). When the police attempted to re-interview Hensley, he fled to Florida. (*Id.*).

In the State of Ohio, law enforcement officers cannot photograph or fingerprint a juvenile without an order from the juvenile court. O.R.C. § 2151.31.3. A court cannot issue such an order without a finding of probable cause that the child was involved in the offense for which he was investigated. *Id.* The Hamilton County Juvenile Court found probable cause that Chris Raisor, Chris Collins, Tony Elofsake,

Nicholas Steiber, and Leslie Kennedy "may have been involved with a Delinquent Act, being investigated at 2228 Adams Road [the Leeman residence]." (Juvenile Court Orders, R. 167-5, PageID 14042-46). The records provided in the federal discovery do not identify the evidence that the police department presented to the juvenile court or the factual basis for the juvenile judge's determination of probable cause.

Trial counsel could have used the information to present the theory that another individual committed the murders. This would have been effective given the issues with Hughbanks' statement. *See* Statement of Facts, IV. **pp.** 8-11, *supra*. Trial counsel could have also used this suppressed information to impeach the testimony of investigating officers concerning the quality of their investigation. The confessions of Douglas Hayes and Stacy Grisby would have been admissible at trial either through their own testimony or the testimony of individuals who heard their confessions. *Gumm, v. Mitchell,* 775 F.3d at 369.

### B. The prosecution suppressed favorable evidence concerning Burt Leeman.

The prosecution's disclosure obligation includes information that a specific individual who testified for the prosecution committed the offenses for which the defendant was standing trial. *Kyles v. Whitley,* 514 U.S. at 447-48 (suppression of informant's statements precluded the defense from attacking the quality of the

investigation and that the informant himself committed the murder); *Castleberry v. Brigano*, 349 F.3d 286, 293 (6th Cir. 2003) ("By withholding the evidence [concerning prosecution's witness Kenneth Thomas], the government was able to prevent the jury from learning that Thomas, because he was an obvious potential suspect himself, had a motive to point to Castleberry as the assailant").

The prosecution in its pretrial *Brady* disclosure provided the following information, "(t)here were some merchants who contacted Master Card after the murders verifying the Master Card of the victim William Leeman. However the card was never actually used." (State's Response to Defendant's Demand for Discovery, R. 166-2, PageID 3950).

Burt ("Burt") Leeman was one of the decedents' three sons. He was discharged from the armed services because of a mental health issues and was still receiving counseling at the time of the murders. (Report Concerning Burt Leeman, R. 167-5, PageID 14064). Each of the decedents' sons received two-hundred thousand dollars upon the death of their parents. (*Id.*). Burt tried to expedite the settlement. (*Id.*).

When Burt arrived at the crime scene on the night of the murders, he was very calm and concerned only with obtaining a box from his father's desk. (*Id.* at PageID 14061). Burt volunteered that "My dad told me to get this if anything happened to both of them, but he was talking about an airplane crash." (*Id.*).

48

Burt arranged for the investigators to simultaneously interview all three of the victims' sons "so one of them didn't say something that would make them look guilty." (*Id.* at PageID 14062). Burt took a polygraph examination, but prior to its administration stated that "he would probably flunk this one." (*Id.* at PageID 14062). Burt told a lifelong friend that he was not worried because he could beat polygraphs and had previously beaten them. (Interview of Larry Day, R. 167-5, PageID 14022). Bill Lewis, who administered the polygraph examination to Burt, reported that his "pre-test and the test were like running two different people." (Report Concerning Burt Leeman, R. 167-5, PageID 14063). The wives of the three sons of the victims initially agreed to take a polygraph, but Burt later cancelled their polygraphs. (Credit Card History, R. 167-5, PageID 14007).

The only item missing from the decedents' residence was Mr. Leeman's wallet which contained his credit cards. (Investigative Report, R. 167-5. PageID 14129). One week after the decedents' deaths, activity appeared on Mr. Leeman's Master Card. (Credit Card History, R. 167-5, PageID 14005-07). A female posing as a merchant called Master Card requesting approval for a phantom customer to make charges on the decedent's credit card. (*Id.* at PageID 14005-06). Between May 20, 1987 and August 24, 1987, that female made eight telephone calls to Master Card. (*Id.* at PageID 14005). The female who made the telephone calls had the authorization numbers for the stores from which she claimed to be calling and the

telephone number for the Master Card authorization center. (*Id.* at PageID 14006). These numbers are not available to the public. (FBI VICAP Report, 167-5, PageID 14138). Burt's wife worked for Discover Card. (Report Concerning Burt Leeman, R. 167-5, PageID 14063). At one point Burt contacted the investigating officers to ascertain if the telephone calls to the Master Card Center could be traced. (Credit Card History, R. 167-5, PageID p. 14006). The telephone calls to Master Card stopped after the investigating officers informed the Leeman brothers that they were suspects involving the credit card calls. (Report Concerning Burt Leeman, R. 167-5, PageID 14063). After the officers accused the brothers of misusing their father's credit cards, the officers asked Burt to submit to a second polygraph. He agreed on the stipulation that his attorney be present and the operator not ask him any questions concerning the murders. (Credit Card History, R. 167-5, PageID 14007).

The investigating officers treated Burt as a suspect. One of the officers prepared a single spaced four page memorandum listing thirty-one points supporting the conclusion that Burt participated in the murders. (Report Concerning Burt Leeman, R. 167-5, PageID 14061-64). The prosecution failed to provide defense counsel with all of this information concerning Burt Leeman.

The value of this suppressed information concerning Burt Leeman increases dramatically when considered in conjunction with the suppressed FBI report. The FBI therein concluded the large number of stab wounds both victims suffered were

consistent with the attacks having a personal nature. (FBI VICAP Report, R. 167-5, PageID 14135). The suppress report also suggests that because both of the decedents were savagely beaten, the assailant had significant issues with each of the victims. (*Id.* at PageID 14137). In a double homicide, normally only one of the victims will be badly beaten. (*Id.*). The savage beatings were inconsistent with "a burglar surprised in the house, trying to get out." (Report Concerning Burt Leeman, R. 167-5, PageID 14061). Yet, aware of this information and having withheld it from the defense, the prosecutor argued to the jury "what made it difficult to solve, in this case, as you'll find out, this particular killer had no connection with this home. Never been there before. He had no connection with the Leemans. He never met them before." (Trial Transcript, R. 163-13, Trial Phase, PageID 3155).

The suppressed FBI report also provides that the assailant most likely knew the victims, "the crime was of a personal nature. The perpetrator may have had a significant amount of anger toward the victims." (FBI VICAP Report, R, 167-5, PageID 14137). When Officer Kemper responded to the scene and asked Ms. Leeman who committed the attacks, she "looked at him and tried to mouth an answer, as if she was telling him who did it." ( Report Concerning Burt Leeman , R. 167-5, PageID 14061). If Hughbanks had "no connection with the Leemans", as the prosecution argued to the jury, then the murders would not have been of a

personalized nature and Ms. Leeman would not have attempted to identify the victims in her dying statement.

If the prosecution timely provided these findings made by skilled law enforcement investigators, trial counsel could have used the information to create a compelling narrative that Burt Leeman committed the murders. According to the FBI report, the killer had issues with both victims and was likely known by them. Burt's actions beginning the night of the murders and continuing for months thereafter were consistent with him having killed the victims.[7] Defense counsel could have called the FBI investigators to testify, or at the very least, could have used the information to cross examine the State law enforcement officers concerning the quality of the investigation and deflect blame for the murders from Hughbanks to Burt.

### C.    The prosecution suppressed favorable trace evidence test results.

The prosecution's duty of disclosure extends to the favorable results from

---

[7]

At one point, the police prepared a composite drawing from a description provided by a psychic. (Composite, R. 167-5, Page ID 14065-66), It was released to the public. (*Id.*). Jill Kelly of Channel 12 conducted an interview of one of the Leeman's sons. The police received a report that the composite matched the physical appearance of one of the decedents' sons. (Correspondence to Dave Heimpold R. 167-5, Page ID 14074). The person providing this information did not identify which of the three sons. (*Id*).

forensic testing. *Apanovitch v. Houk,* 460, 480-82 (6th Cir. 2006). The prosecution in its pretrial *Brady* disclosure provided the following information:

> No fingerprint or forensic evidence exists to link the defendant to the crime.
>
> \* \* \* \* \*
>
> The defendant was questioned about the case when arrested in 1987 for a burglary near the scene of the murders and denied any involvement.

(State's Response to the Defendant's Demand for Discovery, R. 166-2, PageID 3950).

The investigating officers found both palm and fingerprints in the area of the window where the prosecution contended that assailant gained admission to the residence. (R. 167-5, PageID Crime Scene Investigation, PageID 13998; Departmental Correspondence R. 167-5, 14081; FBI VICAP Report, R.167-5, PageID 14136). The investigating officers used these prints to eliminate a number of suspects as the murderers. (Investigative Report, R. 167-5, PageID 14129, LEAD Card, R. 167-5, PageID 14015,).[8] The officers eliminated Hughbanks as a suspect because his prints did not match the prints found at the scene. (Kemper Dep. R. 167-2, PageID 11961).

---

[8]

The investigating officers also found hair on the body of one of the decedents. (Evidence Submission Sheet, 167-5, Page ID 14089). There is no record of the hair that the officers tested the hair.

Trial counsel could have used the suppressed fingerprint results to raise doubt in the prosecution's case; the investigating officers eliminated Hughbanks as a suspect just as they had eliminated every other individual whose prints did not match the prints found at the scene. The information also impeached the quality of the investigation. The State ultimately charged an individual whom the police officers, based on forensic testing, had previously-determined did not commit the murder.

**D. The prosecution suppressed favorable eyewitness statements**

The prosecutor's duty to disclose favorable evidence encompasses eye witness statements. *Castleberry v. Brigano*, 349 F.3d 294 ("A jury should consider the importance of the withheld testimony of three of the victim's neighbors who – collectively observed two *thin* men go in or near the building where the victim was shot"); *See also Boss v. Pierce*, 263 F. 3d 734, 741 (7th Cir. 2001).

Here, the prosecution in pretrial discovery disclosure stated, "No eyewitnesses place the defendant at the crime scene on the night of the murders." (State's Response to the Defendant's Demand for Discovery, R. 166-2, PageID 3950). While that is correct, eyewitness did place individuals at the crime scene on the night of the murders whose physical descriptions did not match Hughbanks' physical description.

Hughbanks is Caucasian male, 5'8" inches in height and was twenty-one years of age at the time of the murders. (Description Sheet, 167-5, PageID 14028-29). The

prosecutors suppressed reports that several neighbors saw several individuals not matching this physical description in the immediate area of the Leeman residence during the time frame in which the murders occurred.

The prosecution's theory included Hughbanks exiting the rear door of the residence, fleeing into the woods at the rear of the residence, and exiting the woods at Greener Elementary School. (Trial Transcript, R. 163-14, Trial Phase, Trial Phase, PageID 3185, 3229). The police officers gave a bloodhound a towel found in the sink of the master bedroom. (*Id.* at PageID 3228-29). The dog followed the scent from the towel, proceeded out the back door of the residence and followed the creek to Greener School. (*Id.*). Chris Raison saw an African-American male who covered with blood running from the school around the time of the homicides. (R. 167-5, PageID 14040). The police made a composite sketch from the information provided by Raison.

Jack Finn saw an African-American male enter the woods behind the Leeman's residence. (LEAD Sheet, R. 167-5, PageID 14014). Karen and Jerry Weddington saw a teenager carrying a foot-long knife in the woods approximately one hour prior to the murders. (Handwritten Note, R. 167-5, *Id.* at PageID 14056). They described the knife as a "machete." (Springfield Township Police Department Report, R. 167-5, PageID 14000). Sue and Shirley Harry saw a teenager flee the woods after dark on the night of the murder. (LEAD Sheet, R. 167-7, PageID 14013).

Between 9:00 and 9:15 Lee Suman witnessed a young Caucasian male who was six feet six to six feet seven walk between his and the Leeman's residences. (Handwritten Note, R. 167-5, PageID 14055).

Four individuals reported seeing a car parked in the immediate vicinity of the Leeman residence at the time of the murders. (LEAD SHEETS, R. 167-5, PageID 13996, 14008, 14009, 14018). Three individuals saw a motor cycle enter or leave the Leeman residence at about the time of the murders. (LEAD SHEETS, R. 167-5, PageID 14010-11, 14012).

The investigating officers prepared at least two composite drawings of the assailant. The first composite described the assailant as being sixteen to eighteen years of age, which was younger than Hughbanks. (Composite Drawing R. 167-5, PageID 14142). Three years after the homicides, the law enforcement officers created another composite based upon information provided by Connie Huser. (Composite Questionnaire, R. 167-5, PageID 14075-76). She described the assailant as forty to forty-five years of age, 6'2" tall and weighing one hundred ninety pounds. (*Id*). Again, this physical description did not match Hughbanks' physical description.

As with much of the other suppressed information, trial counsel could have used it to cross examine Detective Kemper. Because the suppressed reports contained the names of the witnesses, trial counsel could have called the witnesses

in the defense case-in-chief to testify as to the information contained in their eyewitness reports.

### E. The prosecution suppressed favorable evidence which included the FBI report and other reports that impeached its theory of the case.

The prosecution's duty of disclosure includes evidence that rebuts or contradicts its theory of the case. *Jells v. Mitchell,* 538 F.3d 478 (6th Cir. 2008) ("the withheld evidence that weakens the strength of the State's kidnapping case is material for the purpose of *Brady*"); *D'Ambrosio v. Bagley,* 527 F. 3d at 499 ("the district court was correct that the first category of evidence would have further challenged the prosecution's version of the events"); *Gumm v. Mitchell,* 775 F.3d at 367 (the suppressed evidence "potentially undermines the state's narrative of the crime and contradicts details provided in Petitioner's statement to the police").

The prosecution's theory involved an assailant(s) who: (a) did not know the decedents, (b) entered their residence to burglarize it, and (c) killed them when they surprised him during the burglary. The prosecutors possessed evidence that contradicted all three elements of their theory.

### 1. *The assailant(s) knew the victims.*

During opening statement, the prosecution told the jury that "what made it difficult to solve, in this case, as you'll find out, this particular killer had no connection with this [Leeman's] home. Never been there before. He had no

connection with the Leemans. He never met them before. And that made this an exceptionally difficult case to solve." (Trial Transcript, R. 163-13, Trial Phase, PageID 3155). The prosecutor again emphasized this point in closing argument. (*Id.* at PageID 3352). The prosecution made this argument even though that it possessed evidence that impeached or contradicted its argument.

The FBI produced a report that concluded that the murders were not the product of a burglary, but instead the "victims were targeted for the homicide." (FBI VICAP Report, R. 167-5, PageID 14135). The agents based this conclusion on the fact that there was no evidence of sexual assault or robbery and the homicides constituted overkill, "each victim received approximately 24 stab/incised wounds and each had their throat cut, which we interpret as a personalized attack." (*Id.*). The report surmised that "[t]he perpetrator may have held a significant amount of anger toward the victims." [*Id.* at PageID 14137). Finally, the FBI concluded that "[t]he offender wants others to believe he has gone through the drawers looking for something to steal. This is a technique used to draw attention away from himself and his motive." (*Id.*). The Bureau similarly concluded that the severity of the wounds that both victims suffered "indicate a crime motivated by passion or feeling more than a burglar surprised in the house, trying to get out." (Report Concerning Burt Leeman, R. 167-5, PageID 14061).

When Detective Kemper found Mrs. Leeman's body she was still alive. (Trial Transcript, R. 163-13, Trial Phase, PageID 3194). He asked her "Who did this to you?" (*Id.*). Mrs. Leeman "looked at him, and tried to mouth an answer, as if telling him who did it." (Report Concerning Burt Leeman, R. 167-5, PageID 14061). One of the investigating officers concluded that the victim's throats were cut "to make sure they were dead so no I.D. could be made." (*Id.*). Because Hughbanks did not know the victims and had not previously been in their house; he would not have been concerned with the victims identifying him. (Hughbanks' Custodial Statement, R. 193-1, PageID 15473-74).

If the FBI report had been disclosed, trial counsel should have moved for its admission or at least used it during cross examination. Police reports are admissible in the State of Ohio if offered by the defense. Ohio Evid. R. 803(8) ("public records and reports" consisting of "matters observed by police officers and other law enforcement personnel" are not admissible "in criminal case matters" unless offered by the defendant").

This Court previously ruled that reports that support a defendant's theory of the case can constitute *Brady* material. *Denjanjuk v. Petrovsky,* 10 F.3d at 350 ("The Fedorenko Protocols should have been disclosed. They consisted of information provided by a foreign government that supplied some support for Denjanjuk's basic claim from the beginning - that he was a victim of misinformation"). Similarly this

Court ruled that the opinion of a law enforcement official may constitute *Brady* evidence. *D'Ambrosio v. Bagley,* 527 U.S. at 499 ("the warden's argument that the opinion of a police detective can never be *Brady* evidence if the detective put that opinion in writing may also prove too much").

The FBI report, if disclosed, would have opened new areas of cross examination for trial counsel. For instance, Ms. Lehman's slashed throat takes on a different perspective if the prosecution provided trial counsel with the FBI's conclusion that the assailant likely knew the victims. In addition, trial counsel could have used the suppressed FBI report to question the quality of the investigation. The FBI report contradicted almost every portion of the State's theory. *Kyles v. Whitley,* 514 U.S. at 446 ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation") (citation omitted).

2. **The assailant(s) did not enter the residence to commit a theft offense.**

The prosecution told the jury in opening statement that the assailant had entered the victims' residence for purposes of burglarizing (stealing) items from the residence. "And in burglarizing a home in a nice suburban neighborhood, there is a reasonable likelihood of obtaining something worth stealing, something worth breaking into a home for." (Trial Transcript, R. 163-13, Trial Phase, PageID 3147-

48). "You're going to see that from a burglar's point of view the home, though this home is on Adams Road, it's kind of isolated." (*Id.* at PageID 3148-49). "You'll see in these photos dresser drawers pulled open as though the intruder had been looking for valuables in the room." (*Id.* at PageID 3149-50). "Why did he [Hughbanks] do it? And, again it's obvious from the ransacked drawers in the bedroom, and from his own statement, he was there to steal something, to take something of someone else without permission." (*Id.* at PageID 3353). The prosecution concluded its opening statement by telling the jury that "you're not going to have any reasonable doubt that this person here in the courtroom with us today is the person who broke into the home of William and Juanita Leeman, that in the process of the burglary, purposely took their lives." (*Id.* at PageID 3163-64). In closing argument, the prosecution again returned to this refrain, "Why did he do it? It's charged that his purpose was to commit a theft offense. And, again it's obvious from the ransacked drawers in the bedroom . . ." (*Id.* at PageID 335).

The Springfield Township Police Officers prepared an application for assistance from the FBI. (FBI VICAP Application, R. 167-5, PageID 14090-134). In that application, the officers stated that the crime scene was *not* ransacked or vandalized. (*Id.* at PageID 14102). In the concluding section of the application the Officers stated that "no motive" had been established. (*Id.* at PageID 14108). One of

the authors of the applications was Detective Kemper. (*Id.* at PageID 14094). Trial counsel could have used this application to cross examine Detective Kemper.

In the suppressed FBI report, the Bureau determined that, "the drawers had been pulled out neatly without the appearance of ransacking. In other cases where dresser drawers are left in this fashion, staging by the perpetrator has been suspected. The offender wants others to believe he had gone through the drawers looking for something to steal. This is a technique used to draw attention away from himself and his motive." (VICAP Report, R. 167-5, PageID 14137).

Again, the suppressed FBI report may have been admissible and if not admissible would have at least provided a basis for cross examining the officers concerning the reliability of their investigation

### 3. The assailant(s) had not entered in the residence when the Leemans returned.

The prosecution told the jury in opening statement, "[a]s they [the Leemans] pulled into their drive that night and returned home, there was a killer inside their home. There was an armed intruder, a man who had broken in, who brought a weapon with him, and whose intention it was to take whatever they had at whatever the cost." (Trial Transcript, R. 163-13, Trial Phase, PageID 3147). The prosecution continued "[a]nd that night of May 13th, as the Leemans pulled into the driveway; this is the armed killer who's inside their home. They don't know it yet as they got

out of their car, but their fate is waiting them. And quite honestly, they're doomed the moment they get out of the car and enter the house. The evidence is going to show that not long after entering the home, Mr. Leeman encounters this killer, this armed intruder in the area of the master bedroom." (*Id.* at PageID 3149).

The prosecution possessed information that debunked this portion of its opening statement. The victims came home at separate times that evening. (Investigative Report, R. 167-5, PageID 14130). After returning home, the victims worked in the front yard until approximately 9:30 p.m. (FBI VICAP Report, R. 167-05, PageID 14136). After completing the yard work, the victims entered their residence, and Mrs. Leeman change into her night gown. (Crime Scene Investigation, R. 167-05, PageID 13998). The interior lights were on throughout the house. (Kemper Dep., R. 167-2, PageID 11947). The victims turned on their television and the volume "was fairly loud." (*Id.* at PageID 11925). Two reclining chairs were near the television and one of the chairs was in the reclining position "indicating that someone had jumped out the chair from a reclined position without first returning the chair to an upright position." (Crime Scene Investigation, R. 167-5, PageID 13998).

Had trial counsel known of this information, they could have called the authors of the report to testify that the prosecution's theory was not supported by the physical evidence. *Kyles v. Whitley,* 514 U.S. at 445-46 (Trial counsel could have

called witnesses in the defense case in chief to elicit the information contained in the suppressed reports that contradicted the state's theory or adopted the "more conservative course "of not calling the witness and used it on cross examination during the state's case-in-chief).

## F. The prosecution suppressed favorable evidence that impeached its witnesses

The prosecution's duty of disclosure encompasses evidence that impeaches its witnesses. *United States v. Bagley,* 473 U.S. 667, 676 (1985) ("The jury's estimate of truthfulness and reliability of a given witness may well be determinative of guilt or innocence"). Impeachment evidence includes the prior inconsistent statements of prosecution witnesses. *Kyles v. Whitley,* 514 U.S. at 444 ("the evolution over time of a given eyewitness's description can be fatal to its reliability"); *Jamison v. Collins,* 291 F.3d at 389 ("The suppression of a positive identification of different suspects by an eyewitness to the crime certainly disadvantaged Jamison in conducting his defense").

The prosecution must provide trial counsel with information that impeaches the substance of its witnesses' testimony. *Weary v. Cain,* 136 S. Ct. 1002, 1005 (2016) (prosecution suppressed medical records that impeached the testimony of its witness); *Barton v. Warden,* 786 F.3d at 466 (prosecution suppressed statement of

another individual and police report that contradicted its witness's testimony that the defendant had previously committed staged burglaries),

        1.    *Suppressed information that impeached the testimony of Leonard Leeman.*

Leonard Leeman, one of the victim's sons, was the prosecution's first witness. (Trial Transcript, Trial Phase, R. 163-13, PageID 3171-72. He testified at some length concerning his mother's jewelry. (*Id.* at PageID 3176). This left the impression with the jury that the assailant stole the jewelry. If the assailant had not stolen the jewelry, the testimony would not have been relevant. The prosecutors possessed reports that the only item taken from the residence was the wallet of Mr. Leeman. (Investigative Report, R. 167-5, PageID 14129).

Leonard Leeman testified that Hughbanks told the Arizona Detectives police that the victim's kitchen contained white Formica counter tops. (Trial Transcript, R. 163-15, Trial Phase PageID 3179). While Hughbanks initially told the Detectives that the counter tops were white, at the suggestion of the officers, he subsequently stated that the countertops were yellow. (Hughbanks' Custodial Statement, R. 193-1, PageID 15615). Leeman testified that Hughbanks remembered seeing military photographs on the wall of the decedents' residence. (Trial Transcript, R. 163-13, Trial Phase, PageID 3180). Hughbanks, however, was only responding to the Detectives' leading question, "[a]nd you think some of them were people in

uniform?" (Hughbanks' Custodial Statement, R. 193-1, PageID 15615). Finally, Leeman appeared to imply that Hughbanks properly identified the unusual lighting contained in the closet of the master bedroom. The light had a pressure switch that activated when the closet door was opened or closed. (Trial Transcript, R. 163-13, Trial Phase, PageID 3181). Hughbanks incorrectly described the light in the closet as having a pull string. (Hughbanks' Custodial Statement, R. 193-1, PageID 15612).

The prosecutors never corrected the testimony of Leonard Leeman, nor did they provide counsel with the documents necessary to cross examine him. Leonard Leeman was a critical witness; he buttressed the purported confession of Hughbanks which was the "heart of the prosecution's case." Because the prosecution suppressed favorable material evidence, trial counsel, on cross examination of Leeman did not develop the fact that none of the mother's jewelry was missing or the inconsistencies between the actual description of the residence and Hughbanks description.

2. *Suppressed information that impeached the testimony of Detective Kemper.*

Detective Kemper was the first officer on the scene. (Trial Transcript, Trial Phase, R. 163-13, PageID 3194). He became the lead officer on the case. (*Id.* at PageID 3235-36). He provided extensive testimony at trial. (*Id.* at PageID 3190-3243). The prosecution suppressed reports that impeached his testimony.

Detective Kemper testified that the criminalists were not able to recover any trace evidence from the residence for purposes of identifying the assailant(s). (*Id.* at PageID 3228). This was wrong. Officer William Hillard, a criminalist with the Cincinnati Police Department, was one of the two officers who processed the crime scene. (Hillard Dep. R. 167-2, PageID 11637, 11648). He recovered prints from the crime scene. (*Id.* at PageID 11651-52, 11678, 11715). Early in the investigation the officers submitted the prints of Hughbanks. (Kemper Dep. R. 167-2, PageID 11961; Chart of Finger and palm Prints Submitted, R. 167-5, PageID 14026). His fingerprints did not match the prints found at the crime scene. (Kemper Dep. R. 167-2, PageID 11961).

Detective Kemper testified at length that Hughbanks' description of the crime scene matched the interior of the residence. (Trial Transcript, Trial Phase, R. 163-13, PageID 3241). The Detective's testimony was again wrong. Detective Kemper testified that Hughbanks accurately described the "general layout of the house." (*Id.* at PageID 3242). The victims' residence was a single story house. (State's Trial Exhibits 9 to 11, R. 166-32, PageID 11108-10). Hughbanks told the Tucson Detectives that the residence contained two stories and the upstairs carpet was beige. (Hughbanks' Custodial Statement, R. 193-1, Page 15598). The murders were committed in the master bedroom which is located on the front of the house. (State's Trial Exhibit 1, R. 166-32, PageID 11099-11100; Crime Scene Investigation, R. 167-

5, PageID 13998). Hughbanks incorrectly repeatedly told the Detectives that the murders occurred in the rear bedroom of the residence. (Hughbanks' Custodial Statement, R. 193-1, PageID 15540, 15546, 15555, 15602). Detective Kemper testified that Hughbanks accurately described the light in the closet. Trial Transcript, Trial Phase, R. 163-13, PageID 3242). Hughbanks, however, inaccurately stated that the light was activated by pulling a string, as opposed to a being activated by the opening and closing of the closet door. (Hughbanks' Cutodial Statement, R. 193-1, PageID 16612).

Detective Kemper testified that Hughbanks accurately described the victims' wounds. (Trial Transcript, R. 163-13, Trial Phase, PageID 3242). Hughbanks initially told the officers that he used screwdriver to kill the victims. (Hughbanks' Custodial Statement, R. 193-1, PageID 15546, 15553, 15556, 15558). This was incorrect. The victims were killed with a knife. (Trial Transcript, Trial Phase, R. 163-14, Page 3328-29). Mr. Leeman was stabbed seventeen times. (*Id.* at PageID 3310). Hughbanks initially told the Tucson Detectives that Mr. Leeman was stabbed only a few times. (Hughbanks' Custodial Statement R. 193-1, PageID 15500). Hughbanks similarly initially provided incorrect information to the Detectives concerning the wounds that Mrs. Leeman sustained. (*Id.* at PageID 15502-03).

The prosecution did not correct the inaccurate trial testimony of Detective Kemper. Neither did the prosecution provide defense counsel with the reports and

statements which documented the inconsistencies in the witness' testimony. The prosecution's failure to provide this impeachment information was prejudicial. First, because the prosecution suppressed the information concerning the fingerprints, trial counsel could not cross examine Kemper that the police previously eliminated Hughbanks as a suspect because his fingerprints did not match the fingerprints found at the residence. Second, because the prosecution suppressed the application for the FBI report and the report itself, trial counsel could not establishe during cross examination of Kemper that the FBI's conclusions contradicted the prosecution's theory that Hughbanks committed the murders during the course of a burglary. *See* Section IV (E), **pp.**, *supra.*

In addition, trial counsel did not cross examine Kemper concerning his testimony that Hughbanks custodial statement was consistent with the interior of the victims' residence when in fact his custodial statement was often inconsistent until the Arizona Detectives gave him the "correct" information.

**V.  Hughbanks Satisfies The Third Prong Of The *Brady* Test: The Six Categories Of The Suppressed Favorable Evidence When Considered Cumulatively Are Material.**

The test for materiality involving a *Brady* claim was originally set forth in *United States v. Bagley* 473 U.S. at 678:

> "The adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood

as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the verdict."

*See also, Kyles v. Whitley,* 514 U.S. at 434 (quoting *Bagley*); *Strickler v. Greene,* 527 U.S. at 289 (quoting *Bagley*).

When assessing materiality, four aspects are important: (a) the defendant need not demonstrate that the suppressed evidence would lead to his acquittal, (b) it is not a sufficiency of the evidence test, (c) harmless error analysis is not to be conducted, (d) the test focuses on the cumulative impact of the evidence and not item by item. *Kyles v. Whitley,* 51 U.S. 434-36. The suppressed evidence does not need to undercut every aspect of the prosecution's case to be material. *Id.* at 451 (it is not necessary that "every item of the State's case would have been undercut if the *Brady* evidence had been disclosed"). In assessing the materiality prong, a court must examine the entire record. *United States v. Agurs*, 427 U.S. at 112 ("the omission must be evaluated in the context of the entire record") (footnote omitted).

### A. The prosecution's case was totally dependent on Hughbanks' custodial statement.

The strength of the prosecution's case will impact the materiality determination. *Id.* at 113 ("if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt"); *United States v. Tavera,* 719 F.3d at 713 ("The government's

proof of Tavera's intent to join the conspiracy and distribute the drugs was not overwhelming"). Suppressed evidence is more likely to be found material if the prosecution's case is dependent on the testimony of one witnesses. *Wearry v. Cain,* 136 S. Ct. 1002, 1006 (2016) ("The State's trial evidence resembles a house of cards, built on the jury crediting Scott's account rather than Wearry's alibi"); *Harris v. LaFler,* 553 F.3d at 1033 ("Nor was Ward's testimony one damming piece of evidence among many, it was the *only* piece of evidence of eyewitness evidence directly linking Harris to the shooting").

      1.    *This Court previously granted habeas relief on Brady claims in cases in which the petitioners gave inculpatory statements.*

The only admissible evidence linking Hughbanks to the murder was his inculpatory statement to the Tucson Arizona Detectives. This Court recently granted habeas relief in two capital cases in which the petitioners supposedly confessed.

In *Gumm v. Mitchell,* 775 F.3d at 371 the jury heard a tape recording of the petitioner's confession. This Court concluded that "Petitioner's statements to the police were far from overwhelming evidence of his guilt." *Id.* In reaching this conclusion this Court cited the fact that the petitioner "likely could not distinguish between what he was told with the encounters with the police and what he actually remembered from the day of the murder." *Id.* This Court relied on the limitations of the petitioner as described by the mental health expert, "'I find that Darryl was

primarily agreeing with the policemen. As the policemen said things, Darryl would shake his head meaning yes and occasionally add things. But the things that he was asked and added had nothing to do with the testimony in this case.'" *Id.* at 372. The Panel observed that "the state relied on Petitioner's own confession to the murder." *Id.* at 371. This Court summarized its assessment of the inculpatory statement in the context of the materiality issue, "there are numerous reasons why a jury would have discounted Petitioner's statements to the police, taking into account Petitioner's diminished capacity, especially had it been presented with a compelling alternative theory of the crime based on the mountain of exculpatory evidence." *Id.*

In *Bies v. Shelton,* the Court again grant habeas relief despite the petitioner having purportedly confessed to the investigating officers. *Id.* at 402. The Panel initially cited to Bies' low IQ. *Id.* It found that "[e]ven if the jury believed that Bies did in fact make incriminating statements as alleged, they had good reasons to question the legitimacy of his confessions." *Id.* The Panel pointed to the methods the officers used for questioning Bies. They turned off the tape recorder, gave Bies some facts concerning the crime and then turned on the recorder for Bies to repeat those facts as well having him respond to their leading questions. *Id.* The Court further elaborated on the questioning process, "[d]uring the videotaped walk-through of the crime scene, Bies was confused about which building was which and gave vague details about the crime scene – some of which were not consistent with the evidence."

*Id.* This Court concluded "[t]o be sure a jury could have accepted that Bies' confession was genuine notwithstanding these problems; however, if the jury had also been presented with evidence that implicated other individuals in the murder and was inconsistent with the State's and Bies' own accounts of the crime, it may have well determined that Bies' alleged confession was unreliable." *Id.*

2. *Like Bies and Gumm, Hughbanks, was severely mentally ill.*

Hughbanks suffers from three serious mental illnesses: bipolar disorder, post-traumatic stress disorder, and substance abuse (marijuana, alcohol, and amphetamine dependence). (Trial Transcript, Mitigation Phase, R. 163-15, PageID 3439, 3442; Smith Affidavit, R. 166-20 PageID 9285-86, ¶¶ 14). He may also suffer from significant brain impairment which would affect his cognitive processes, emotions, and reasoning ability. (*Id.* at PageID 9294, ¶¶ 50). Hughbanks has been hospitalized eight times for his mental illnesses. (Trial Transcript, 163-15, Mitigation Phase, PageID 3435, 3518-22723). His three mental illnesses have a synergy effect. (Smith Affidavit R. 166-20, PageID 9295, ¶ 51). His mental illnesses impair his judgment. (*Id.*).

3. *The detectives used the same strategies for questioning Hughbanks that the detectives used when questioning Gumm and Bies.*

The fact that Hughbanks' statement was recorded works in his favor, given the manner in which the Detectives fed Hughbanks the facts concerning the murders of the Leemans:

<blockquote>
a.    <u>The Detectives told Hughbanks the time of day when the murders were committed</u>:
</blockquote>

Hughbanks told the Detectives that he did not know the time of day that the murders occurred. (Hughbanks' Custodial Statement R. 193-1, PageID 15477). The officers then gave him the time that the murders occurred. (*Id.* at PageID 15478).

<blockquote>
b.    <u>Hughbanks incorrectly described the exterior of the victims' residence</u>:
</blockquote>

Q.    How did you know the house was empty?

A.    There were no cars in the driveway and I checked around, looked through the windows and that.

Q.    Knocked on the door, ring [sic], that kind of shit?

A.    Yeah.

Q.    Then you went in. It was dark?

A.    Yeah.

(*Id.* at PageID 15610).

The victims' car was parked in the driveway. (State's Trial Exhibit 10, R. 166-32, PageID 11109). The lights were on throughout the house. (Kemper Dep.

R. 167-2, PageID 11947). The victims were watching television. (*Id.* at PageID 11925).

> c.  The Detectives told Hughbanks the manner in which entrance was obtained to the Leeman's residence:

Q.  Which was the window that you guys got in?

A.  I believe that it was a back window.

Q.  And that was a bedroom window?

A.  A kitchen or something. It was along the kitchen. I know I tried to get in the door and couldn't.

Q.  Well now you told me before that it was a bedroom window. Where would it have been?

A.  I know it was a window. It was in the back of the house.....

Q.  Okay and that was in a room?

A.  That was in a room.

Q.  Probably a bedroom?

A.  A utility room or something?

Q.  But it could have been a bedroom?

A.  It could have been a bedroom, I don't know

(Hughbanks' Custodial Statement, R. 193-1, PageID 15550-51).[9]

---

[9] The State's theory involved the assailant gaining access to the residence through a bedroom window in the front, not rear of the residence. (Crime Scene Investigation, R. 167-5, Page ID 13998).

        d.    <u>The Detectives gave Hughbanks a detailed description of the interior of the Leeman's residence</u>:

Q.    The kitchen had a bar in the middle?

A.    Like a ...

Q.    A breakfast kind of bar kind [sic] of thing?

A.    Yeah. Like it separated the kitchen from the living room.

Q.    There were pictures along the wall in the hallway?

A.    Yeah.

Q.    And you think that some of them were people in uniform?

A.    Yeah.

Q.    More than one person or at least?

A.    At least one. But there was [sic] pictures.

Q.    Do you remember any – how the furniture was set up in the living room. Was there a coffee table with couches? What was there?

A.    Coffee table, couch and there was a recliner.

Q.    TV?

A.    Yeah, there was a TV.

(*Id.* at PageID 15514-15).

The Arizona detectives believed that Hughbanks obtained the murder weapon (knife) from the closet. (*Id.* at PageID 15599; 15611). How did you turn the light on?

A.    There was a light in the closet.

76

Q.    Well, you're reaching up. Was there a pull cord type light?

A.    I think so, yeah.

(*Id.* at PageID 15612)[10]

   **e.** <u>The Detectives informed Hughbanks as to Mrs. Leeman's response when she purportedly saw him in the residence</u>:

Q.    You didn't hear the women screaming or yelling?

A.    No because I was – the guy was going on (inaudible). I don't remember hearing a women screaming. The woman was running through the house, yelling, Oh my God, help, help.

Q.    You heard a women screaming and running

A.    Screaming and running away, yelling my God, help, help

(*Id.* at PageID 15544).

   **f.** <u>Hughbanks initially incorrectly identified the murder weapon</u>:

A.    I might have had a screwdriver with me.

---

[10] The victims' son testified that the light in the closet was activated when the door to the closet opened and closed and not by pulling a cord that hung down from the light. (Trial Transcript, Trial Phase, R. 163-13, Page ID 3181). The photograph of the closet would have easily led the Detectives to this misperception which in turn caused their leading questions to contain inaccurate facts. (State's Trial Exhibit 12, R. 166-32, Page ID 11111). Assuming that photograph caused the Detective's misperception, then the Ohio officials provided the Tucson Police Department with at least some of their files. This transfer of documents was contrary to the Arizona Officers' testimony that they had very little information concerning the murders. (Trial Transcript, Trial Phase, R. 166-3, Page ID 4219-20; Page ID 4257-58).

Q.    Is it possible you stabbed him with a screwdriver a couple of times?

A.    Possible

Q.    Is it more likely than possible?

A.    It's more likely than possible

Q.    So you stabbed the guy a couple times with a screwdriver?

A.    Yes

(*Id.* at PageID 15546).[11]

> **g.**    The officers told Hughbanks from where he obtained the murder weapon:

A.    I kept it [the knife] because I thought it was a real military knife.

Q.    But you had it that night

A.    Yeah

Q.    You took it out of the closet?

A.    I can't remember - -

(*Id.* at PageID 15566).

Q.    But you know you cut him with this knife that you found in the closet?

A.    I might have stabbed him with it.

(*Id.* at PageID 15568).

---

[11]    The victims were killed with a knife. (Trial Testimony, Trial Phase, R. 163-14, PageID 3328-29).

Q.   But you remember when you sold him the knife, you know that was the knife that came from the house?

A.   It could have been, I don't remember if I got the knife from the house or not…

(*Id.* at PageID 15570).

Q.   You think that you got it out of the closet?

A.   I think I got it out of the guy's house

(*Id.* at PageID 15571).

Q.   Do you think that you got it [the knife] out of the closet, or do you think that you got it somewhere else in the house?

A.   I think that I got it out of the closet.

(*Id.* at PageID 15599).

**h.**   <u>The Detectives informed Hughbanks as to the details involved in the fatal stabbing of Mr. Leeman:</u>

Q.   When he [Mr. Leeman] went down, after you cut his throat and stabbed him, do you remember how many times you stabbed him?

A.   Two or three times.

Q.   Is it possible you stabbed him a lot more times than that?

A.   Possible

Q.   Were you really scared?

A.   I was scared man.

Q.   Is it possible you stabbed him a whole bunch of times?

A.   Possible?

Q. Is it more likely or not likely?

A. Probably more likely because when you're in fear like that, man, you have think you done something, but probably you did it more.

(*Id* at PageID 15601-02).

### i. The Detectives instructed Hughbanks concerning the details involving the stabbing of the Mrs. Leeman:

Q. And then she [Mrs. Leeman] went running out and you went after her?

A. I probably grabbed her - - and down [sic] her from the left to the right.

Q. Did you stab her to?

A. Not that I remember.

Q. Is it possible you did?

A. It's possible, but I doubt it. I think that I just cut her.

Q. You think that you just cut her throat?

A. Yeah

Q. There in the living room?

A. Somewhere

Q. Was it in the living room or outside?

A. It was probably in the living room and she got out before it could
   . . .

(*Id.* at PageID 15502-03).

**j.**   <u>The Detectives informed Hughbanks as to the property that he purportedly took from the residence:</u>

Q.   So, you were looking for jewelry and cash. Did you find any at this place?

A.   Uh-huh.

Q.   Did you take this guy's wallet out of his pocket or anything?

A.   Uh-huh.

(*Id.* at PageID 15607).

**k.**   <u>The Detectives through their questioning got Hughbanks to confess that he had stolen jewelry from the residence, even though no jewelry was taken from the residence:</u>

Q.   Did you take anything from the house?

A.   No. I was scared.

Q.   Nothing at all

A.   I was scared. I ran (Inaudible).

(*Id.* at PageID 15542).

Q.   Did you give anything to anybody that came from the house?

A.   Uh-huh.

Q.   None of the jewelry, nothing?

A.   I may have left the jewelry there. I don't - -

(*Id.* at PageID 15607).

Q.   Did you take anything else out of the house besides the knife? Jewelry, cash, anything?

A.   That's all I remember.

81

(*Id.* at PageID 15570).

A.    I think I went through the dressers.

Q.    Do you remember anything specific in there?

A.    No

Q.    Did you see any kind of jewelry or anything that you were going to pick up or that you did pick up?

A.    I may have picked some jewelry up.

Q.    Well, what kinds of things did you pick up?

A.    Some jewelry and that, but I think I got rid of the jewelry.

Q.    Just pitched it or sold it?

A.    Pitched and got rid of it

Q.    What was it - - what did it look like?

A.    Like old lady jewelry.

Q.    Costume or real jewelry?

A.    Yeah. Like costume jewelry, something like that.

Q.    Necklaces, rings, what?

A.    Necklaces, earrings.

Q.    Pins or anything?

A.    Brooches, stuff like that.

(*Id.* at PageID 15599-600).

1.    <u>The Detectives got Hughbanks to confess that he washed the blood from his clothes in a nearby creek:</u>

82

Q. Did you stop in the creek and wash that blood off?

A. I probably did.

Q. No, not probably now – what did you do?

A. I was soaking wet. So I probably washed the blood off me in the creek.

Q. So you were covered with blood?

A. Yeah.

Q. You hit the creek and cleaned yourself up?

A. Cleaned myself up.

Q. How big was the creek? I mean, the creek to me is a damn river. We ain't got any water in Arizona.

A. Probably about three feet, four feet wide. With banks on both sides.

Q. How deep was the water?

A. About ankle deep

Q. So to get water all over yourself, you'd have to lay down in it practically?

A. Yes, I would have to say, probably even fell in the creek, and started getting it off me.

(*Id.* at PageID 15605).

Contrary to Hughbanks statement, the police determined that the assailant washed the blood off his person and clothes in the sink of the victims' residence (Trial Transcript, Trial Phase, R. 163-13, PageID 3210). The police officers gave a

bloodhound a towel found in the sink of the master bedroom. (*Id.* at PageID 3228-29).

 m. Consistent with the Detectives' conflicting suggestions, Hughbanks gave conflicting answers as to the involvement of other individuals in the murders:

In the initial part of their interrogation, the Detectives suggested to Hughbanks that other individuals were involved in the murders. (Hughbanks' Custodial Statement, R. 193-1, PageID 15523-24). Hughbanks fell in line and identified the other individuals involved in the murders and the degree of their participation. (*Id.* at PageID 15534, PageID 15536, 15539). The Detectives subsequently adopted a different position and instructed Hughbanks that he was the only participant in the murders. (*Id.* at PageID p. 15584-89). Hughbanks concurred that he acted alone.

The critical evidence linking Hughbanks to the murder was his own custodial statement. The credibility of that statement is undercut because the Tucson Officers repeatedly asked Hughbanks leading questions. In addition, many of Hughbanks' answers were not consistent with the physical evidence or the findings of the ten year old investigation. He qualified many of his answers with phrases such as "possibly," "I may have," "it could have," "I believe it was," "I think so," etc. *Id.* Given the significant issues with Hughbanks custodial statement, it was far from overwhelming evidence of guilt.

**B.    The prosecution offered little other admissible evidence that connected Hughbanks to the murders.**

The prosecution called three witnesses in its case in chief. None of their testimony significantly bolstered the prosecution's case.

      1.    *The testimony of Leonard Leeman did not accurately portray Hughbanks' inculpatory statement.*

The prosecution first witness was Leonard Leeman, one of the victims' sons. (Trial Testimony, Trial Phase, R. 163-13, PageID 3171). His testimony was limited to citing the purported consistencies between the interior of his parents' residence and the portion of Hughbanks' statement describing the interior of the parents' residence. (*Id.* at PageID 3178-88). He testified, "there was no doubt. Whoever [Hughbanks] was in that, that person was in the house." (*Id.* at PageID 3179).

However, many of Hughbanks "answers" that Leeman cited were answers the Arizona detectives gave Hughbanks. Leonard Leeman testified that Hughbanks told the Arizona Detectives that the victim's kitchen contained white Formica counter tops. (*Id.* at PageID 3179). While Hughbanks initially told the Detectives that the counter tops were white, at the suggestion of the Detectives, he subsequently stated that the countertops were yellow. (Hughbanks' Custodial Statement, R. 193-1, PageID 15615). Leeman testified that Hughbanks remembered seeing military photographs on the wall. (Trial Testimony, Trial Phase, R. 163-13, Page ID3180). In actuality, Hughbanks was only responding to the Detective's leading question,

"[a]nd you think some of them were people in uniform?" (Hughbanks' Custodial Statement, R. 193-1, Page ID 15615). Finally, Leeman implied that Hughbanks properly identified the unusual lighting fixture in the closet of the master bedroom. The light was activated by a pressure switch when the closet door was opened or closed. (Trial Testimony, Trial Phase, R. 163-13, Page ID 3181). Hughbanks incorrectly described the light fixture as having a pull chain. (Hughbanks' Custodial Statement, R. 193-1, Page ID 15612). Trial counsel did not cross Leeman as to any of these discrepancies and limited their cross examination to five questions, (Trial Transcript, Trial Phase, R. 163-13, PageID 3188-89).

### 2. *The testimony of Detective Kemper misled the jury.*

Detective Kemper of the Springfield Township Police Department, initially responded to the crime scene. (*Id.* at PageID 3194). In his testimony through the use of photographs he described in detail the crime scene as he found it. (*Id.* at PageID 3194-3235). During this portion of his testimony he responded "no" to the question concerning whether the "criminalists [were] ever able to locate any trace evidence, hair, fiber, fingerprints, anything which could be used to identify the killer and tie him to the scene." (*Id.* at PageID 3228). This was incorrect. Officer William Hillard, a criminalist with the Cincinnati Police, testified at his federal habeas deposition that he recovered prints from the crime scene. (Hillard Dep. R. 167-2, PageID 11651-52, 11678, 11715).

Detective Kemper testified that Hughbanks' brother contacted and reported that Hughbanks confessed to him. (Trial Transcript, Trial Phase, R. 163-13, PageID 3232-27). Trial counsel did not object to this hearsay. (*Id.*).

The Detective spent most of the remainder of his testimony identifying the similarities between Hughbanks' statement and the crime scene. (*Id.* at PageID 3241-42). The prosecution, in the second to last question of this witness posited the following, *"Did you find any significant things in his* [Hughbanks'] *statement that were not accurate"* to which Detective Kemper replied, *"[n]othing of significance."* (*Id.* PageID 3243).

However, the Detective's testimony was again inaccurate. Detective Kemper testified that Hughbanks accurately described the "general layout of the house." (*Id.* at PageID 3242). The victims' residence was a single story house. (State's Trial Exhibits 10 and 11, R. 166-32, PageID 11109-10). Hughbanks told the Tucson Detectives that the residence contained two stories and the upstairs carpet was beige. (Hughbanks' Custodial Statement, R. 193-1, PageID 15598). The murders were committed in the master bedroom (Crime Scene Investigation, R. 167-5, PageID 13998), which is located on the front of the house. (State's Trial Exhibit 1, *Id.,* R. 166-32, Page ID 11099- 100). Hughbanks repeatedly told the Detectives that the murders occurred in the rear bedroom. (Hughbanks' Custodial Statement, R. 193-1, PageID 15540, 15546, 15555, 15602). Detective Kemper testified that Hughbanks

accurately described the light fixture in the closet. (Trial Transcript, Trial Phase, R. 163-13, PageID 3242). Hughbanks inaccurately stated that the light was activated by pulling a string, as opposed to a being activated by the opening and closing of the closet door. (Hughbanks' Custodial Statement, R. 193-1, PageID 16612). Detective Kemper testified that Hughbanks accurately described the victims' wounds. (Trial Transcript, Trial Phase, R. 163-13, PageID 3242). Hughbanks initially told the officers that a screwdriver was used to kill the victims. (Hughbanks' Custodial Statement, R. 193-1, PageID 15546, 15553, 15556, 15558). This was incorrect. The victims were killed with a knife. (Trial Transcript, Trial Phase, R. 163-14, Page 3328-29). The male victim was stabbed seventeen times. (*Id.* at PageID 3310). Hughbanks initially told the Tucson Detectives that the male victim was stabbed only a few times. (Hughbanks' Custodial Statement, R. 193-1, PageID 15500). Again, the police used leading questions to obtain the desired answer. (*Id.* at PageID 15500-01). Hughbanks also initially provided incorrect information to the Detectives concerning the wounds sustained by Mrs. Leeman. (*Id.* at PageID 15502-03).

On cross examination, trial counsel did not ask Detective Kemper any questions, "Judge, I don't have any questions." (Trial Transcript, Trial Phase, R. 163-13, PageID 3243).

**3.** *The testimony of John Jay consisted mainly of inadmissible hearsay that contained no details.*

John Jay is an investigator with the Hamilton County Prosecutor's Office. (*Id.* at PageID 3249). He testified concerning his meeting with Hughbanks' brother and father. (*Id* at PageID 3251). Jay testified that Larry Hughbanks, the brother, gave him (Jay) a knife that Hughbanks threw into a wooded area in 1988. (*Id.* at PageID 3251). Jay then identified a survival knife (State's Exhibit 45) that the brother gave him. (*Id.* at PageID 3252). Jay stated that he also interviewed the father who "implicated" Hughbanks in the murder. (*Id.* at PageID 3253). Jay further testified that he later interviewed Hughbanks' uncle, Jerry Shaw and Hughbanks' cousin, Howard Shaw who both implicated Hughbanks in the murder of the Leemans. (*Id.* at PageID 3254). Finally, Jay testified that he interviewed Lisa Leggett, Hughbanks' former common law wife, who also gave him a survival knife (State' Exhibit 46) that belonged to Hughbanks. (*Id.* at PageID 3255).

The statements made by Hughbanks' brother, father, uncle and nephew to Investigator Jay constituted inadmissible hearsay, were highly prejudicial and were admitted only because trial counsel failed to object (*Id.* at PageID 3256). More importantly, Jay's testimony was also inaccurate, as the prosecution was aware. Hughbanks' brother, Larry Hughbanks told the investigating officers that when Hughbanks was drunk he stated that he killed "people," not specifically the

Leemans. (Larry Hughbanks' Affidavit, R. 166-17, PageID 8490, ¶ 7).[12] When "drunk" Hughbanks "would agree to anything" including crimes that he had not committed. (*Id.* at PageID 8491-92 ¶¶ 7-9). In his statement to the officers, the brother gave the names of two persons who may have killed the Leemans and opined that he believed that his brother did not kill the Leemans. (*Id.* at PageID 8492, ¶ 11).[13] The brother told the Hamilton County Prosecutor that he would not testify because "the police twisted my story." (*Id.* at PageID 8492, ¶ 19). Hughbanks' father similarly provided: (a) out of anger he implicated his son because his son and he were romantically pursuing the same woman, (b) he does not believe that his son killed the Leemans, and (c) trial counsel never spoke with him. (Gary Hughbanks Sr.'s Affidavit, R. 166-17, PageID 8493-94).

4.    *The testimony of Michael Millstone only provided background information as to Hughbanks' custodial statement.*

Millstone was one of the two detectives from the Tucson Police Department who interviewed Hughbanks. (Trial Transcript, Trial Phase, R. 163-13, PageID 3258). He met with the Hamilton County officials after Hughbanks was arrested on

---

[12]

The brother passed a polygraph in which he affirmed that Hughbanks said "people" rather than the Leemans. (*Id.* at PageID 8491, ¶ 13).

[13]

Trial counsel never spoke with the brother. (*Id.* at R. 166-17, PageID 8491-92, ¶¶ 15-17, 21).

September 9, 1997. (*Id.* at PageID 3259). The officials provided Millstone with some information concerning the case. (*Id.* at PageID 3260-61). He interviewed Hughbanks on the day of his arrest and Hughbanks he did not implicate himself. (*Id.* at PageID 3262). The Hamilton County officials asked him to re-interview Hughbanks which the Detective did on September 16, 2019. (*Id.* at PageID 3263).

5.     *The testimony of James Fillippelli only provided background information as to Hughbanks' custodial statement*

Fillippelli is a detective with the Tucson Police Department. (*Id.* at PageID 3270) He met with the Hamilton County officials on September on September 9, 1997, but did not have any contact with Hughbanks on that date. (*Id.* at PageID 3270-71). He identified the recording of Hughbanks custodial interview (State's Exhibit 48) and the prosecution played the tape for the jury. (*Id.* at PageID 3272, 3275-78).

6.     *The testimony of Doctor Lee Lehman confirmed that it was impossible to determine that if either of the knives that the brother and former common law wife gave the officers was the murder weapon.*

Dr. Lehman performed the autopsies on both victims. (Trial Transcript, Trial Phase, R. 163-14, at PageID 3307). He testified that the knives that Hughbanks' brother and former common wife gave Investigator Jay (State's Exhibits 45 and 46)

are consistent with the knife used to murder the Leemans. (*Id.* at PageID 3300).[14] However, he testified that his opinion is dependent on the knives having been in better shape in 1987, than they were at the time of trial. (*Id*). He testified that the serologist who conducted testing on the knives did not find any blood on the knives. (*Id*). He also testified that he cannot tell if the murder weapon had a straight or serrated blade and that there are many other types of knives than State's Exhibits 45 and 46 that could have been the murder weapon. (*Id.* at PageID 3333).[15]

### C.    Conclusion, the suppressed evidence was material.

1.    *The prosecution's case was not strong.*

Hughbanks' custodial statement was not overwhelming evidence of his guilt. His answers to the detective's questions were often incorrect as to significant facts concerning the offenses, such as the identity of the murder weapon, the description of the exterior and interior of the residence and the point of entry into the residence.

---

[14]

The brother gave the police the "knife in an effort to demonstrate that Gary was not involved in the murders. To the best of my knowledge the knife did not contain any evidence linking Gary to the Leeman murders." (Larry Hughbanks Affidavit, R. 166-17, PageID 8491, ¶ 11).

[15]

The trial court admitted both knives over the objections of trial counsel. (Trial Transcript, Trial Phase, R. 163-14, PageID 3340). There was no evidence that two knives were used in the murder.

Often times when Hughbanks' answers appeared correct, his responses were the product of leading questions in which the Detectives fed him the "correct" answers.

The prosecution's case spent much of its case attempting to bolster Hughbanks' custodial statement. Leonard Leman and Detective Kemper testified at length that the portions of Hughbanks' custodial statement describing the interior of the victims' residence were accurate. However, a detailed comparison of the transcript Hughbanks' custodial statement with the testimony of the Leonard Leeman and Detective Kemper reflects that the witnesses' testimony was not accurate in this regard. Trial counsel did not raise any of the inaccuracies on cross examination.

No physical evidence linked Hughbanks to the murders. No blood was found on the knives that Hughbanks' brother and former common law wife gave the investigating officers. The coroner testified that he could not even tell whether those types of knives were the type used to kill the victims. Instead, the physical evidence that did exist eliminated Hughbanks as the murderer. His fingerprints did not match the fingerprints found at the scene.

Detective Jay testified as to vague and sketchy statements made by other individuals that implicated Hughbanks in the murders. However, those statements constituted inadmissible hearsay. Trial counsel could have been reasonably expected

to have objected to the testimony if the prosecution had not suppressed the evidence in this case. In addition, the hearsay statements inaccurate.

The prosecution's case was weak given: (a) the "holes" in Hughbanks' inculpatory statement, (b) the inaccurate testimony that supposedly corroborated the details of his statement and (c) the lack of other evidence inculpating Hughbanks in the murders.

### 2. The suppressed evidence was material especially given the prosecution's weak case.

The evidence suppressed by the prosecution was both favorable and material: (a) neighbors gave physical descriptions of individuals seen in the immediate area of the victims' residence at the time of the murders that did not match Hughbanks' physical description, (b) the police identified existence of other suspects, including two individuals who confessed, and Burt Leeman, one of the victims' sons, (c) Hughbanks' fingerprints did not match the fingerprints recovered from the scene, (d) the FBI report contradicted almost every aspect of the prosecution's case, and (e) the prior statements of the prosecution's witnesses contradicted their trial testimony. Trial counsel armed with the suppressed evidence and given the prosecution's weak case could have constructed a "plausible alternative narrative of the crime and raised reasonable doubt in the minds of the jurors." *Bies v. Shelton*, 775 F.3d at 400.

A "reasonable probability" of a different result exists when the State's evidentiary suppression undermines any confidence in the verdict. The question is whether Hughbanks received a fair trial, not whether sufficient evidence exists to support the conviction. *United States v. Bagley* 473 U.S. at 678. Here, the prosecution's failure to furnish Hughbanks legal team with the subject *Brady* material denied Hughbanks a fair trial.

## VII. The District Court Erred Both Factually And Legally When It Denied Hughbanks Relief on his Brady Claim.

The District Court's entire analysis as to the portion of Hughbanks' *Brady* claim that was dependent on evidence obtained during the federal discovery:

> Petitioner, in his argument, overstates how probative and exculpatory the evidence at issue actually is. For instance, while the police report stated that "although the male victim's wallet was taken, . . . other items of value were left untouched[,]" (App'x, R. No. 167-5, Page ID 14135), Petitioner confessed to Millstone and Filippelli that he took Mr. Leeman's wallet (Petitioner Statement, R. No. 193-1, Page ID 15582). Further, while the Springfield Township Police Investigator's narrative summary of the investigation stated that "no motive [was] established" (App'x, R. No. 167-5, Page ID 14108), the summary also stated that Kemper found "Juanita Leeman . . . lying at the end of the driveway . . . , bleeding profusely from multiple stab wounds[,]" and that, upon entering the house, Kemper found William Leeman "lying dead on the floor in a pool of blood, from numerous stab wounds. William Leeman also had his throat cut." *Id.* Those descriptions are consistent with the way in which Petitioner, in his confession, described killing the Leemans (Petitioner Statement, R. No. 193-1, Page ID 15599-15604). Finally, while several factors led law enforcement to conclude that the crimes were "of a personal nature," rather than a burglary gone awry, the investigator's report identified the perpetrator as "most likely a

95

white male"[;] who "resides, works, or visits the area of the homicides"[;] "may be known to possess the knife used in the assault"[;] and whose "prior criminal activity could include . . . assaultive behavior such as domestic disturbances." (App'x, R. No. 167-5, Page ID 14138-39). Petitioner met all of those criteria.

, In sum, it is unclear whether the evidence produced in 2007 was exculpatory, and at any rate, Petitioner has not demonstrated that these items of evidence, either by themselves or collectively[10] allowed for a reasonable possibility that the outcome would have been different at the guilt or penalty phase of the trial. Thus, the evidence in the second post-conviction petition, is not material, and Claim Seven must be overruled in its entirety.

(Decision and Order Dismissing Petitioner's Third Amended Petition for Writ of Habeas Corpus, R. 242, PageID 16615-16)

The District Court erred factually when it found that Hughbanks' inculpatory statement accurately described the murders and the facts surrounding the murders. In reaching its conclusion it did not address Hughbanks' numerous responses that incorrectly described the crimes and the victims' residence. *See State of Facts, Section IV p. 10 supra.* Furthermore, it did not address the Detectives' leading questions that often provided Hughbanks with information concerning the murders and the victims' residence. *Id.* Instead, the District Court relied on the following portion of Hughbanks' statement:

while the police report stated that "although the male victim's wallet was taken, . . . *other items of value were left untouched*[,]" (App'x, R. No. 167-5, Page ID 14135), Petitioner confessed to Millstone and Filippelli that he took Mr. Leeman's wallet (Petitioner's Statement R. 193-1, PageID 15582).

(*Id.* at PageID 16615) (emphasis added).

The district court's finding that Hughbanks accurately told the Detectives about Mr. Leeman's wallet ignores those portions of Hughbanks' statement in which he inaccurately claimed that he stole other evidence from the residence. He: (a) initially told the Detectives that he took nothing from the residence (Hughbanks' Custodial Statement, R. 193-15, PageID15542), (b) then later in his statement said that he possibly took jewelry from the house (*Id.* at PageID 15570), and (c) yet later said that he stole costume jewelry including necklaces, earring, brooches and "stuff like that" (*Id.* at Page ID 15599-600). At that point in his statement, where he said that he took Mr. Leeman's wallet, he also said that he took the victim's car keys, entered his car, and took some marijuana that he found in the car. (*Id.* at PageID 15582-83). This is not supported by any evidence.

The District Court also cited another portion of Hughbanks' statement:

> Further, while the Springfield Township Police Investigator's narrative summary of the investigation stated that "no motive [was] established" (App'x, R. No. 167-5, Page ID 14108), the summary also stated that Kemper found "Juanita Leeman . . . lying at the end of the driveway . . . , bleeding profusely from multiple stab wounds[,]" and that, upon entering the house, Kemper found William Leeman "lying dead on the floor in a pool of blood, from numerous stab wounds. William Leeman also had his throat cut." *Id.* *Those descriptions are consistent with the way in which Petitioner, in his confession, described killing the Leemans* (Petitioner Statement, R. No. 193-1, Page ID 15599-15604).

97

(Decision and Order Dismissing Petitioner's Third Amended Petition for Writ of Habeas Corpus, R. 242, R. 242, PageID 16616) (emphasis added).

The District Court's conclusion ignores the fact that Hughbanks inaccurately described: (a) Mrs. Leeman response when she saw him in the residence, (Hughbanks' Custodial Statement, R. 193-1, PageID 1544), (b) the murder weapon (*Id.* at PageID 15544), (c) the number of times that he stabbed Mr. Leeman (*Id.* at PageID 15601-02), and (d) that he cut Ms. Leeman rather than stabbed her (*Id.* at PageID 1544). *See* Statement of Facts, Section IV, p. 10 *supra.*

Contrary to the district court's findings, Hughbanks did not "in his argument overstate[] how probative and exculpatory the evidence at issue actually is."

Finally, the District Court cited to portions of the suppressed FBI report in an effort to show consistencies with Hughbanks guilt:

> Finally, while several factors led law enforcement to conclude that the crimes were "of a personal nature," rather than a burglary gone awry, the investigator's report identified the perpetrator as "most likely a white male"[;] who "resides, works, or visits the area of the homicides"[;] "may be known to possess the knife used in the assault"[;] and whose "prior criminal activity could include . . . assaultive behavior such as domestic disturbances." (App'x, R. No. 167-5, Page ID 14138-39). Petitioner met all of those criteria.

(Decision and Order Dismissing Petitioner's Third Amended Petition for Writ of Habeas Corpus, R. 242, PageID 16616)

However, the district court failed to consider the remainder of the suppressed FBI report which debunked the prosecution's theory. The suppressed report concluded that the murders were not the product of a burglary, but instead the "victims were targeted for the homicide." (FBI VICAP Report, R. 167-5, Page ID 14135). The report provided that "[t]he perpetrator may have held a significant amount of anger toward the victims." [*Id.* at Page ID 14137). Finally, the FBI concluded that "[t]he offender wants others to believe he has gone through the drawers looking for something to steal. This is a technique used to draw attention away from himself and his motive." (*Id.*). The fact that the suppressed report accurately indicated that the assailant was Caucasian who carried a knife and had committed prior felonies did not deprive the remainder of its exculpatory value report. The portion of the FBI report on which the District Court cited did not contain significant information. For instance, given that the murder weapon was a knife (and not a screwdriver as Hughbanks reported), the FBI's conclusion that the assailant carried a knife was nothing more than common sense. In addition, most burglars and murderers have prior criminal records.

The District Court's weight of the evidence analysis that focused on the evidence item by item rather than cumulatively, the Supreme Court rejected. *Kyles*

*v. Whitley,* 51 U.S. at 434-36. The District Court erred, both factually and legally, when it held that the evidence in question was not material.

## VIII.  Hughbanks' Brady Claim Is Not Procedurally Defaulted

It is well settled that when a petitioner presents a constitutional claim in such a manner that violates a state procedural rule and the state court declines to address the merits of that claim, the claim is procedurally defaulted for purposes of federal review. *Coleman v. Thompson*, 501 U.S. 729, 750 (1991); *Lee v. Kemna,* 534 U.S. 362, 375 (2002).  However, the federal courts will excuse that default if the petitioner can demonstrate cause and prejudice. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Amadeo v. Zant,* 486 U.S. 214, 222 (1988) .

A petitioner demonstrates cause when he presents a substantial reason to excuse the procedural default. *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994). The withholding of evidence by the state that precludes an individual from discovering the factual basis for a constitutional claim constitutes "cause" to excuse the procedural default. *Strickler v. Greene*, 527 U.S. at 282, 289; *Amadeo v. Zant*, 486 U.S. at 222. The procedural  default analysis of a *Brady* claim is coextensive with the merits of the constitutional violation. *Strickler v. Greene*, 527 U.S. at, 282 (1936), and *Banks v. Dretke*, 540 U.S. at 668, 691.

It was not until the District Court granted Hughbanks leave to conduct discovery that Hughbanks first identified the specific documents upon which his *Brady* claim relies. (Sipe Affidavit, R. 167-3, PageID 12723-24). The Warden has not disputed this fact. In an almost identical situation the Supreme Court concluded that the habeas petitioner demonstrated cause. *Strickler,* 527 U.S. at 283. In that case the state court officials did not disclose the suppressed documents until the federal court granted leave to conduct discovery. *Id.*

This Court reached the same conclusion as to cause when the state officials initially disclosed the evidence in federal court habeas discovery proceedings. *Jamison v. Collins*, 291 F.3d at 388 ("Since the factual basis of the claim was not reasonably unknown to the defendant's counsel [until federal habeas discovery], we affirm the district court's judgment as to cause"). This Court again reached the same conclusion in facts identical to this case. *Bies v. Shelton.* In that case Bies identified the basis for his Brady claim "for the first time as part of routine discovery during Bies' federal habeas proceedings almost nine years after his criminal trial." 775 F.3d at 394. The District Court ordered the federal habeas proceeding held in abeyance while Bies returned to state court to exhaust his state court remedies. The Hamilton County Court of Appeals found that the *Brady* claim defaulted because he failed to satisfy the criteria contained in O.R.C. § 2953.23 (*Id. a*t 396). This Court ruled that

when it found that Bies' *Brady* claim was meritorious, it also found Bies proved "prejudice" to excuse the default.

Hughbanks' *Brady* claim is premised exclusively on the information that he initially identified in the federal habeas discovery. (Sipe Affidavit, R. 167-3, PageID 12723-24, ¶¶ 3-7). The District Court ordered the proceedings held in abeyance to permit Hughbanks to return to state court to exhaust his state court remedies. (Decision and Order Granting Petitioner's Motion to Stay Proceedings, Pending Exhaustion, R. 106, p. 3). The Hamilton County Court of Appeals found that Hughbanks defaulted his *Brady* claim because he had not satisfied the jurisdictional requirements contained in O.R.C. § 2953.23(A), (State Appellate Court, Judgement Entry, R. 167-5, PageID 14430-31). Hughbanks' previously demonstrated herein that his *Brady* claim is meritorious. *See* Sections III to V, pp. 32-84, *supra.*

This Court should address the merits of Hughbanks' *Brady* claim.

## IX. Conclusion, This Court Should Order The Writ Granted.

Hughbanks demonstrated herein that his *Brady* claim is not procedurally defaulted, is entitled to de novo review, and is meritorious. The Hamilton County Prosecutor's Office, as it has in other capital case, suppressed favorable material, evidence. This Court should order a writ of habeas corpus be granted and Hughbanks receive a new trial.

## Thirteenth Claim Ground for Relief

**Trial Counsel Failed To Provide Hughbanks With Effective Assistance Of Counsel In The Sentencing Phase Of His Capital Case.** *Strickland v. Washington,* **466 U.S. 668 (1963).**

Hughbanks' death sentences are unlawfully and unconstitutionally imposed, in violation of the Sixth, Eighth, and Fourteenth Amendments because he was denied effective assistance of counsel at the penalty-phase of his capital trial. Counsel's performance fell below the reasonable standards of representation, which prejudiced Hughbanks. Counsel's failures included not adequately investigating, preparing, and presenting evidence in the penalty phase.

## I.     The Governing Law on Penalty Phase Ineffective Assistance of Counsel Claims.

Ineffective-assistance claims are governed by the familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). "The Sixth Amendment . . . envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair." *Strickland*, 466 U.S. at 685.

## A. The Prevailing Law on Deficient Performance

"To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins*, 539 U.S. at 521, quoting *Strickland*, 466 U.S. at 688. Trial counsel fails to satisfy the Sixth Amendment standards when they "undermine[s] the proper functioning of the adversarial process." *Strickland*, 466 U.S. at 686. Beyond these general terms the Supreme Court has consistently relied upon codified and judicially recognized duties of counsel as guides to judging the reasonableness of attorneys' performance "'under prevailing professional norms.'" *Wiggins*, 539 U.S. at 521, quoting *Strickland*, 466 U.S. at 688.

*Strickland* requires that a court deciding an ineffective assistance of counsel claim "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id* at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. In addition, "courts may not indulge '*post hoc* rationalization' for counsel's decision making that contradicts the available evidence of counsel's actions." *Harrington v. Richter*, 562 U.S. 86, 109 (2011), quoting *Wiggins*, 539 U.S. at 526-27. "Just as a reviewing court should not second guess the strategic

decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer." *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990), citing *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986).

A reviewing court should "assess counsel's overall performance throughout the case in order to determine whether the identified acts or omissions overcome the presumption that a counsel rendered reasonable professional assistance." *Kimmelman, supra*, 477 U.S. at 386 (internal quotation marks and citations to *Strickland* omitted). This includes an examination of counsel's performance both "before and at trial." *Id.*; *see also Cullen v. Pinholster*, 563 U.S. 170, 189 (2011).

In response to the allegations of ineffective assistance of counsel in Kimmelman, the Attorney General protested that counsel's performance was not deficient because counsel "crafted a sound trial strategy," and that viewed in its entirety, "counsel's pretrial investigation, preparation and trial strategy were professionally reasonable." *Kimmelman*, 477 U.S. at 383-84, quoting the Attorney General's brief. The Supreme Court disagreed. The Court found that, even though trial counsel may have taken other positive actions to prepare for trial, counsel failed to request pretrial discovery. Because counsel had not conducted discovery, counsel did not know that the State intended to introduce evidence that would forensically tie the defendant to the crime. Counsel's failure to engage in discovery was not based on strategy but on a failure to know the law. Id. at 385.

"Strickland requires a reviewing court to 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.'" *Kimmelman*, 477 U.S. at 386, citing *Strickland*, 466 U.S. at 690. The reviewing court must assess counsel's overall performance throughout the case to determine whether the alleged acts or omissions overcome the presumption that counsel rendered reasonable professional assistance. *Kimmelman*, 477 U.S. at 386 (emphasis added). Even if trial counsel's performance is "creditable enough" overall, Id., a reviewing court may nonetheless overcome the presumption that counsel performed effectively if counsel's overall performance, in light of all the circumstances, was outside the wide range of professionally competent assistance.

**B.     The Prevailing Law as to Prejudice**

A petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is less than a preponderance. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The petitioner does not have to "show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 93. As to the sentencing phase of a capital case, the petitioner must show that "there is a reasonable probability that he would have received a different sentence." *Porter v. McCollum*, 558 U.S. 30, 41

(2009). A petitioner demonstrates prejudice if he shows that at least one juror would have voted to recommend a sentence of less than death. *Wiggins*, 539 U.S. at 537.

When assessing prejudice, the Court must consider the totality of the mitigating evidence, both that adduced at trial and the evidence adduced in post-conviction proceedings and requires a reweighing of the aggravating and mitigating evidence. *Porter*, 558 U.S. at 41; *Williams (Terry)*, 529 U.S. at 397. The Court must consider all of trial counsel's unprofessional errors against "the totality of the evidence" adduced at trial and in post-conviction proceedings. *Strickland*, 466 U.S. at 695; *Wiggins*, 539 U.S. at 536; *Williams (Terry)*, 529 U.S. at 397. "Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Strickland*, 466 U.S. at 695-96.

## II. The Evidence Trial Counsel Presented at Hughbanks' Sentencing Hearing.

### A. Voir Dire

Trial counsel in voir dire repeatedly told the prospective jurors that the facts were horrible, the crime scene photographs were gruesome, and the victims did not deserve their fate. (Trial Transcript, Voir Dire, R. 163-9, PageID 2663, 2695, 2699, 2706, 2742; R 163-10, Trial Transcript, Voir Dire, R. 163-10, PageID 2765, 2766, 2785, 2798, 2824, 2842; Trial Transcript, Voir Dire, R. 163-11, PageID 2860, 2863-

74, 2898, 2926-27, 2938, 2956-57, 2990-91, 3025-26, 3052, 3072-73; Trial Transcript, Voir Dire, R. 163-12, PageID 3093-94). Trial counsel repeatedly informed prospective jurors that the jury would find Hughbanks guilty and the case would proceed to the sentencing phase. (Trial Transcript, Voir Dire, R. 163-9, PageID 2554, 2604, 2651-52, 2662, 2678, 2706; Trial Transcript Voir Dire, R. 163-10, PageID 2764, 2786, 2795, 2824, 2842; Trial Transcript Voir Dire, R. 163-11, PageID 2865, 2873, 2898, 2901, 2900, 2927, 2957, 2977, 2990, 3026, 3052, 3072; Trial Transcript Voir Dire, R. 163-12, PageID 3093). Little mention was made concerning the mitigating evidence counsel would present.

**B.    Defense Opening Statement in the Sentencing Phase**

Trial counsel's opening statement in the mitigation phase was brief. (Trial Transcript, Mitigation, R. 163-15, PageID 3425-29). Counsel told the jury, "I told you you [sic] wouldn't have trouble finding a guilty verdict and you didn't. We presented nothing." (*Id.* at PageID 3426). Trial counsel stated "we're *going to try to show you* in this mitigation phase what Gary Hughbanks is about and the why and how of Gary Hughbanks." (*Id*). (emphasis added). Trial counsel then identified the witnesses that they would call, but provided no details as to their testimony. (*Id.* at PageID 3426-27).

## C.   Trial Counsels' Sentencing Presentation

In the sentencing phase, trial counsel called six witnesses, including Hughbanks who gave an unsworn statement:

### 1.   Dr. Sagi Raju

Trial counsels' first witness appeared by video deposition. (*Id.* at PageID 3431). He was semi-retired from the practice of medicine. (*Id.* at PageID 3427).

Dr. Raju twice admitted Hughbanks to Christ Hospital in 1986. (*Id.* at PageID 3436, 3449). The first hospital admission was for a period of fourteen days and the second for a period of three days. (*Id.* at Page 3452). Dr. Raju had no contact with Hughbanks in the twelve years between the second hospital admission and the mitigation hearing. (*Id.*). Dr. Raju never spoke with members of Hughbanks' family nor conducted or caused to be conducted any testing. (*Id.* at PageID 3454). Because he did not have any contact with Hughbanks for twelve years at his deposition, "every time he was asked a question, he had to go to his notes, and he had to flip through the notes, the medical records. If there was something in there he could read that off his notes, but if it wasn't there, he couldn't answer the question." (*Id.* at PageID 3763-64).

At the time of his first admission to Christ Hospital, Hughbanks was hearing voices and experiencing homicidal thoughts. (*Id.* at PageID 3437-38). At the time of

his release, Dr. Raju diagnosed Hughbanks as suffering from bipolar, major affective, and substance disorders, the later drug and alcohol related. (*Id.* at PageID 3439).

### 2. Doctor Bernard DeSilva

Dr. Bernard DeSilva also appeared by video deposition, (*Id.* at PageID 3483). Trial counsel conducted the deposition at the doctor's residence because the doctor recently had triple bypass surgery. At the time of his deposition Dr. Silva was suffering from post-surgery complications including "recurrent fever which is not under control." (*Id.* at PageID 3484).

The Doctor was semi-retired and limited his practice to fifteen to eighteen hours a week. (*Id.* at PageID 3485). He previously testified somewhere between "100 to 150 times" which included "a lot in the '70's" but not "very much in the late '80's or the early '90's." (*Id.* at Page ID 3489). Hughbanks sentencing hearing was held in the late 90's.

Doctor DeSilva last saw Hughbanks in 1996, two years prior to the sentencing hearing. (*Id.* at PageID 3543). Doctor DeSilva lost his own file concerning his treatment of Hughbanks and had to rely on the hospital records concerning Hughbanks. (*Id.* at PageID 3541-42).

Doctor DeSilva testified that he treated Hughbanks' family including his mother, father, and uncle. (*Id.* at PageID 3491). Hughbanks' father, Gary, Sr.

suffered from paranoid schizophrenia and schizoaffective disorder. (*Id.* at PageID 3492-94). The father saw a threatening devil like figure. (*Id.* at PageID 3494-55).

Doctor DeSilva testified that the father's mental illnesses were transferred to Hughbanks through genetics and environment. (*Id.* at PageID 3499-501). DeSilva treated Hughbanks for approximately five years. (*Id.* at PageID 3490), and diagnosed Hughbanks as suffering from schizoaffective, depression, bipolar, and substance abuse disorders. (*Id.* at PageID 3501-04). The Doctor testified that as a result of his bipolar disorder, Hughbanks had periods of grandiose thoughts and was at times both impulsive and suicidal. (*Id.* at PageID 3506, 3508). In addition, like his father, Hughbanks had hallucinations that included a threatening devil like figure. (*Id.* at PageID 3517-18). Finally, according to DeSilva, Hughbanks did not stay on his prescribed medications. (*Id.* at PageID 3511-13, 2515-16).

On cross examination, Dr. DeSilva testified that because he lost Hughbanks' file, he could not document any of his testimony. (*Id.* at PageID 3542). The prosecution attempted to cross-examine Dr. DeSilva concerning Hughbanks' behavior in prison, but the Doctor was unable to respond because he had not reviewed the prison records. (*Id.* at PageID 3546-47). The prosecution cross examined Dr. DeSilva concerning his prior statements (even though he had not seen Hughbanks in the two years prior to his sentencing) that Hughbanks: (a) was incompetent, (b) wasn crazy since his birth, and (c) may have had his constitutional

rights violated by the Tucson, Arizona detectives when they interrogated him without counsel. (*Id.* at PageID 3563-53). Finally Doctor DeSilva admitted that his testimony did not: (a) account for any information post 1987, (b) take into consideration the facts of the murders, and (c) include an opinion as to Hughbanks' state of mind at the time of the murders. (*Id.* at PageID 3568, 3573-74).

### 3.    Larry Kramer

Larry Kramer is Hughbanks' maternal uncle. (*Id.* at PageID 3589). Despite the fact that his video deposition was taken two months prior to the sentencing hearing, trial counsel failed to have the video of the deposition prepared in time for trial and, as a result, the transcript of the deposition was read to the jury. (Trial Transcript, R 163-16, PageID 3586-87).

Kramer testified that Hughbanks' mother, Evangeline was sixteen or seventeen years of age when she gave birth to Hughbanks. (*Id.* at PageID 3590). Hughbanks was born with a birth defect; he had an opening in his stomach. (*Id.* at PageID 3589).

Kramer also testified that Hughbanks' father suffered a serious work related injury that caused him to become very withdrawn. (*Id.* at PageID 3592). The father's mental illnesses led to him being hospitalized multiple times during which he received electric shock treatments. (*Id.* at PageID 3596-97).

According to Kramer, both parents were jealous of each other. (*Id.* at PageID 3592). The father beat the mother (*Id.* at PageID 3592, 3594), some of which the Hughbanks' children witnessed. (*Id.* at PageID 3608). The father was often involved with other women and absent from the home. (*Id.* at PageID 3592-3). The family experienced financial difficulties. (*Id.* at PageID 3594-95).

### 4.     Larketa Ann Hughbanks

Larketa Hughbanks is Gary Hughbanks' younger sister. (*Id.* at PageID 3610). Unlike the first three witnesses in the mitigation hearing, she testified in person.

Larketa testified that Hughbanks' father had mental health issues. (*Id.* at PageID 3613, 3619). When he became angry, the father sat in his room for days (*Id.* at PageID 3613). He once overdosed on drugs. (*Id.* at PageID 3619). The father was often involved with other women and during those times would refer to Larketa's mother as "worthless" and a "bitch." (*Id.* at PageID 3618).

The father's interaction with the family differed greatly depending on his mood. He physically abused their mother including choking her. (*Id.* at PageID 3614). When the father was in a bad mood, the children were sent to bed early. (*Id.* at PageID 3615, 3616). The Hughbanks children had few friends because their father interfered with any meaningful relationships. (*Id.* at PageID 3616). He did not permit the children to leave the yard. (*Id.* at PageID 3615).

Like his father, Hughbanks saw a shadowy figure. (PageID 3600-1). Hughbanks tried to commit suicide by (a) drug overdose, (b) slitting his wrists, and (c) jumping off a balcony. (*Id.* at PageID 3627-30).

### 5.    Evageline Hughbanks

Evageline Hughbanks is Gary Hughbanks' mother. (*Id.* at PageID 3635). She was the last witness called by trial counsel. (*Id.* at PageID 3633).

She testified that her husband was very abusive. (*Id.* at PageID 3640). His physical abused her including beating and choking her. (*Id.* at PageID 3640-41). He became especially abusive when he had a migraine headache during which about anything would set him off. (*Id.* at PageID 3643). He was often involved with other women. When he was in one of his frequent relationships with women outside the marriage, the intensity of his abuse increased including calling the witness a "whore" in front of their children. (*Id.* at PageID 3650).

She testified that Gary Sr.'s mental illnesses included hallucinations. (*Id.* at PageID 3639). Because he was very paranoid and jealous, he did not permit the witness to have any friends and the window shades in the family residences always had to be closed. (*Id.* at PageID 3637-38). He was hospitalized countless times during which he received shock therapy. (*Id.* at PageID 3644). He attempted suicide several times. (*Id.* at PageID 3645-47).

While Gary Sr. did not physically abuse his children, he mentally abused them including humiliating them in front of their friends. (*Id.* at PageID 3642). He did not let the children go anyplace. (*Id*).

Finally, she testified that Hughbanks was born with an open stomach which caused him to remain in the hospital for the first two months of his life. (*Id.* at PageID 3636). Hughbanks attempted suicide countless times. (*Id.* at PageID 3655-57). Both of her other children experienced difficulties with the law. (*Id.* at PageID 3658-59).

### 6. Gary Hughbanks

Hughbanks gave a four page unsworn statement. (*Id.* at PageID 3670-73). He talked about his mental illness being with him all of his life. (*Id.* at PageID 3672) ("This is something that's been inside of me bottled up, and I would push it way for a while and then it would come back"). He also told the jury that he understood if the jury hated him because if the roles were reversed, he would hate the individual on trial for killing his parents. (*Id*).

### C. The Prosecution's Sentencing Presentation

The prosecution called only one witness, Dr. Nancy Schmidtgoessling of the Hamilton County Court Clinic. (*Id.* at PageID 3678). The trial court initially appointed the Court Clinic to conduct a pretrial insanity evaluation of Hughbanks because he entered a not guilty by reason of insanity plea. (Entry Appointing

Community Diagnostic Center, R. 166-2, PageID 3947). Later, the trial court sua sponte appointed the Clinic a second time to "assist the Court in determining the proper disposition of the case." (Entry Appointing Community Diagnostic Center, R. 166-3, PageID 4372).[16] Dr. Schmidtgoessling testified that she interviewed Hughbanks three times. (Trial Transcript, Mitigation Phase, R. 163-16,). Dr. Schmidtgoessling administered four psychological tests to Hughbanks. (*Id.* at PageID 3681). In addition, Dr. Schmidtgoessling had the assistance of a staff member who obtained Hughbanks' prior mental health records (*Id.* at PageID 3694, 3703-05, 3723-24) and interviewed Hughbanks' mother and sister (*Id.* at PageID 3713-14). In addition a psychiatrist met with Hughbanks. (*Id.* at PageID 3681, 3689).

Doctor Schmidtgoessling testified that when she initially met with Hughbanks he denied any involvement in the murders, but in a later meeting, afer here second appointment admitted his involvement.[17] (*Id.* at PageID 3685-86, 3689). She

----

[16]

The trial court lacked the authority to make this second appointment. O.R.C. § 2929.03(D)(1). ("A pre-sentence investigation or mental examination shall not be made except upon request of the defendant"). Trial counsel did not object to either the second appointment of Dr. Schmidtgoessling or the portion of her testimony that was based on the later problematic interviews.

[17]

Hughbanks' statement to Schmidtgoessling concerning the events surrounding the murders was not consistent with facts developed by the law enforcement agencies during their investigation of the murders.

testified that Hughbanks was sane at the time of the offense and competent to stand trial. (*Id.* at PageID 3685, 3687-94).[18] She diagnosed Hughbanks with a substance abuse, mood, and character disorders. (*Id.* at PageID 3696). However, because the trial court's referral question to the Court Clinic was limited to sanity, she did not make a diagnosis within a reasonable degree of psychological certainty. (*Id.* at PageID 3710-11). She testified, however, that Hughbanks met the criteria for an anti-social personality diagnosis. (*Id.* at PageID 3696-97).

### D.    Closing Arguments

During closing argument trial counsel told the jury that "There is part of me that is outraged by this. There's a part of you that wants to execute him, and I don't discount that, because if I was in your position, I would feel the same way." (Trial Transcript, Mitigation, R. 163-17, PageID 3782). Trial counsel also told the jury, "[c]an't play golf anyway so we might as well be here" and "[t]he depositions were a little boring" (*Id.* at PageID 3788). Trial counsel argued that Hughbanks was a product of genetics and his childhood environment. (*Id.* at PageID 3773-78). They

---

18

Trial counsel did not object to her testimony concerning competency and insanity even though neither issue is relevant to whether the aggravating circumstances outweighed the mitigating factors by proof beyond a reasonable doubt.

117

further argued that he was on trial only because he confessed to the Tucson Arizona Detectives. (*Id.* at PageID 3780-85).

The prosecution in closing argument told the jury that Dr. Raju's testimony was not credible because, he had: (a) not seen Hughbanks' in twelve years, (b) no independent recollection of Hughbanks, and (c) no opinion as to Hughbanks' mental state at the time of the crimes. (*Id.* at PageID 3763-64). The prosecution similarly faulted Dr. DeSilva because he did not have an opinion as to Hughbanks' mental state at the time of the crimes and by his own admission knew nothing about the facts of the crimes. (*Id.* at PageID 3765-66). The prosecution contrasted the testimony of Doctors Raju and DeSilva with the testimony of Doctor Schmidtgoessling who was appointed by the court and therefore a neutral witness. Furthermore, unlike Doctors Raju and DeSilva she stated Hughbanks Hughbanks did not have a mental disease or defect at the time of the offenses. (*Id.* at PageID 3767-68). The prosecution cited Hughbanks' unsworn statement in which he told the jury that he knew right from wrong at the time of the offenses. (*Id.* at PageID 3768). Finally, in both portions of its closing argument, the prosecution argued that Hughbanks' childhood environment was not as bad as trial counsel made it appear:

> "Until the time he was 14 or 15 years old, he was a normal kid, did reasonably well in school, he was popular. I think her [his mother's] word that she used on the stand to me was charisma, that he had charisma, that it was only after he began to use drugs as a teen that these problems really began to appear, I think that said about 14 or 15."

(*Id.* at PageID 3770)

> "You know, we talk about this terrible background of his. You can walk a quarter of a mile north of tis courthouse and find thousands of adolescents and teen-agers that have it a lot more difficult than Gary Hughbanks. They don't even know who their father is. They may see their mom once or twice a week. They're on their own running the streets when they're 5, 6, 7 years old."

(*Id.* at PageID 3798)

### E. The Jury Deliberations

In the State of Ohio in the mitigation phase of a capital case the trial court is required to instruct the jury that "a solitary juror may prevent a death recommendation by finding that the aggravating circumstances do not outweigh the mitigating factors." The trial court did not give the required *Brooks* instruction. Trial counsel did not object to the trial court's failure to instruct the jury pursuant to *Brooks*. (*Id.* at PageID 3834).

The jury commenced its deliberations at 12:25 p.m. and immediately went to lunch. (*Id.* at PageID 3834, 3836). It resumed its deliberations at 1:35 p.m. and deliberated until 9:25 p.m. that evening without reaching a verdict. (*Id.* at PageID 3836, 3838). The following day the jury resumed its deliberations at 9:45 a.m. and at 12:10 returned its verdicts recommending death. (Trial Transcript, Mitigation, R. 163-18, PageID 3844).

### F.   The Trial Court's Sentencing

In Ohio a jury's death verdict is only a recommendation and the trial judge makes the ultimate decision concerning whether the aggravating circumstances outweigh the mitigating factors by proof beyond a reasonable doubt. O.R.C. § 3929.03(D). On July 6, 1998, the trial court conducted the sentencing hearing. (Trial Transcript, Mitigation, R. 163-19, PageID 3852). Neither trial counsel argued in favor of sentences of less than death. (*Id.* at PageID 3853). The trial court accepted the jury's recommendations and imposed death on both counts. (*Id.* at PageID 3855). The trial court stated "it is without hesitation that this Court remarks that the factors offered in mitigation were unremarkable and unpersuasive." (*Id.* at PageID 3855-56).

### III.   The Evidence Trial Counsel Failed to Present at Hughbanks' Sentencing Hearing.

Trial counsel failed to present substantial evidence in the sentencing phase that was different in nature and not cumulative of the evidence that was presented.

### A.   Evidence concerning Hughbanks' childhood.

As set forth in the prior section, trial counsel presented evidence of the dysfunction in the Hughbanks' family. The jury heard that Hughbanks' father was severely mentally ill, was abusive to family members, often absent, and limited the

children's contact with the outside world. However, the jury did not hear the following compelling lay testimony:

1.     Sexual abuse including rape

An older male cousin, Jeff Stratton repeatedly raped Hughbanks when he was approximately seven years of age. At the time Hughbanks was residing with the Strattons and had no adult to turn to concerning the abuse. (Smith Affidavit, R. 166-20, PageID 9290, ¶ 25).

A stranger abducted Hughbanks when he was fifteen years of age, drove him to a nearby park, and anally raped him. Hughbanks did not report it for approximately three years because the stranger threatened to kill Hughbanks if he reported the rape to anyone. (*Id.* at ¶ 26).

2.     Mother's substance abuse

In closing argument, the prosecution focused on Hughbanks' mother as having a positive impact on Hughbanks: "[h]e had a mother who lived with him who would make sacrifices for him, who would do for him" (Trial Transcript, Mitigation, R. 163-17, PageID 3770). Trial counsel failed to present any evidence to offset this argument. Hughbanks' mother also suffered from a significant mental illness, substance abuse that began with alcohol and progressed to carisoprodal ("SOMA"). The mother's substance had a genetic component, her father and three brothers

abused alcohol and other substances.[19] (Smith Affidavit, R. 166-20, PageID 9292, ¶ 36).

### B. Evidence concerning prior treatment for Hughbanks' mental illnesses.

Although the witnesses referenced Hughbanks' prior hospitalizations and treatment, trial counsel failed to document for the jury the full extent of those hospitalizations and treatments. Thirteen separate sets of documents illustrate the nature of Hughbanks' chronic mental illnesses. (*Id.* at PageID 9297-89, ¶ 22). Those documents support the conclusion that Hughbanks does suffer from bipolar disorder. (*Id.*) ("the documentation presents overwhelming evidence that Mr. Hughbanks suffered from Bipolar Disorder since his adolescent").

### C. Evidence concerning Hughbanks' mental illnesses.

Trial counsel failed to present any evidence or testimony from any mental health expert who personally saw, tested or evaluated Hughbanks in connection with his capital case. (Trial Transcript, Mitigation, R. 163-15, PageID 3526, 3575). Instead, trial counsel only presented evidence that Hughbanks was previously diagnosed with major affective, schizoaffective, depression, bipolar, and substance

---

[19] Hughbanks' father was a binge drinker and abused psychotropic medications. (*Id.* at PageID 9292, ¶ 36).

abuse disorders. (*Id.* at PageID 3439, 3501). Trial counsel did not present any evidence that Hughbanks suffered from any of those mental illnesses at the time of the offenses or at the time of the sentencing phase. (*Id.* at PageID 3574).

During the state post-conviction process, Doctor Robert Smith interviewed, tested, and evaluated Hughbanks. (Smith Affidavit, R. 166-20, PageID 9284, ¶ 10). At the time that he evaluated Hughbanks, Dr. Smith had the following professional appointments: (a) Assistant Clinical Professor of Psychology, Department of Psychology Case Western University, (b) Assistant Professor of Psychology, Department of Psychiatry, Case Western School of Medicine (c) Director, Chemical Dependency Treatment Services, Department of Psychiatry Metro Health Medical Center, Cleveland Ohio, and (d) Clinical Psychologist for Behavior Management Associates, Inc. in Beachwood and Rocky River Ohio. (*Id.* at PageID 9493). Dr. Smith was (a) licensed clinical psychologist in the State of Ohio, (b) listed on the National Register of Health Service Providers in Psychology, (c) a member of the American Academy of Health Care Providers in the Addictive Disorders, (d) a member of the American College of Forensic Examiners, and (e) had a certificate of proficiency in the Treatment of Alcohol and other Psychoactive Substance Abuse Use Disorders. (Smith Curriculum Vitae, R. 166-21, PageID 9495). Based on his education, training and professional experiences, Dr. Smith diagnosed Hughbanks

as suffering from bipolar, post-traumatic, and substance disorders at the time of the offense.

First, it was Doctor Smith's opinion within a reasonable degree of psychological certainty the Hughbanks suffered from a bipolar disorder at the time of the offense. (Smith Affidavit, R. 166-20, PageID 9285, ¶ 14). He reached this opinion after conducting an exhaustive review of Hughbanks' medical records. (*Id.* at ¶ 21). In reaching this conclusion he assessed each set of the thirteen medical records and set forth the reason that those records were consistent with a diagnosis of bipolar disorder. (*Id.*).

Second, it was also Doctor Smith's conclusion within a reasonable degree of psychological certainty that Hughbanks suffered from Post-Traumatic Stress Disorder. (*Id.* at Page ID 9289, ¶ 23). He reached this conclusion after examining Hughbanks' medical records that reflected: (a) the dysfunction in the Hughbanks household, (b) Hughbanks at the age of seven was repeatedly raped by a cousin, and (c) Hughbanks at the age of fifteen was abducted and anally raped by a stranger. (*Id.* at PageID 9290, ¶¶ 24-26). Dr. Smith reached this opinion after administering to Hughbanks the Trauma Syndrome Inventory which indicated that Hughbanks continued to have "significant symptoms of PTSD" at the time of the testing. (*Id.* at PageID 9291, ¶¶ 30-31). This mental illness caused Hughbanks to dissociate, or

"alter his consciousness awareness" when experiencing high levels of stress. (*Id.* at ¶ 31).

Third, it was Doctor Smith's conclusion within a reasonable degree of psychological certainty that Hughbanks suffered from a substance abuse disorder including dependence on (a) alcohol, (b) cannabis, (c) amphetamines, and (d) other drugs. (*Id.* at ¶ 34). While all three of the mental health professionals who testified at trial found that Hughbanks suffered from a substance abuse disorder (*Id.* at Trial Transcript, Mitigation Phase, R. 163-15, PageID 3439, 3505; Trial Transcript. Mitigation Phase, 163-16, PageID 3696), none of three witnesses identified the events precipitating his substance abuse. Doctor Smith, in his affidavit, documented that Hughbanks' bipolar, post-traumatic and familial history of substance abuse was linked to his substance disorder. (Smith Affidavit, R. 166-20, PageID 9293, ¶¶ 42-45). For instance, "[a]pproximately 40% to 60% of children who are physically and/or sexually abused resort to alcohol and other drugs to reduce their emotional pain and to cope with their dysfunctional life situations." (*Id.* at ¶ 42).

The failure by trial counsel to raise these facts at the sentencing phase was not the result of strategic decision making but instead resulted from trial counsel's neglect and failure to even minimally investigate prepare, and present to the jury a full and complete picture of a man facing the prospect of execution. Without the information contained in Doctor's Smith's affidavit, the jury was

likely to view Hughbanks' mental illnesses as a mitigating factor deserving very little weight. A reasonable probability exists that Hughbanks would have received different sentences had the information been presented and that at least one juror would have voted to recommend a sentence of less than death.

## IV. Trial Counsel Failed To Conduct A Reasonable Sentencing Investigation.

In a capital case, the sentencing process focuses on the defendant's moral culpability, A capital sentencer must be permitted to assess "the character and record of the individual offender." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (internal quotation marks and citation omitted). The necessity of an individualized sentence requires consideration of "evidence about the defendant's background and character . . . because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks and citation omitted), *abrogated on other grounds Atkins v. Virginia*, 536 U.S. 304 (2002); *see also California v. Brown*, 479 U.S. 538 (1987) (O'Connor, J., concurring); *Eddings*, 455 U.S. at 112 (explaining that consideration of offender's life history is a "constitutionally indispensable part of the process of inflicting the penalty of death").

Courts have found the ABA Criminal Justice Standards and Death Penalty Guidelines useful in assessing the reasonableness of counsel's performance. Justice Stevens noted in *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010): "We long have recognized that '[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . .'" *Id.* at 366. (citing *Strickland*, 466 U.S. at 688, *Bobby v. Van Hook*, 558 U.S. 4 (2009) (*per curiam*); *Florida v. Nixon*, 543 U.S. 175, 191, n.6 (2004); *Wiggins*, 539 U.S. at 524; and *Williams*, 529 U.S. at 396). Justice Stevens concluded: "Although they [ABA standards] are 'only guides,' *Strickland*, 466 U.S. at 688, and not 'inexorable commands,' *Bobby*, 558 at 8, these standards may be valuable measures of the prevailing norms of effective representation . . ."

The ABA standards in effect at the time of Hughbanks' trial provided that the sentencing "investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." American Bar Association Guidelines for the Appointment and Performance of Counsel In Death Penalty Cases 1989 § 11.4.1(C) ("ABA standards"). Hughbanks, in support of his initial post-conviction petition, submitted the affidavit of Dorian Hall, MA. L.S.W. (Hall Affidavit, R. 166-20, PageID 9297, ¶ 1). She was the supervisor for the Investigative Section of

the Office of the Ohio Public Defender. At the time she submitted her affidavit she had been "involved in the investigation and/or preparation of more than one hundred and fifty (150) death penalty cases at the trial and post-trial levels in the States of Ohio and Indiana." (*Id.* at ¶ 3). Her affidavit reflected the ABA standards were the prevailing standards in the State of Ohio at the time of Hughbanks' trial:

> A mitigation investigation is conducted by gathering all relevant information available about the defendant and his family and using this information to construct a psychosocial history and understanding of the defendant. Only after this history and understanding is constructed can the defense team (including the attorneys, mitigation specialist, and any experts) form a complete picture of the defendant, his mental functioning, and his history, character, and background. This complete picture is necessary for the defense attorneys to develop a mitigation theory.

(*Id.* at ¶ 4)

### A. Trial counsel failed to collect all necessary records.

The relevant ABA standards provided that trial counsel should collect the following information in the course of the sentencing investigation "including, but not limited to: medical history, (mental and physical illness or injury of alcohol and drug use, birth trauma and developmental delays); . . . family and social history (including physical, sexual or emotional abuse); ... prior adult and Juvenile record; prior correctional experience . . ." ABA Standards, § 11.4.1(D)(2)(C). Ms. Hall's affidavit reflects the same standard, "the mitigation specialist must then collect all relevant records regarding the defendant. . . for example, medical history,

mental health history, family history, substance dependence and abuse . . ." (Hall Affidavit, ¶ 8, R, 166-20, PageID 9299).

In this case, state post-conviction counsel assembled twenty-eight sets of records concerning Hughbanks. (Smith Affidavit, R. 166-20, PageID 9285, ¶ 13). Trial counsel either did not obtain these records or if they did obtain them they did not read them. Dr. Smith in his affidavit observed that "it is important to note that the traumatic events reported by Mr. Hughbanks [the cousin's repeated molestation of him and the later abduction and rape by a stranger] were documented in the medical records, as well as the reports by Dr. Gail Hellmann and Dr. Nancy Schmidtgoessling." (*Id.* at PageID 9290, ¶ 29).

**B.    Trial counsel failed to conduct necessary and adequate interviews of Hughbanks' family members.**

The relevant ABA standards provided that "[c]ounsel should consider interviewing potential witnesses, including: witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s), possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death;" ABA Standard 11.4.1(D)(3)(B). Ms. Hall similarly opined that "[t]he defendant's report of his psychosocial history and experiences must be corroborated through in-depth interviews with collateral sources: that is, all of the defendant's

significant family members (including parents, siblings, grandparents, aunts, uncles, and cousins)." (Hall Affidavit, ¶ 7, R. 166-20, PageID 9299).

Trial counsel did not interview Hughbanks' father, Gary Hughbanks Sr. (Hughbanks, Sr.'s Affidavit, R 166-17, PageID 8494, ¶ 9 ("Gary's defense counsel did not contact me to testify for Gary's trial. Had Gary's defense counsel contacted me, I would have testified on Gary's behalf during both the guilt and sentencing phase."). Trial counsel also did not interview Hughbanks' brother, Larry Hughbanks. (*Id.* at PageID 8492, ¶¶ 16-17) ("Because Gary's defense attorneys did not contact me, I contacted them. Whenever I contacted Mr. Schmidt or Mr. Wenke, they were not available and failed to return my calls. Had Mr. Schmidt or Mr. Wenke contacted me, I would have testified . . . at his sentencing hearing in an attempt to have the jury spare Gary's life.")

Trial counsel called Larketa Hughbanks to testify in the mitigation phase. They first spoke with her on the Saturday before her testimony. (Trial Transcript, Mitigation Phase, R 163-16, PageID 3611). They also called Hughbanks' mother Evageline Hughbanks to testify. (*Id.* at PageID 3633). They first spoke with her via telephone a few weeks prior to the sentencing hearing and did not meet with her until the Sunday prior to her testimony. (*Id.* at PageID 3639).

Trial counsel's lack of knowledge concerning Hughbanks' family became evident at the sentencing hearing when one of counsel's questions inaccurately represented the number of siblings Hughbanks had. (*Id.* at PageID 3635).

### C.    Trial counsel failed to retain a competent clinical psychologist.

A reasonable sentencing investigation includes the retention of all reasonably necessary experts. *Horsely v. State of Alabama*, 45 F.3d 1486, 1494-1495 (11th Cir. 1995); *Glenn*, 71 F.3d at 1210; *Harris By And Through Ramseyer v. Wood*, 64 F.3d 1432, 1436 (9th Cir. 1995). To assure meaningful access to justice, the defense has a right to the assistance of a mental health expert, "to effectively 'assist in evaluation, preparation, and presentation of the defense.'" *McWilliams v. Dunn*, 137 S.Ct.1790, 1793 (2017) (citing *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985)).

The relevant ABA guideline provided that "[c]ounsel should secure the assistance of experts where it is necessary or appropriate for presentation of mitigation." 11.4.1(D)(7)(D). Ms. Hall in her affidavit stated that "[i]nformation learned from the interviews and records must be presented to a qualified and licensed clinical psychologist who, as the defense team psychological expert, can provide insight into and an assessment of the defendant's behavior, history, character, and background." (Hall Affidavit, R. 166-20, PageID 9300, ¶ 12). Dr. Smith reached the same conclusion, "[a] *review of all available records is essential* in order for the mental health expert to determine the defendant's developmental

experiences, his family's functioning and dynamics, the parenting capabilities of the defendant's parents, the defendant's level of intellectual functioning, the defendant's ability to relate to others, the defendant's sexual and marital history, the defendant's medical history, and the defendant's psychological functioning throughout his lifetime." (Smith Affidavit, R. 166-20, PageID 9284, ¶ 6) (emphasis added).

The relevant guidelines recognized the need to retain "expert assistance" to rebut "any portion of the prosecution's case at the guilt/innocence phase or the sentencing phase of trial." ABA Standards 11.4.1(D)(7)(C). On direct examination, Dr. Schmidtgoessling testified that Hughbanks met the criteria for an antisocial diagnosis. (R 163-16, PageID 3697). Doctor Smith concluded that this was an incorrect diagnosis, "[i]t is important to note that the diagnostic criteria for Antisocial Personality Disorder emphasize that the behavior is not the result of Schizophrenia or a Manic Episode of a Bipolar Disorder. In light of the significant evidence of Mr. Hughbanks' Bipolar Disorder, it is believed that his behavior is better explained as the result of a manic episode as part of his Bipolar Disorder. Consequently, I do not believe that Mr. Hughbanks has met the criteria for an Antisocial Personality Disorder." (Smith Affidavit, R 166-20, PageID 9294, ¶ 49).

Trial counsel did not present any of Hughbanks' medical or mental health records to Dr. Raju or Dr. DeSilva. As a result neither expert could provide any

insight to Hughbanks' level of functioning, (a) at the time of trial, (b) at the time of the offense, and (c) in the decade immediately prior to trial. Dr. Raju admitted that he had no contact with Hughbanks since 1986. (Trial Transcript, Mitigation Phase, R. 163-15, Page 3452). Dr. DeSilva's opinion did not take into account any information that was accumulated after 1987. (*Id.* at PageID 3568). Counsel did not prepare Dr. Raju to testify. The prosecutor described his testimony: "every time he was asked a question, he had to go to his notes, and he had to flip through the notes, the medical records. If there was something in there he could read that off his notes, but if it wasn't there, he couldn't answer the question." (Trial Transcript, Mitigation, R 163-17, PageID 3763-64). If trial counsel had adequately prepared the witness, Dr. Raju would have been aware of the contents of his notes and the questions trial counsel would ask him, therefore obviating the need for him to review and read his notes prior to responding to each question.

Doctors Raju and DeSilva limited their testimony to their treatment of Hughbanks more than a decade prior to trial. According to the affidavit of the late Attorney Richard Ketchum who had represented more than twenty-five capitally charged defendants, the testimony of Doctors Raju and DeSilva did not obviate the need to present testimony from a clinical psychologist specifically retained for purpose of trial who could have "presented a comprehensive picture of Mr. Hughbanks' behavior, history, character, and psychological issues, particular his

133

bipolar and substance abuse issues." (Ketchum Affidavit, R. 166-21, PageID 9504, ¶36). Similarly, Ms. Hall found that while the testimony of Doctors Raju and DeSilva was helpful, trial counsel should have used it in conjunction with a clinical psychologist who could have "present[ed] a comprehensive picture of the defendant's behavior, history, character, and background, specifically his psychosocial history and psychological issues." (Hall Affidavit, R. 166-20, PageID 9301, ¶ 16). Instead, the mental health testimony was incomplete and ineffective and easily belittled by the prosecution during argument.

Doctors Raju's and DeSilva's lack of current knowledge concerning Hughbanks and preparation to testify, is telling which contrasted with Doctor Schmidtgoessling's knowledge of Hughbanks and her preparation to testify. Doctor Schmidtgoessling saw Hughbanks three times during the pretrial proceedings (Trial Transcript, Mitigation Phase, R. 163-16, PageID 3689) while Doctors Raju and DeSilva did not see Hughbanks at all during the pretrial proceedings. (Trial Transcript, Mitigation Phase, R. 163-15, PageID 3452). Doctor Schmidtgoessling administered four psychological tests to Hughbanks (Trial Transcript, Mitigation Phase, R. 163-16, PageID 3681), while Doctors Raju and DeSilva did not administer any tests to Hughbanks (Trial Transcript, Mitigation Phase, R. 163-15, PageID 3454, 3563). Doctor Schmidtgoessling sought a second opinion from a psychiatrist concerning Hughbanks (Trial Transcript, Mitigation Phase, R. 163-16, PageID

3689), but trial counsel failed to procure or direct Doctors Raju or DeSilva to seek a third opinion to insure the accuracy of their opinions. Doctor Schmidtgoessling had the assistance of an individual who collected updated records and interviewed witnesses concerning Hughbanks. (Trial Transcript, Mitigation Phase, R 163-16, PageID 3713-4). Neither Doctors Raju nor DeSilva had someone collect records or conduct interviews. (Trial Testimony, Mitigation Phase, R 163-15, PageID 3452, 3568).

The sentences of death are no surprise given the lopsided distribution of resources. (*Id.* at PageID 3472). Had trial counsel retained and adequately prepared a competent clinical psychologist, a reasonable probability exists that at least one juror would have voted to recommend a sentence of less than death.

## D. Conclusion, trial counsel conducted an unreasonable sentencing phase investigation.

Trial counsel failed to review the records that documented the repeated sexual abuse Hughbanks suffered as a child, first by a cousin and later by a stranger. Trial counsel failed to interview family members (Hughbanks' father and brother) and inadequately interviewed other family members (Hughbanks' mother and sister). Trial counsel failed to retain a competent clinical psychologist.

Strategic choices resulting from lack of diligent preparation and investigation are not protected by the presumption in favor of counsel. *Wiggins,* 539 U.S. at 521-

22. Here trial counsels' failure to conduct a reasonable sentencing investigation deprived counsel of the "defense" that their decisions were "strategic." When counsel unreasonably fails to interview witnesses, collect records and retain necessary experts, such inaction constitutes "negligence, not trial strategy." *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1998). The failure to conduct a reasonable investigation "does not reflect a *strategic* decision, but rather an abdication of advocacy." *Austin v. Bell*, 126 F.3d 843, 849 (6th Cir. 1997).

## V. Trial Counsel's Failure to Conduct a Reasonable Sentencing Investigation Prejudiced Hughbanks.

### A. The standard for establishing prejudice.

To demonstrate the existence of prejudice Hughbanks "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is less than a preponderance of the evidence. *Kyles*, 514 U.S. at 434 (1995). Hughbanks must show that "there is a reasonable probability that he would have received a different sentence." *Porter*, 558 U.S. at 41. Determinations of prejudice require a cumulative assessment of counsel's errors:

"Taking the unaffected findings as given, and taking due account of the effect of the errors on the remaining findings, a court making a prejudice inquiry must ask

if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Strickland*, 466 U.S. at 696.

The Court must "proceed on the assumption that the decision maker is reasonably, conscientiously, and impartially applying the standards that govern the decision" whether to convict of a particular offense, or impose a sentence of death. *Id* at 695. Ohio requires juror unanimity at the penalty stage of a capital case. Hughbanks demonstrates prejudice if he shows the available mitigation evidence that trial counsel failed to present in conjunction with the mitigation that was presented may have caused "at least one juror [to] have struck a different balance." *Wiggins*, 539 U.S. at 537.

**B.    Three factors establish the existence of prejudice.**

Three factors both individually and cumulatively, support the conclusion that trial counsel's deficient performance prejudiced Hughbanks.

    1.    Trial counsel failed to present lay and expert testimony in support of a sentence of less than death.

Hughbanks previously identified the lay evidence and testimony that trial counsel failed to present at the sentencing hearing. *See* Section III, pp.120-126 *supra.* That information included: (a) an older cousin repeatedly molested Hughbanks when he was approximately seven years of age (Smith Affidavit, R. 166-20, PageID 9290,  25); (b) a stranger abducted and anally raped him when he was

fifteen years of age (*Id.* at ¶ 26); (c) his mother was addicted to SOMA (*Id.* at PageID 9292, ¶ 36) and (d) his mother's family had a significant history of substance abuse (*Id*).

Hughbanks previously identified the expert evidence and testimony that trial counsel failed to present. *See* Section III, pp. 120-126 *supra*. That testimony included: (a) Hughbanks suffered from bipolar disorder at the time of the offenses (*Id.* at PageID 9289, 22); (b) Hughbanks suffered from post-traumatic stress disorder at the time of the offenses which caused him to disassociate (*Id.* at PageID 9289, ¶ 23); (c) Hughbanks does not suffer from an anti-personality disorder (*Id.* at PageID 9294, ¶ 49), and (d) his substance abuse was linked to (i) his bipolar disorder, (ii) post-traumatic disorder, and (iii) his family history of substance abuse. (*Id.* at PageID 9291-82, ¶¶ 35-56).

    2.    The substantial expert testimony that trial counsel failed to present would have negated the prosecution's closing argument that the aggravating circumstances outweighed the mitigation factors by proof beyond a reasonable doubt.

The existence of prejudice is also readily apparent from the prosecution's closing argument. *See Kyles*, 514 U.S. at 444 ("the likely damage is best understood by taking the word of the prosecutor who contended during oral argument . . ."). In *Kyles*, the Court analyzed the prosecution's closing argument in the context of the

evidence it suppressed. Here the same analysis is applicable, but in terms of evidence and testimony that trial counsel failed to present.

The prosecution in its initial closing argument cited to the weakness of the testimony of Doctor Raju because, he (a) had not seen Hughbanks in twelve years, (b) had not conducted any testing, and (c) did not have an opinion as to Hughbanks' mental state at the time of the offenses. (Trial Transcript, Mitigation Phase, R. 163-17, PageID 3763-65). If trial counsel retained a competent expert such as Dr. Smith, the prosecution would not have been able to make this argument. Dr. Smith's affidavit contains: (a) the results of Hughbanks recent psychological testing that support Dr. Smith's diagnoses (Smith Affidavit, R. 155-20, PageID 9201-92, ¶¶ 30, 38-40) and (b) his opinion within a reasonable degree of psychological certainty that Hughbanks suffered from bipolar and post-traumatic disorders at the time of the offenses and these psychiatric illnesses impaired Mr. Hughbanks' cognitive functioning and emotional reactions at the time of the instant offense. (*Id.* at PageID 9295, ¶ 51).

The prosecution similarly faulted the testimony of Dr. DeSilva, citing the fact that the Doctor did not know the facts of the case and did not have an opinion as to Hughbanks' functioning at the time of the offense. (Trial Transcript, Mitigation Phase, R. 163-17, PageID 3765-66). Again, if trial counsel retained a competent expert such as Dr. Smith, the prosecution would not have been able to make this

argument. In his affidavit, Doctor Smith demonstrates his familiarity with the facts of the case and that "that Mr. Hughbanks was, at the time of the instant offense, suffering from several psychiatric illnesses" [that] "impaired Mr. Hughbanks' cognitive functioning and emotional reactions at the time of the instant offense." (Smith Affidavit, R. 166-20, PageID 9295, ¶ 51).

Finally, the prosecution argued to the jury that Hughbanks' mother was a steadying influence in his life. (Trial Transcript, Mitigation Phase, R. 163-17, PageID 3770 ("[h]e had a mother who lived with him who would make sacrifices for him, who would do for him"). In the prosecution's second closing argument, the prosecution again relied on the mother being a steady and calming influence. (*Id.* at PageID 3798). However, if trial counsel retained a competent expert, they would have been able to rebut this argument; Hughbanks mother's ability to be a positive influence was greatly diminished by her addictions to alcohol and the prescription medication, SOMA. (Smith Affidavit, R. 166-20, *Id.* at PageID 9292, ¶ 36).

> 3. The prosecution did not have a strong case in favor of death as evidenced by the length of the jury's sentencing deliberations.

Hughbanks need not undercut all of the prosecution's evidence and arguments to prevail. *See Kyles,* 514 U.S. at 451. The prejudice determination will be impacted by the strength of the prosecution's case. *Strickland,* 466 U.S. at 496 ("a verdict or conclusion only weakly supported by the record is more likely to have been affected

by the errors than one with overwhelming record support."). In the sentencing phase, the jury on the first day deliberated eight hours, from 1:35 p.m. to 9:25 p.m. without reaching a verdict, (Trial Transcript Mitigation Phase, R. 163-17, PageID 3836-3838). The following day the jury deliberated another two hours and twenty-five minutes from 9:45 a.m. until 12:10 p.m. before it returned its sentencing verdicts. (Trial Transcript, Mitigation Phase, R. 163-18, PageID 3844). The length of the jury's deliberations demonstrates that one or more jurors experienced difficulty in finding that the prosecution proved beyond a reasonable doubt that aggravating circumstances outweighed the mitigating factors. The additional evidence developed in the post-conviction proceedings would have led at least one of those "hold out jurors" to vote for a sentence of less than death.

### C. Trial counsels' deficient performance in the sentencing phase prejudiced Hughbanks

The Supreme Court has never limited *Strickland*'s prejudice inquiry "to cases in which there was only 'little or no mitigation evidence.'" *Sears,* 561 U.S. at 954. The number of witnesses does not dictate or control the prejudice determination. *See Rompilla,* 545 U.S. at 382-83; (counsel was ineffective despite having consulted with three mental health experts and interviewed five family members). *Mason v. Mitchell,* 320 F.3d 604, 619-620, 622 (6th Cir. 2003) (case remanded for an evidentiary hearing on ineffectiveness claim even though defense counsel: (a) called

seven witnesses, (b) introduced twelve exhibits, (c) reviewed three thousand pages of records concerning petitioner, and (d) consulted with mental health experts).

The inquiry into prejudice is not answered by the fact that counsel mustered some evidence at the mitigation phase, but rather by the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented. The substantial evidence that Hughbanks developed during state post-conviction proceedings was consistent with, but not cumulative of the evidence that trial counsel presented in the sentencing phase. The presentation of this new evidence would not have opened the door to the prosecution introducing otherwise inadmissible evidence.

This is not a case in which the new evidence "would barely have altered the sentencing profile." *Porter*, 558 U.S. at 41, citing *Strickland*, 466 U.S. at 700. A reasonable probability exists that after considering the testimony adduced at the mitigation hearing plus the testimony and exhibits contained in the initial post-conviction petition and identified herein, one or more jurors would have voted to return verdicts recommending sentences of less than death.

**VI.  The State Appellate Court's Ruling on Hughbanks Sentencing Ineffective Assistance of Counsel Claim Constituted Both an Unreasonable Application of Clearly Established Federal Law and an Unreasonable Determination of Facts as They Existed Before that Court.**

The Hamilton Count Court of Appeals rendered the last reasoned state court judgment on Hughbanks mitigation ineffective assistance of counsel claim. (First Appellate District, Decision, R. 166-26, PageID 10617-18). It addressed the merits of his claim. (*Id.*).

Because Hughbanks filed his habeas petition after 1996, the standards contained in 28 U.S.C. 2254 § (d)(1)-(2) apply to his case. *Stojetz v. Ishee*, 892 F.3d 175, 190 (6th Cir. 2018). For Hughbanks to prevail, he must demonstrate that the state appellate court decision:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)

Even after the enactment of § 2254(d), federal habeas corpus still plays an important role in promoting fundamental fairness in the imposition of the death penalty. *McFarland v. Scott*, 512 U.S. 849, 859 (1994). The deference that § 2254(d) requires "does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

The standards contained in § 2254 are in the disjunctive and Hughbanks need only prove that the state court decision is infirm under either (d)(1) or (d)(2).

*Brumfield v. Cain*, 135 S. Ct. 2269, 2276 (2015); *see Berghuis v. Thompkins*, 560 U.S. 370, 379 (2010) (federal court may grant relief on a claim only if state court decision was contrary to or an unreasonable application of clearly established federal law *or* if it was based on an unreasonable determination of fact); *Miller-El*, 545 U.S. at 240 (granting relief after finding petitioner satisfied (d)(2) without mentioning (d)(1)); *Williams (Terry)*, 529 U.S. at 404-05 (Opinion O'Connor, J.) ("contrary to" and "unreasonable application of" clauses of (d)(1) are separate and petitioner need satisfy only one); *Garcia v. United States*, 469 U.S. 70, 75 (1984) ("terms in question are made separate and distinct from one another by Congress' use of the disjunctive").

In order for a state court's decision to be contrary to clearly established federal law it "must be substantially different from the precedent of [the Supreme] Court." *Williams (Terry)*, 529 U.S. at 405. Where a "state court applies a rule that contradicts the governing law," its decision "will certainly be contrary to . . . clearly established precedent." *Id.* In addition, "a state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 406.

In order for a state court's decision to be "an unreasonable application of clearly established federal law," the state court decision must identify the correct

governing legal principle from this [Supreme] Court's decision, but unreasonably applies that decision to the facts of petitioner's case." *Id.* at 413. The state court decision must have been "objectively unreasonable." *Id.* at 409.

Clearly established federal law consists of those Supreme Court decisions that were decided prior to the relevant state court decision. *Lockyer v. Andrade,* 538 U.S. 63, 71 (2003).

To prevail under § 2254 (d)(2), the state court decision must be premised on an unreasonable determination of the facts in light of the evidence presented before the state court. The petitioner must overcome by clear and convincing evidence the presumption of correctness afforded the state court fact finding. § 2254(e)(1). While the standard is demanding, it is not unattainable; it does "not by definition preclude relief." *Miller-El,* 545 U.S. at 240.

The First Appellate District's decision addressing Hughbanks sentencing ineffective assistance of counsel claim consists of three paragraphs. (Opinion, R. 166-26, PageID 10617-18). The first paragraph summarily described the claim, much of which Hughbanks is not raising in this appeal. (*Id.* at 10617). The relevant part of that paragraph provided, "[i]n his twenty-third through twenty-eighth claims, he assailed counsel's performance in failing to investigate, prepare, and present, during the penalty phase of his trial, evidence concerning his history, character and background and evidence concerning his substance dependency and the bipolar and

145

post-traumatic-stress disorders under which he suffered and the effect of these disorders on his conduct at the time of the offenses and on his ability to function while incarcerated." (*Id.*). The state court of appeals denied Hughbanks relief because:

> Much of the evidence that Hughbanks offered in support of these postconviction claims, including evidence probative of his mental-health history, his family background, and his substance-abuse problem, had been presented at trial. Moreover, proof of the existence of mitigation evidence that was not presented at trial, but that might have supported an alternative theory of mitigation, does not constitute proof of counsel's ineffectiveness, when, as here, the record demonstrates that counsel presented the case in mitigation competently in view of the facts available to them. See *State v. Post* (1987), 32 Ohio St.3d 380, 388-389, 513 N.E.2d 754.
>
> Nothing in the record before us or in the evidentiary material offered in support of these claims presents a reasonable probability that, but for the alleged omissions of counsel, the result of the penalty phase of Hughbanks's trial would have been different. See *Bradley, supra.* Thus, Hughbanks failed to sustain his initial burden of demonstrating substantive grounds for relief. We, therefore, hold that the common pleas court properly dismissed, without an evidentiary hearing, his sixteenth, twentieth, twenty-third through twenty-eighth, and thirty-first claims, along with the noted portion of his forty-second claim. See *Pankey, supra; Jackson, supra.*

(*Id.* at PageID 10617).

The state appellate court's decision constituted both an unreasonable application of clearly established law and an unreasonable determination of the facts as they existed before that court. Hughbanks will address both alternatives, *albeit* in reverse order.

## A. The state appellate court's unreasonable factual determinations

The appellate court, in light of the evidence before that court, made two incorrect factual findings that skewed its decision: (a) it downplayed the significance of evidence that Hughbanks developed in the state post-conviction proceedings and (b) it found that this evidence developed during post-conviction was not available to trial counsel.

First, the state appellate court factually erred when it found that "much of the evidence that Hughbanks offered in support of these postconviction claims, including evidence probative of his mental-health history, his family background, and his substance-abuse problem, had been presented at trial." (*Id.* at PageID 10617-18). This is incorrect. *See* Section III, *supra.* Hughbanks set forth in the initial post-conviction proceedings the following significant evidence that trial counsel failed to present in the sentencing phase: (a) at the approximate age of seven Hughbanks was repeatedly sexually abused by a cousin, (Smith Affidavit, R. 166-20, PageID 9290, ¶ 25); (b) at the age of fifteen Hughbanks was abducted by a stranger and anally raped (*Id.* at ¶ 26); (c) his mother abused substances and suffered from a substance abuse disorder (*Id.* at PageID 9292, ¶ 36 and ¶ 42); (d) his mother's side of the family had a history of significant substance abuse (*Id)*; (e) at the time of the offenses Hughbanks suffered from both bipolar and post-traumatic stress disorders (*Id.* at

PageID 9285, ¶ 14; Page ID 9289, ¶ 23); and, (f) his substance abuse was linked to his bipolar and post-traumatic stress disorders (*Id.* at PageID 9292, ¶¶ 42-49).

Second, the state appellate court erred factually when it found that "the record demonstrates that counsel presented the case in mitigation competently *in view of the facts available to them.*" (First Appellate District Opinion, R. 166-26, PageID 10168) (emphasis added). As noted previously, the new facts and diagnosis were available to counsel if they had conducted a reasonable sentencing investigation. The facts that Hughbanks was molested by his cousin and later by a stranger "were documented in the medical records as well as the reports by Dr. Gail Hellman and Dr. Nancy Schmidtgoessling." (Smith Affidavit, R. 166-20, PageID 9290, ¶ 29). Counsel needed to have only collected the relevant records and read them which was required by the then prevailing standards of practice. *See* 1989 ABA Standards, § 11.4.1(D)(2)(C). In addition, trial counsel could have obtained additional diagnoses of post-traumatic stress and bipolar disorders and the linkage of those two disorders to Hughbanks' substance disorders if they had conducted the requisite record collection and retained a competent clinical psychologist. The prevailing standards proscribed that trial counsel should undertake both the document collection and the retention of reasonably necessary experts. *Id.* at 1989 ABA Standards, § 11.4.1(D)(2)(C) and (D)(3)(B).

The state appellate court's decision constituted "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d)(2).

**B.** **The state appellate court's unreasonable application of clearly established Federal law.**

The clearly established federal law governing Hughbanks' ineffective assistance of counsel claim stems from the Sixth Amendment and the Supreme Court's decision in *Strickland*. To prevail on a claim of ineffective assistance of counsel, a petitioner must show both: (1) that counsel's deficient performance fell below "an objective standard of reasonableness, *Strickland*. 466 U.S. at 688; and, (2) prejudice stemming from counsel's deficiencies that undermines confidence in the result of the proceedings, *Id.* at 694.

The state appellate court erred when it held that "much of the evidence that Hughbanks offered in support of these postconviction claims, including evidence probative of his mental-health history, his family background, and his substance-abuse problem, had been presented at trial." (First Appellate District, Opinion, R. 166-26, PageID 10617-18). That trial counsel may have presented some evidence is not controlling as to the prejudice calculus. In determining the prejudice prong, the Court was required to consider the *totality* of the mitigating evidence, including both the evidence presented at trial and the evidence adduced in the postconviction

proceedings, a consideration that requires a reweighing of the aggravating and mitigating evidence. *Porter*, 558 U.S. at 41; *Williams (Terry) v. Taylor*, 529 U.S. at 397.

The state appellate court also erred when it ruled that "[n]othing in the record before us or in the evidentiary material offered in support of these claims presents a reasonable probability that, but for the alleged omissions of counsel, the result of the penalty phase of Hughbanks's [sic] trial would have been different." (First Appellate District, R. 166-26, PageID 10618). The state appellate court unreasonably applied the decisions of the Supreme Court in which that Court held that in cases involving similar fact patterns as here, a reasonable probability exists that the defendant would have received a different sentencing result if the trier of fact had heard the same type of evidence that counsel deficiently failed to present in this case. *See* Penry, 492 U.S. at 319 ("disadvantaged background, or to emotional and mental problems"); *Porter*, 558 U.S. at 41, quoting Wiggins, 539 U.S. at 535 (counsel failed to uncover and present any mitigating evidence regarding petitioner's mental health, family background, or military service); *Rompilla*, 545 U.S. at 392 (evidence of severe abuse and neglect and brain damage); *Wiggins*, 539 U.S. at 535 (evidence of "severe privation and abuse," homelessness, and "diminished mental capacities"); *Williams*, 529 U.S. at 398 (evidence of childhood mistreatment and neglect, head injuries, possible organic mental impairments, and borderline mental retardation); *Sears*, 561

U.S. at 962 (2010) (false portrayal of petitioner's family and upbringing, was deficient and prejudicial, warranting remand).[20]

The state appellate court's decision constituted "an unreasonable application of, clearly established Federal law." 28 U.S.C. 2254(d)(1). [21]

## VII. The District Court Erred When It Denied Hughbanks Relief on His Mitigation Ineffective Effective Assistance of Counsel Claim. (R 242, Page ID 16636-6644).

The District Court, after initially providing an overview of Hughbanks' mitigation ineffective assistance of counsel claim (Decision and Order Dismissing Petitioner's Third Amended Petition for Writ of Habeas Corpus, R. 242, PageID 16636-39), divided its opinion into two sections, trial counsels' a) "Investigation and Preparation" (*Id.* at PageID 16639-41) and b) "Performance during Mitigation Phase" (*Id.* at PageID 16641-44).

---

[20]

If this Court determines that one or more of these decisions or other Supreme Court decisions are factually materially indistinguishable from this case, then the state appellate court decision is contrary to clearly established federal law. *Williams (Terry)*, 529 U.S. at 40 406.

[21]

If this Court should determine that the state appellate court's decision concerning prejudice is a factual finding, then that finding is premised on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d)(2).

## A.    Investigation and Preparation

### 1.    Failure to retain a competent expert

The District Court found that trial counsel's failure to retain a mental health expert to assess Hughbanks for purpose of sentencing did not constitute deficient performance because trial counsel relied on the testimony of Doctors Raju and DeSilva. (*Id.* at PageID 16640). The District Court found that their testimony was:

> intensive in nature and their testimonies detailed the severe symptomology of Petitioner's bipolar and substance abuse disorders, his history of abuse, and Dr. DeSilva's diagnosis of schizoaffective disorder. . . . Petitioner does not identify any additional evidence about which another psychiatrist would have testified that would have made a non-death sentence more likely.

(*Id.* at PageID 16640).

That is simply wrong. Hughbanks did identify that additional evidence that another expert could have provided if retained to provide a current assessment of Hughbanks at the time of trial. Doctor Smith in his affidavit found that Hughbanks had: (a) post-traumatic stress disorder because he had been sexually molested (Smith Affidavit, R. 166-20, PageID 9289-90, ¶¶ 23-29) and (b) bipolar and post-traumatic disorders at the time of the offenses that impaired his cognitive functioning, (*Id.* at PageID 9295, ¶ 51; Page ID 9289, ¶ 23). Furthermore Dr. Smith concluded that Hughbanks' (a) substance abuse was linked to his bipolar and post-traumatic stress disorders (*Id.* at PageID 9292, ¶¶ 42-49), (b) mother suffered from a substance abuse

disorder (*Id.* at ¶ 42) and, (c) relatives on his mother's side had a history of significant substance abuse (*Id*). Doctors Raju and DeSilva did not make any of the findings.

The stark contrast between the District Court's reliance on the testimony of Doctors Raju and DeSilva and the prosecution's belittlement of the same testimony is instructive. The prosecution told the jury that Dr. Raju: a) last saw Hughbanks "some twelve years ago," b) "had no independent memory of this defendant," and (c) "never tried to formulate an opinion as to the defendant's mental state one year later in May of 1987 when this defendant committed these murders." (Trial Transcript, Mitigation Phase, R 163-17, PageID 3764).[22] The prosecution argued to the jury, "but with Dr. Silva, I don't even know where to start," he: (a) "could not even offer an opinion as to this defendant's mental state in May of 1987 when the homicides occurred," (b) "testified that this defendant was crazy even before he was born," (c) "hasn't seen this person [Hughbanks] for more than a year before he was arrested" and (d) "didn't know about the facts. He didn't know about the statement

---

[22] The prosecution told the jury, "while I was watching the deposition [of Dr. Raju], I thought that it would have been interesting if we could have had Gary Hughbanks at the deposition with us, with maybe five or six or seven or eight other people, and say, Doctor, can you pick out Gary Hughbanks. I would be willing to bet that he couldn't even identify him. That's how little memory he had of this defendant." (*Id.* at PageID 3764).

this defendant gave." (*Id.* at PageID 3763-67). This is the same testimony the District Court found to be "intensive" and "detailed".

### 2. Failure to develop a detailed social history

The District Court, after noting the Hughbanks' uncle, sister and mother testified about "Petitioner's mental illness and substance abuse, and the corporal and mental abuse that his parents inflicted upon him," found that trial "[c]ounsel was under no obligation to present every piece of potentially mitigating evidence." (Decision and Order, R 242, PageID 16641-42). While trial counsel in a death case is not obliged to present insignificant facts in mitigation, the following facts were not trivial or insignificant: (a) an older male cousin, Jeff Stratton repeatedly raped Mr. Hughbanks when he was approximately seven years of age (Smith Affidavit, R. 166-20, PageID 9290, ¶ 25); (b) a stranger abducted Hughbanks when he was fifteen years of age drove him to a nearby park and anally raped him (*Id.* at PageID (*Id.*); (c) Hughbanks mother was addicted to alcohol and later prescription medications (*Id.* at PageID 9292, ¶ 36); and (d) Hughbanks' mother's substance had a genetic component, her father and three brothers abused alcohol and other substances. (*Id.*). These were significant events in Hughbanks' history and critical if the jury was to have a complete picture of Hughbanks. (*Id.* at PageID 9290-23, ¶¶ 25-48).

The District Court found that "counsel's decision not to interview them [Hughbanks' father and brother] was *reasonable trial strategy*" because it was

unclear when they recanted their pretrial statements. (Decision and Order, R, 242, PageID 16641) (emphasis added). Trial counsel would have learned when the witnesses recanted by interviewing the witnesses. Trial counsel's failure to interview the father and brother did not constitute "a *strategic* decision, but rather an abdication of advocacy." *Austin* 126 F.3d at 849. Hughbanks' brother Larry clearly indicated that he recanted his statement prior to the start of the trial, "before the trial commenced, I received a call from Hamilton County Prosecutor, Joseph Deters requesting me to testify at Gary's trial. Because I believed that the prosecutors and police twisted my story, I advised Prosecutor Deters that he could subpoena me to testify, but that my testimony would only be helpful for Gary's case." (Larry Hughbanks' Affidavit, R. 16617, PageID 8492, ¶¶ 18-19).

The District Court's analysis as to trial counsel's "investigation and preparation" was flawed both factually and legally.

**B.      Performance during Mitigation Phase.**

1.      Trial counsels' opening and closing statements

The District Court found that trial counsel's performance in the sentencing opening and closing statements did not prejudice Hughbanks. The Court found that in opening statement trial counsel gave "a lengthy overview of the mitigation evidence." (Decision and Order, R. 242, PageID 16642). This is factually incorrect. Trial counsel in his four page opening statement devoted three paragraphs to the

mitigation evidence. (Trial Transcript, R. 163-15, PageID 3426-28). In assessing the reasonableness of trial counsel's opening and closing statements, the District Court did not address counsel's statements in closing argument that (a) "[t]here's a part of you that wants to execute him, and I don't discount that, because if I was in your position, I would feel the same way" (Trial Transcript, Mitigation Phase, R. 163-17, PageID 3782); (b) "[c]an't play golf anyway so we might as well be here" (*Id.* at PageID 3788) and, "(c) [t]he depositions were a little boring. (*Id*)."

2.      The information that trial counsel failed to present.

The District Court found that the only information contained in Dr. Smith's affidavit that was not presented to the jury was "an alleged failure to introduce the synergistic effects of Petitioner's disorders, and the Court cannot reasonably conclude that any failure to introduce evidence as to that narrow area prejudiced Petitioner by making a death sentence more likely." (Decision and Order, R. 242, PageID 16643). This is factually incorrect. Hughbanks has repeatedly addressed this issue, and for the sake or brevity incorporates his prior analysis on this issue. *See* Sections, III, pp. 120-126, *supra;* IV, pp. 126-135, *supra*; V, pp. 136-141, *supra*; and VI, pp. 142-150, *supra*. Significantly, Hughbanks was molested numerous times as a child. In addition, his mother, who the prosecution cited as having a positive effect on Hughbanks' life, was addicted to alcohol and later pills.

3.    The admission of Dr. Schmidtgoessling's testimony

The District Court addressed the admissibility of Dr. Schmidtgoessling's testimony in the mitigation phase. (Decision and Order, R 242, PageID 16643-44). It found the trial court lacked the authority to appoint the Court Clinic to conduct a second round of evaluations of Hughbanks for the purpose of sentencing. (*Id.* at PageID 16644) ("Petitioner is correct that, in an aggravated murder case, a presentence investigation and mental evaluation, for the purposes of aiding the Court in disposition, may only be made upon the request of a defendant. Ohio Revised Code § 2929.03(D)(l)"). Nevertheless, the Court found that Ohio law did not preclude Dr. Schmidtgoessling from testifying as to the information she garnered during the Clinic's insanity evaluation of Hughbanks. (*Id.*).[23]

The District Court's statement of law is correct, but only to the extent that Dr. Schmidtgoessling's testimony was indeed limited to the information she obtained during the insanity evaluation and not the later evaluation of Hughbanks. Dr. Schmidtgoessling testified that she interviewed Hughbanks twice and a psychiatrist once during the problematic sentencing evaluation. (Trial Transcript, Mitigation

---

[23]    The District Court incorrectly found that Dr. Schmidtgoessling previously evaluated Hughbanks as to his competency to stand trial as opposed to his level of functioning at the time of the offense (insanity). (*Id.* at PageID 16644).

Phase, R. 163-16, PageID 3689-90). She stated that Hughbanks was more open with her and forthcoming in the sentencing evaluation. (*Id.* at PageID 3689-94, 3699-3700).

The record is unclear as to the extent that her testimony was tainted by information that she obtained during the problematic sentencing evaluation, but it is clear that her testimony was tainted. For example, Dr. Schmidtgoessling testified that in the sentencing interview process, Hughbanks no longer denied involvement in the offenses, as he had during the insanity evaluation. (*Id.* at PageID 3689-94). The prosecution seized upon this information in closing statement. It argued that Hughbanks lied to Schmidtgoessling during the sanity evaluation, but later admitted his involvement in the sentencing interview, and that this was a reason for the jury to find that the aggravating circumstances outweighed the mitigating factors by proof beyond a reasonable doubt:

> But when he realizes what is against him, his father, his brother, it's time to change tactics, *just like with Dr. Schmidtgoessling*, when he realized the strength of this case, it's time to change tactics. And we put on the suit and we put on the glasses, and we apologize to the family.

(Trial Transcript, Mitigation, R. 163-17, PageID 3804) (emphasis added).

The District Court's decision as to trial counsel's "performance during mitigation phase" was flawed both factually and legally.

**VII. Conclusion, Trial Counsel Failed to Provide Hughbanks in the Sentencing Phase With Effective Assistance of Counsel as Guaranteed by the Sixth, Eighth and Fourteenth Amendments.**

Hughbanks has demonstrated herein: (a) that trial counsel failed to conduct a reasonable sentencing investigation: (b) this failure resulted in the jury not hearing significant, relevant information including that Hughbanks in his youth was sexually assaulted by two individuals; and at the time of the offenses Hughbanks had several psychiatric illnesses that impaired his cognitive functioning and emotional reactions; and (c) if the jury had heard all of the relevant information one or more jurors would have voted to return a sentence of less than death.

## CONCLUSION

For the reasons set forth herein and in the interests of justice, this Court should reverse the District Court's judgment and remand the matter with instructions to grant Hughbanks habeas relief in the form of either relief from convictions for capital murder or relief from his two death sentences.

Respectfully submitted,

*/s/ Dennis L. Sipe*
DENNIS L. SIPE - 0006199
410 Front Street, Unit 2
Marietta, Ohio 45750
Telephone: (740) 525-7760
Email: Dennis@buellsipe.com

And

*/s/David P. Williamson*
David Paul Williamson - 0032614
Bieser, Greer & Landis, LLP
6 North Main Street, Suite 400
Dayton, Ohio 45402-1908
Telephone: (937)-223-3277
Facsimile: (937)-223-6339
Email: dpw@biesergreer.com

Counsel for Gary Hughbanks

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief was prepared using a proportionality spaced type-face in Microsoft Word (Times New Roman 14 Pt), and that according to the Microsoft word-count feature, there are 39,847 words in this brief, exclusive of the Table of Contents, Table of Authorities, Statement in Support of Oral Argument, Addendum and Certificates of Counsel Fed. R. App. P 32(a)(7)(B)(iii) and 6 Cir. R. 28(b).

*/s/David P. Williamson*
David Paul Williamson – 0032614
Counsel for Gary Hughbanks

## CERTIFICATE OF SERVICE

I hereby certify that on this the **27th** day of **January, 2010** a true copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. The parties may access the filing through the Court's system.

/s/*David P. Williamson*
David P. Williamson
Counsel for Gary Hughbanks

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

In accordance with 6 Cir. R. 30(f)(1), Gary Hughbanks hereby designates as "Relevant District Court Documents" the following documents filed in the district court and available via that court's electronic CM/ECF system:

# FEDERAL DISTRICT COURT RECORD OF PROCEEDINGS

| Record No. | PageID | Date of Entry | Description of Item in District Court's Electronic Docket |
|---|---|---|---|
| 16 | 46 to 102 | 02/12/2007 | Initial Habeas Petition for Writ of Habeas Corpus |
| 22 | 655 to 761 | 04/13/2007 | Initial Return of the Writ |
| 24 | 1 to 2 | 05/04/2007 | Decision and Order Granting Petitioner's Motion for Discovery |
| 106 | 1 to 3 | 01/29/2010 | Decision and Order Granting Petitioner's Motion to Stay Proceedings Pending Exhaustion |
| 158 | 2293-94 | 05/22/2015 | Order Dissolving Stay and Setting Schedule |
| 188 | 15239-15439 | 06/24/2016 | Second Amended Petition for Writ of Habeas Corpus |
| 193-1 | 15457-653 | 08/08/2016 | Custodial Statement of Hughbanks |
| 194 | 15654-15734 | 08/10/2016 | Warden's Supplemental Return of the Writ |
| 202 | 15770-73 | 01/31/2017 | Decision and Order on Motion to Dismiss |
| 213 | 15901-16131 | 04/21/2017 | Third Amended Petition for Writ of Habeas Corpus |
| 234 | 16204-478 | 09/15/2017 | Traverse for His Third Amended Habeas Petition |
| 242 | 16530-16650 | 09/07/2018 | Decision and Order Dismissing Petitioner's Third Amended Petition for Writ of Habeas Corpus |
| 243 | 16651 | 09/07/2018 | Judgment in A Civil Case |
| 244 | 16652 | 10/05/18 | Notice of Appeal |

# STATE COURT RECORD OF PROCEEDINGS

| Record No. | PageID | Date of Entry | Description of Item In District Court's Electronic Docket |
|---|---|---|---|
| 163-1 to 163-7 | 2307 to 2432 | 06/11/2015 | Trial Transcripts - Pretrial |
| 163-8 to 163-12 | 2433 to 3142 | 6/11/2015 | Trial Transcripts – Voir Dire |
| 163-13 to 163-14 | 3143-3408 | 6/11/2015 | Trial Transcripts – Trial Phase |
| 153-15 to 163-19 | 3409 to 3862 | 6/11/2015 | Trial Transcripts – Mitigation Phase |
| 166-2 | 3925-28 | 06/25/2015 | Indictment |
| 166-2 | 3930-31 | 06/25/2015 | Pretrial Request for Bill of Particulars |
| 166-2 | 3932-34 | 06/25/2015 | Pretrial Defendant's Demand for Discovery |
| 166-2 | 3994-95 | 06/25/2015 | Pretrial Request for Notice of Intention to Use Evidence |
| 166-2 | 3948-51 | 06/25/2015 | State's Response to Defendant's Demand for Discovery |
| 166-2 | 3954-55 | 06/25/2015 | State's Bill or Particulars |
| 166-2 | 3996-4001 | 06/25/2015 | Pretrial Motion for Disclosure of Witness Statements |
| 166-2 | 4002-06 | 06/25/2015 | Pretrial Motion for Disclosure of Rebuttal Witnesses |
| 166-2 | 4007-08 | 06/25/2015 | Pretrial Demand for Disclosure of Favorable Evidence |
| 166-2 | 4012-19 | 06/25/2015 | Pretrial Motion to Compel Disclosure of and Specific Requests for Exculpatory Evidence |

| 166-2 | 4020-21 | 06/25/2015 | Pretrial Motion to Require Prosecution Check Criminal Records of Its Witnesses |
|-------|---------|------------|-------------------------------------------------------------------------------|
| 166-2 | 4048-49 | 06/25/2015 | Pretrial Motion to Compel Disclosure of Information Relating to Mitigating Factors |
| 166-2 | 4050 | 06/25/2015 | State's Response to Defendant's Request for Evidence Notice |
| 166-2 | 4061-62 | 06/25/2015 | State's Response to Defendant's Motion for Pretrial Disclosure of Witness Statements |
| 166-2 | 4063-64 | 06/25/2015 | State's Response to Defendant's Motion to Compel Disclosure of and Specific Requests for Exculpatory Evidence |
| 166-2 | 4065-66 | 06/25/2015 | State's Response to Motion for Information Relating to Mitigating Factors |
| 166-2 | 4067-68 | 06/25/2015 | State's Response to Defendant's Motion for Disclosure of Rebuttal Witnesses |
| 166-2 | 4147-49 | 06/25/2015 | Pretrial Motion for Disclosure of Impeaching Information |
| 166-3 | 4185-86 | 06/25/2015 | State's Response to Defense Motion for Disclosure of Impeaching Information |
| 166-3 | 4209-13 | 06/25/2015 | Motion to Suppress Statement |
| 166-3 | 4214-4250 | 06/25/2015 | Transcript of Deposition of Tucson Arizona Detective Michael D. Millstone (submitted at motion to suppress) |
| 166-3 | 4384-86, 4393-98 | 06/25/2015 | Trial Phase Verdicts |
| 166-3 | 4418-19 | 06/25/2015 | Sentencing Verdicts |
| 166-3 | 4420 | 06/25/2015 | Trial Court's Sentencing Entry |
| 166-4 | 4643-4677 | 06/25/2015 | Direct Appeal Decision, First Appellate District |
| 166-5 | 4952-77 | 06/25/2015 | Direct Appeal Decision, Supreme Court of Ohio |

| 166-6 | 5002-11 | 06/25/2015 | Application to Reopen Direct Appeal |
|---|---|---|---|
| 166-14 | 7907-08 | 06/25/2015 | Application for Reopening, First Appellate District, Entry Overruling Application |
| 166-15 | 8173-76 | 06/25/2015 | Application for Reopening, Supreme Court of Ohio Decision |
| 166-16 | 8192-8281 | 06/25/2015 | First Post-Conviction Petition |
| 166-17 | 8490-92 | 06/25/2015 | First Post-Conviction Petition Exhibit S, Affidavit of Larry Hughbanks |
| 166-17 | 8493-94 | 06/25/2015 | First Post-Conviction Petition Exhibit T Affidavit of Gary Hughbanks, Sr. |
| 166-17 | 8497 | 06/25/15 | First Post-Conviction Petition Exhibit V, "Entry Withdrawing Absconder Warrant and Continuing Defendant on Probation" |
| 166-17 | 8498 | 06/25/2015 | First Post-Conviction Petition Exhibit W, Entry Terminating Probation |
| 166-18 | 8956-57, 8959 to 8966, 8969-71, 8973 | 06/25/015 | First Post-Conviction Petition, Exhibits KK, MM, NN, OO, PP, QQ, RR, SS, TT, UU, XX (All these are newspaper articles), |
| 166-19 | 9060 | 06/25/15 | First Post-Conviction Petition Exhibit Newspaper Clipping, "Brother Skips Prison With Tip" |
| 166-20 | 9283-95 | 06/25/15 | First Post–Conviction Petition Exhibit FFF, Affidavit of Dr. Robert L. Smith |
| 166-20 | 9297-303 | 06/25/2015 | First Post-Conviction Petition, Exhibit HHH, Affidavit of Mitigation Specialist, Dorian Hall, M.A., L.S.W. |

| 166-21 | 9443-9492 | 06/25/2015 | Notice of Supplementation and/or Amendment to Post-Conviction Petition |
|---|---|---|---|
| 166-21 | 9493-96 | 06/25/2015 | Doctor Robert Smith's Curriculum Vitae |
| 166-21 | 9497-507 | 06/25/2015 | Affidavit of Richard Ketcham |
| 166-23 | 10049-62 | | Post-Conviction, Trial Court's Findings of Fact, Conclusions, And Entry Dismissing Petition to Vacate, |
| 166-26 | 10596-623 | 06/25/2015 | Post-Conviction Decision, First Appellate District |
| 166-27 | 10739 | 06/25/2015 | Post-Conviction, Entry declining jurisdiction, Supreme Court of Ohio |
| 166-28 | 10753-63 | 06/25/2015 | Gary L. Hughbanks' Post-Conviction Petition Pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002) |
| 166-28 | 10856-62 | 06/25/2015 | Intellectual Disability, Trial Court, Findings of Fact, Conclusions of Law, and Entry Denying Dismissing Successive Petition, Filed Pursuant to *Atkins v. Virginia* |
| 166-29 | 10991-98 | 06/25/2015 | Intellectual Disability, First Appellate District, Decision |
| 166-30 | 11053 | 06/25/2015 | Intellectual Disability, Supreme Court of Ohio, Entry |
| 166-31 | 11069-71 | 06/25/2015 | Intellectual Disability, Trial Court's Entries Appointing Experts and Ordering Release of Records |
| | | | |
| 166-32 | 11108-10 | 06/25/2015 | State's Trial Exhibits 9 to 11, Photographs of Front Exterior of Victims' Residence |
| 167-1 | 11414 | 07/24/2015 | Intellectual Disability, Trial Court, Amended Entry Denying Atkins Post-Conviction Petition |

| 167-1 | 11535-38 | 07/24/2015 | Intellectual Disability, First District Court of Appeals, Judgment Entry |
|-------|----------|------------|---------------------------------------------------------------------------|
| 167-1 | 11573 | 06/24/2015 | Intellectual Disability, Supreme Court of Ohio, Entry (Denying Discretionary Jurisdiction) |
| 167-2 | 11587-631 | 07/24/2015 | Gary L. Hughbanks Jr.'s Second Post-Conviction Petition |
| 167-2 | 11633-738 | 07/24/2015 | Second Post-Conviction Petition Exhibit, Habeas Deposition of Cincinnati Police Dept. Criminalist William B. Hillard |
| 167-2 | 11909-12150 | 07/24/2015 | Second Post-Conviction Petition Exhibit, Habeas Deposition of Detective Patrick Kemper |
| 167-3 | 12436-515 | 07/24/2015 | Second Post-Conviction Petition Exhibit Habeas Deposition of Detective William Fletcher of Hamilton County Prosecutor's Office |
| 167-3 | 12567-78 | | Second Post-Conviction Petition, State's Proposed Findings of Fact, Conclusions of Law |
| 167-3 | 127243-24 | 07/24/2015 | Second Post-Conviction Petition, Hughbanks' Memo Contra to State's Motion to Dismiss, Appendix, Exhibit 1, Sipe Affidavit |
| 167-5 | 13996, 14008-12, 14018 | | Second Post-Conviction Petition Exhibit Memorializing Neighbors' Sightings |
| 167-5 | 13998-99 | 07/24/2015 | Second Post-Conviction Petition Exhibit, Springfield Township Police Dept., "Crime Scene Investigation" |
| 167-5 | 14000 | 07/24/2015 | Second Post-Conviction Petition Exhibit Springfield Township Police Department Report |

| 167-5 | 14005-7 | 07/24/2015 | Second Post-Conviction Petition Exhibit, "Credit Card History" |
|---|---|---|---|
| 167-5 | 14014 | 07/24/2015 | Second Post-Conviction Petition Exhibit LEAD Sheet |
| 167-5 | 14013 | 07/24/2015 | Second Post-Conviction Petition Exhibt LEAD Sheet |
| 167-5 | 14015 | 7/24/2015 | LEAD CARD |
| 167-5 | 14020 | 7/24/2015 | Letter/Memo from Detective Kemper to Dave (no last name) |
| 167-5 | 14021 | 7/24/2015 | Second Post-Conviction Petition Exhibit "Supplementary Offense Report" |
| 167-5 | 14022 | 7/24/2015 | Handwritten notes from Interview of Larry Day |
| 167-5 | 14024-27 | 07/24/2015 | Chart of Finger and Palm Prints Submitted for Comparison |
| 167-5 | 14034-35 | 07/24/2015 | Oct. 8, 1993 Letter from Detective Kemper to Warden Edwards of Ross Correctional Facility |
| 167-5 | 14040 | 7/24/2015 | Handwritten notes of telephone call with Chris Raison |
| 167-5 | 14042-46 | 07/24/2015 | Hamilton County Juvenile Court Orders |
| 167-5 | 14028-29 | 07/24/2015 | Second Post-Conviction Petition Description Sheet and Prisoner\s Descrription |
| 167-5 | 14052-54 | 07/24/2015 | Second Post-Conviction Petition Exhibit Letter dated "December 21, 1987" Author "LTC David Heimpold" of the Springfield Township Police Department |
| 167-5 | 14055 | 07/24/2015 | Handwritten Note |
| 167-5 | 14056 | 07/24/2015 | Handwritten Note |

| 167-5 | 14058-60 | 07/24/2015 | Second Post-Conviction Petition Exhibit, Handwritten notes of interview of Lori (no last name identified) |
|-------|----------|------------|---|
| 167-5 | 14061-64 | 07/24/2015 | Second Post-Conviction Petition Exhibit, Springfield Police Dept. Report Concerning Burt Leeman |
| 167-5 | 14065-66 | 07/24/2015 | Second Post-Conviction Petition Composite Drawing |
| 167-5 | 14070-71 | 07/24/2015 | Polygraph Report for Thomas Edward Buster |
| 167-5 | 14074 | 07/24/2015 | Correspondence to Dave Heimpold of the Springfield Township Police Department |
| 167-5 | 14075-76 | 07/24/2015 | Composite Questionnaire |
| 167-5 | 14081 | 07/24/2015 | Departmental Correspondence |
| 167-5 | 14089 | 07/24/2015 | Evidence Submission Sheet |
| 167-5 | 14090-134 | 07/24/15 | VICAP Application |
| 167-5 | 14142 | 07/24/2015 | Composite Drawing |
| 167-5 | 14128-31 | 07/24/2015 | Second Post-Conviction Petition Exhibit Springfield Township Police Dept., "List" |
| 167-5 | 14135-39 | 07/24/2015 | Second Post-Conviction Petition Exhibit FBI Violent Criminal Apprehension Program ("VICAP") Crime Scene Report |
| 167-5 | 14141 | 07/24/2015 | Handwritten notes of interview of Jenny Bircg |
| 167-5 | 14185-92 | 07/24/2015 | Second Post-Conviction Petition, Trial Court's Findings of Fact, Conclusions of Law and Entry Dismissing Gary L. Hughbanks Jr.'s Post-Conviction Petition |

| 167-5 | 14429-31 | 07/24/2015 | Second Post-Conviction Petition, First Appellate District, Judgment Entry |
|-------|----------|------------|---------------------------------------------------------------------------|
| 167-5 | 144542 | 7/24/15 | Second Post-Conviction Petition, Supreme Court of Ohio, Entry, Declining Discretionary Jurisdiction |